**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO,** | ) ) ) | **CASE NO. 2:25-CV-00286 JUDGE GRETCHEN S. LUND** |
| | ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) | |
| **REPUBLIC SERVICES, a/k/a NEWTON COUNTY LANDFILL PARTNERSHIP, d/b/a NEWTON COUNTY LANDFILL, a/k/a LAKE COUNTY C & D DEVELOPMENT PARTNERSHIP, d/b/a LAKE COUNTY C & D LANDFILL,** | ) ) ) ) ) ) ) | |
| | ) | |
| **Defendant and Counterclaimant.** | ) ) ) ) ) | |

---

**SUPPORTING BRIEF[1]**
**TO MOTION FOR SUMMARY JUDGMENT**
**FILED BY DEFENDANT/COUNTERCLAIMANT**

---

*/s/ Steve A. Miller*

Steve A. Miller
Fisher & Phillips LLP
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
Telephone: 312-346-8061
Facsimile 312-346-3179
smiller@fisherphillips.com

Richard A. Millisor
*(Pro Hac Vice Motion Pending)*
Fisher & Phillips LLP
200 Public Square, Suite 4000
Cleveland, Ohio 44114
Telephone: 440-838-8800
Facsimile: 440-838-8805
rmillisor@fisherphillips.com

*Counsel for Defendant/Counterclaimant Newton County Landfill Partnership, d/b/a Newton County Landfill a/k/a Republic Services*

---

[1] Pursuant to L.R. 56-1, Defendant and Counterclaimant Newton County Landfill Partnership d/b/a Newton County Landfill, a/k/a Lake County C&D Development Partnership, d/b/a Lake County C&D Landfill, incorrectly referred to as Republic Services, by and through its counsel, files its Supporting Brief separately from its Motion for Summary Judgment and its Statement of Material Facts, all for this Court's consideration.

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................1

II.   STANDARD OF REVIEW..............................................................................1

III.  LEGAL ANALYSIS .......................................................................................3

    A.   The Arbitration Award drew its essence from NCLF CBA Article 4 titled *Grievances and Arbitration* ........................................................................4

        i.   Arbitrator Bales analyzed NCLF CBA Article 4 and interpreted the key provisions he deemed instructive on the issue of procedural arbitrability........5

        ii.  The Arbitration Award did not ignore or add to the NCLF CBA - it interpreted it .................................................................................7

            a.   *Arbitrator Bales utilized NCLF CBA Article 4.3 as the foundational basis of his award – he did not ignore it as the Union claims* ....................7

            b.   *An arbitrator's factual determination on the purpose of a pre-discharge phone call does not create a basis to overturn an arbitration award, even where the determination is in error or based on insufficient evidence (which it was not)* ........................................9

            c.   *The Union cannot overcome Arbitrator Bales's application of NCLF CBA Article 4.3's 24-hour grievance and Step 2 presentment timeline to the December 4, 2023 phone call* ........................................11

                1.   *Notification of an intent to discharge does not qualify as "action" under NCLF CBA Article 4.3 – discharge must be formally executed to constitute "action"* ........................................11

                2.   *The NCLF CBA requires grievances to be presented in writing - an oral communication does not satisfy the "presentation" requirement in Article 4.3* ........................................12

IV.   CONCLUSION................................................................................................15

i

## Cases

*AGCO Corp.* v. *Anglin,* 216 F.3d 589, 593 (7th Cir. 2000)..............................................2

*Am. Postal Workers Union* v *Runyon,* 185 F.3d 832, 835 (7th Cir. 1999) ...........................2

*American Zurich Insurance Co.* v. *Sun Holdings, Inc.,* 103 F.4th 475 (7th Cir.2024)................3

*Amoco Oil Co. v. Oil, Chem. & Atomic Workers Int'l Union, Local 7-1, Inc.,* 548 F.2d 1288, 1294 (7th Cir.1977) .......................................................................................... 10

*Android Industries, Inc. v. UAW Local 1268,* 2018 WL 6696549 (N.D. Ill. 2018)................2, 4

*Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994) .............................2

*Butler Mfg v. United Steelworkers of America,* 336 F.3d 629, 632 (7th Cir. 2003) ...............2, 10

*Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)............................2

*Chicago & N. W. Transp. Co.* v. *United Transp. Union,* 905 F.2d 171, 173 (7th Cir. 1990) .. 2, 16

*Clear Channel Outdoor, Inc.* v *Int'l Unions of Painters & Allied Trades, Loc. 770,* 558 F.3d 670, 675 (7th Cir. 2009)....................................................................................................2

*Dean,* 118 F.3d at 1171 ............................................................................................... 10

*Dexter Axle Co. v. Int'l Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 767 (7th Cir. 2005) ........................................................................................... 2, 4

*Elmar Hotel Management, LLC v. Unite HERE Local 1,* 2025 WL 1807890, *5 (N.D. Ill. 2025).. ....................................................................................................................................2

*Ethyl Corp. v. United Steelworkers of America, AFL-CIO-CLC*, 768 F.2d 180 (7th Cir.1985).... 4, 10

*Ethyl Corp. v. United Steelworkers of America,* cert. denied, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986) ............................................................................................... 10

*F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union Local No. 781,* 629 F.2d 1204, 1214-16 (7th Cir.1980)...............................................................................................4

*Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.,* 86 F.3d 96, 100 (7th Cir.1996)...................10

*Gingiss International, Inc. v. Bormet,* 58 F.3d 328, 333 (7th Cir.1995) ...................................10

*Hasbro v. Catalyst USA, Inc.,* 367 F.3d 689, 691-92 (7th Cir. 2004) ...........................................2

*Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1194-95 (7th Cir.1987) ........................................9

*HUI* v. *Norfolk & Western Ry,* 814 F.2d 1192, 1194—95 (7th Cir. 1987).......................................3

*Jones Daily Farm* v. *Local No. P-1236, United Food Workers,* 760 F.2d 173, 176 (7th Cir.1985) ....................................................................................................................................5

*Major League Baseball Players Association* v. *Garvey,* 532 U.S. 504. 509-10. 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) ...............................................................................................3

*Manhattan Coffee Co. v. International Brotherhood of Teamsters, Local No. 688,* 743 F.2d 621, 623-24 (8th Cir.1984).................................................................................................4

*Miller Brewing Co.* v. *Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1164-65 (7th Cir. 1984)..............................................................................................................................5

*Mobil Oil Corp.,* 679 F.2d at 302................................................................................... 10

*National Wrecking Co. v. International Broth. of Teamsters, Local 731*, 990 F.2d 957 (7th Cir. 1993)............................................................................................................................ 10

*Oxford Health Plans LLC* v *Sutter,* 569 U.S. 564. 571-73, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013) ............................................................................................................................3

*Paperworkers Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987) ............................................................................................................................... 10

*Quality Custom Distribution Services, LLC v. International Brotherhood of Teamsters, Local 710,* 131 F.4th 597, 599-600 (7th Cir.2025) ................................................................... 3, 8

*Standard Sec. Life Ins. Co. of New York v. FCE Benefit Adm'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020)................................................................................................................................ 2

*Super Tire Engineering Co. v. Teamsters Local Union No. 676,* 721 F.2d 121, 122-24 (3d Cir.1983) ........................................................................................................................... 5

*United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1360-61, 4 L.Ed.2d 1424 (1960)............................................................................... 4

*Young Radiator Co.* v. *International Union, U.A.W.,* 734 F.2d 321, 325 (7th Cir. 1984).............. 5

## Rules

Fed. R. Civ. P. 56(a) ............................................................................................................... 2
Fed. R. Civ. P. Rule 11 ...........................................................................................................11

iii

## I.     **INTRODUCTION**

Precedent of the Seventh Circuit and this Court present an insurmountable hurdle for the International Union of Operating Engineers, AFL-CIO Local #150 ("Union" or "IUOE") as the April 2, 2025 Arbitration Award [2] ("Arbitration Award") most certainly drew its essence from the collective bargaining agreement.[3]  Arbitrator Bales determined the Union's grievance procedurally deficient based on his interpretation of NCLF CBA Article 4 titled *Grievance and Arbitration*. That the Union believes a different interpretation applies does not make it so and does not serve as a basis to disturb the Arbitration Award.  Particularly so when Arbitrator Bales provided a thorough analysis with his contractual interpretation as to why the grievance did not meet the procedural requirements set forth in NCLF CBA Article 4.  Therefore, Defendant[4] respectfully requests this Court to effectuate enforcement of the Arbitration Award through grant of its Counterclaim and a dismissal with prejudice of the Union's Complaint.

## II.     **STANDARD OF REVIEW**

The Federal Arbitration Act ("FAA"), which sparks jurisdiction in this Court to review an arbitration award, utilizes a laser-focused inquiry. Specifically, a party seeking to vacate an award must establish evidence that: (1) the award had been procured through corruption, fraud, or undue means; (2) partiality or corruption in the arbitrator; (3) arbitrator misconduct; or (4) the arbitrator exceeded their authority. *Elmar Hotel Management, LLC v. Unite HERE Local 1*, 2025 WL

---

[2] Doc. 1-1, pp. 74-91 (Arbitration Award).

[3] The collective bargaining agreement at issue shall be referred to as the "NCLF CBA" herein. *See*, Defendant/Counterclaimant's *Statement of Material Fact* at (B)(1). The NCLF CBA governed the underlying arbitration and remains the operative collective bargaining agreement in this case. The Union did not attach the NCLF CBA to its Complaint. Instead, it attached the LCLF CBA, which it claimed had identical relevant provisions. (Doc. 1-1, p. 2, ¶ 4). Defendant/Counterclaimant denied this point to the extent the allegations are inconsistent with the language contained within the applicable CBA. (Doc. 6, p. 3-4, ¶ 4).

[4] Newton County Landfill Partnership is the sole party to the NCLF CBA and is the only appropriate defendant in this case. "Republic Services" is sometimes used as a d/b/a in connection the Newton County Landfill Partnership. (Doc. 6, p. 2, fn. 1).

1807890, *5 (N.D. Ill. 2025). As the court noted in *Elmar*, judicial review is "tightly limited"[5] and *confirmation* of an arbitration award is "usually routine and summary."[6] *Id.* at *4.  On this point, the district court reiterated prior Seventh Circuit explanations:

> **A court must grant an arbitration award great deference if "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority**." *Id.* "This is true even if the arbitrator's award contains a serious error of law or fact." *Butler,* 336 F.3d at 632. An arbitrator's authority is "limited by the actual issue submitted by the parties." *See Am. Postal Workers Union* v *Runyon,* 185 F.3d 832, 835 (7th Cir. 1999); *see also AGCO Corp.* v. *Anglin,* 216 F.3d 589, 593 (7th Cir. 2000) ("Arbitrators have the authority to decide only those issues actually submitted by the parties."). **Once determined that there is authority, the question is "only whether or not the arbitrator interpreted the agreement, not if the arbitrator's interpretation of the agreement is correct**." *See Chicago & N. W. Transp. Co.* v. *United Transp. Union,* 905 F.2d 171, 173 (7th Cir. 1990). **Courts are to resolve any doubts "in favor of enforcing the award."** *See Clear Channel Outdoor, Inc.* v *Int'l Unions of Painters & Allied Trades, Loc. 770,* 558 F.3d 670, 675 (7th Cir. 2009).

(emphasis added). Id. at *5. Stated otherwise, one carries a "heavy burden" in attempting to vacate an arbitrator's award. *Android Industries, Inc. v. UAW Local 1268,* 2018 WL 6696549 (N.D. Ill. 2018) (citing *Dexter Axle Co. v. Int'l Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 767 (7th Cir. 2005)).

Pursuant to Fed. R. Civ. P. 56(a), summary judgment shall be granted "if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Although all evidence and reasonable inferences therefrom will be construed in the non-movant's favor, the *non-movant* must make "a showing sufficient to establish the existence of an element essential to the party's case and on which the party will carry the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Here, the Union cannot adequately demonstrate a legal basis for overturning the Arbitration Award.

---

[5] *Elmar*, citing *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994).
[6] *Elmar*, citing *Standard Sec. Life Ins. Co. of New York v. FCE Benefit Adm'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020) (citing *Hasbro v. Catalyst USA, Inc.*, 367 F.3d 689, 691-92 (7th Cir. 2004).

III.    <u>**LEGAL ANALYSIS**</u>

Earlier this year, the Seventh Circuit provided even greater clarity to its already well-established precedent on reviewing arbitration awards, stating:

> Year after year, in case after case, litigants insist that an arbitrator erred in adopting one view rather than another from the panoply of possible interpretations. Year after year, in case after case, we reject that assertion and hold that the choice belongs to the arbitrator. **Courts do not ask whether arbitrators interpreted the contractual language correctly; it is enough that they tried to implement the parties' bargain**. We put it this way in one opinion that has been quoted frequently:
>
>> As we have said too many times to want to repeat again, **the question for decision by a federal court asked to set aside an arbitration award ... is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. If they did, their interpretation is conclusive.** By making a contract with an arbitration clause the parties agree to be bound by the arbitrators' interpretation of the contract. A party can complain if the arbitrators don't interpret the contract —that is, if they disregard the contract and implement their own notions of what is reasonable or fair. A party can complain if the arbitrators' decision is infected by fraud or other corruption, or if it orders an illegal act. **But a party will not be heard to complain merely because the arbitrators' interpretation is a misinterpretation.** Granted, the grosser the apparent misinterpretation, the likelier it is that the arbitrators weren't interpreting the contract at all. But once the court is satisfied that they were interpreting the contract, judicial review is at an end, provided there is no fraud or corruption and the arbitrators haven't ordered anyone to do an illegal act.
>
> *HUI* v. *Norfolk & Western Ry,* 814 F.2d 1192, 1194—95 (7th Cir. 1987) (citations omitted). **The Supreme Court has said the same thing**. See, e.g., *Major League Baseball Players Association* v. *Garvey,* 532 U.S. 504. 509-10. 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001); *Oxford Health Plans LLC* v *Sutter,* 569 U.S. 564. 571-73, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013). See also, e.g., *American Zurich Insurance Co.* v. *Sun Holdings, Inc.,* 103 F.4th 475 (7th Cir.2024).

(emphasis added.). *Quality Custom Distribution Services, LLC v. International Brotherhood of Teamsters, Local 710,* 131 F.4th 597, 599-600 (7th Cir.2025). From this binding guidance, one sees that simple disagreement with an arbitrator's contractual interpretation does not support overturning an arbitration award. Indeed, the Seventh Circuit has characterized the task of vacating

an arbitrator's award as a "heavy burden." *Android Industries, Inc. v. UAW Local 1268,* 2018 WL 6696549 (N.D. Ill. 2018) (citing *Dexter Axle Co. v. Int'l Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 767 (7th Cir.2005)).

A. **The Arbitration Award drew its essence from NCLF CBA Article 4 titled** *Grievances and Arbitration*.

Parties to a collective bargaining agreement who utilize arbitrators to interpret and apply their negotiated contract bargained for arbitrators (not courts) to determine interpretation disputes. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1360-61, 4 L.Ed.2d 1424 (1960). Courts must enforce an arbitration award "so long as it draws its essence from the collective bargaining agreement." (Id.). The *Steelworkers* Court made clear its position as to the court's role in reviewing arbitration awards:

> … the **question of interpretation of the collective bargaining agreement is a question for the arbitrator**. It is the arbitrator's construction which was bargained for; and **so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his**.

(emphasis added.). (Id. at 599). Applying this narrow review accomplishes the intent of the parties – final resolution of labor disputes – and does not undermine the congressional objective of settling labor-management disputes utilizing arbitrators skilled in industrial practices and customs. (Id. at 596-98).

In *Ethyl Corp. v. United Steelworkers of America, AFL-CIO-CLC*, 768 F.2d 180 (7th Cir.1985), the Seventh Circuit followed the *Steelworkers* precedent and elaborated on what "drawing its essence" means stating:

> **But so long as the award is based on the arbitrator's interpretation—unsound though it may be—of the contract, it draws its essence from the contract**. See, e.g., *F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union Local No.* 781, 629 F.2d 1204, 1214-16 (7th Cir.1980); *Manhattan Coffee Co. v. International Brotherhood of Teamsters, Local No. 688,* 743 F.2d 621, 623-24 (8th Cir.1984); *Super Tire*

*Engineering Co. v. Teamsters Local Union No. 676,* 721 F.2d 121, 122-24 (3d Cir.1983)—the last a particularly good example of deference to a highly improbable reading of the collective bargaining agreement by the arbitrator. **It is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is <u>outside the contract (and not incorporated in it by reference, either</u>**, see *Jones Daily Farm* v. *Local No. P-1236, United Food Workers,* 760 F.2d 173, 176 (7th Cir.1985)**) that the award can be said not to "draw its essence from the collective bargaining agreement**," as in our recent decisions in *Young Radiator Co.* v. *International Union, U.A.W.,* 734 F.2d 321, 325 (7th Cir. 1984), and *Miller Brewing Co.* v. *Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1164-65 (7th Cir. 1984).

(emphasis added.). (Id. at 184-185).

The NCLF CBA was a blueprint, negotiated by both the Union and the Company (collectively the "Parties"). After being selected by the Parties to serve as their arbitrator under NCLF CBA Article 4, Arbitrator Bales did not bring in new architectural plans or imagine a different building to arrive at his decision. Instead, he acted as a skilled builder, carefully reading the blueprint and constructing the outcome aligned to the Parties' original design. The decision in this case is not a story of arbitral overreach or exceeding of power; it is a story of arbitral restraint— honoring the architects and their agreed upon blueprint. Thus, Arbitrator Bales did not ignore nor add language to the NCLF CBA Article 4 as alleged in ¶¶ 17-22 of the Complaint. Rather, he skillfully analyzed and articulated the contractual roadmap he used in rendering his procedural arbitrability decision. As more fully summarized below, it remains beyond a shadow of a doubt that the Arbitration Award drew its essence from the NCLF CBA Article 4 as a matter of law. Accordingly, it must be treated as a final, binding, and enforceable decision on the Parties.

i.     <u>**Arbitrator Bales analyzed NCLF CBA Article 4 and interpreted the key provisions he deemed instructive on the issue of procedural arbitrability.**</u>

The Arbitration Award identified the NCLF CBA Article 4 language Arbitrator Bales utilized as the foundational basis of his decision. Arbitrator Bales determined the procedural issue had to be decided by analyzing specific contractual language and made very clear to the Parties

what language in NCLF CBA Article 4 he was interpreting through a footnote reading "Red font here and below has been added by the Arbitrator **to emphasize contract language critical to the arbitrability issue**." (emphasis added.). (Doc 1-1, p. 84). The Arbitration Award presented the red inked language as follows:

ARTICLE 4
GRIEVANCE AND ARBITRATION

**4.1 Grievances.** The term "grievance" means a difference or dispute during the term of this Agreement between an employee and a representative of the Company as to the interpretation and/or application of the express terms of this Agreement. During the term of this Agreement, whenever a grievance shall arise, such dispute or difference shall be resolved in the following manner (J. 1A at 4).

> **STEP 1** – An effort shall be made to adjust the grievance by and between the steward, the employee having the grievance and the Company. All grievances shall be reduced to writing and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence. All *written* grievances shall bear the name and signature of the aggrieved employee, list the specific nature of the grievance and state the alleged violation of the Agreement. * * *

> **STEP 2** – A meeting shall be held between the Company and the Union, within seven (7) calendar days. * * * The Company shall give its answer in writing to the Union within then [sic] (10) calendar days after the date of the Step 2 meeting.

**4.2 Union General Grievances.** Union general grievances involving the overall application or interpretation of the Agreement as it applies to the bargaining unit shall be reduced to writing and proceed directly to Step 2.

**4.3 Discharge Related Grievances.** Grievances incidental to termination or discharge shall proceed directly to Step 2. A request for a Step 2 hearing incidental to discharge or termination must be presented within twenty-four (24) hours after the time the Union is notified of the Company's action and the Step 2 hearing shall be held not later than seven (7) calendar days following such notice (J. 1A at 5).

* * *

**4.7 Time Limits.** Any time limit set forth above may be extended only by the mutual agreement of the parties.

6

<u>This case ends right here</u> – the fact Arbitrator Bales identified the exact NCLF CBA provisions he interpreted (Article 4, Sections 4.1, 4.2, 4.3, and 4.7) unequivocally establish that his decision drew its essence from the collective bargaining agreement. Indeed, legal precedent demands this point not be ignored.

ii.     **The Arbitration Award did not ignore or add to the NCLF CBA – it interpreted it.**

a.     ***Arbitrator Bales utilized NCLF CBA Article 4.3 as the foundational basis of his award – he did not ignore it as the Union claims.***

Arbitrator Bales began his analysis and conclusion section stating:

**3. Arbitrator's Analysis and Conclusion**

The issue presented is whether IUOP's Grievance and referral to Step 2 concerning Mr. Claussen's discharge was timely under Article 4.3 of the CBA. **After careful consideration of the language of the agreement, the conduct of the parties, and the evidence presented at the hearing, I conclude that the Grievance was untimely and is therefore not procedurally arbitrable.**

(emphasis added.). (Doc 1-1, p. 88). Thereafter, he provided a detailed 2-page analysis wherein he explained how the written grievance was untimely under the NCLF CBA  as the timeline for discharge related grievances, which proceed directly to Step 2, requires presentation "within twenty-four (24) hours after the time the Union is notified of the Company's action."  Relying on the evidence presented at hearing, Arbitrator Bales explained his application of NCLF CBA Article 4.3 as follows:

**There is no dispute that Republic issued Mr. Claussen a written discharge on the morning of Tuesday, December 5, 2023,** and that Republic communicated this action both (1) in-person by delivering a written discharge letter at a meeting attended by IUOE Steward Chrissie Strong, and (2) subsequently by email to IUOE Business Agent Tony Deliberto at 11:17 a.m. that same day. **IUOE did not submit its written Grievance or request a Step 2 hearing until Friday, December 8, at 4:13 p.m. – more than 76 hours later. On its face, then, the written Grievance was more than two full days late.**

(emphasis added.). (Doc 1-1, p. 88). In its Complaint, the Union admitted all these material facts - NCLF CBA Article 4.3 applied (Doc. 1, p. 3, ¶ 6), the written discharge occurred December 5, 2023 (Doc. 1, p. 4, ¶ 10), and the Union submitted its written grievance on December 8, 2023 (Doc. 1, p. 4, ¶ 11).

While the Union will likely argue that Arbitrator Bales misquoted the language of Article 4.3 in one section of his Award (though he quoted and analyzed the actual language of the CBA correctly and thoroughly in his Award),[7] the entirety of his decision, rooted in the CBA, itself, demonstrates that he interpreted the CBA; and in doing so, he concluded that discharge grievances (as with all grievances) must be in writing (*see infra* Section III.A.ii.c.) and that the timeline for discharge related grievances, which proceed directly to Step 2, specifically requires presentment "within twenty-four (24) hours after the time the Union is notified of the Company's action . . . ." To the extent the Union argues that the twenty-four hour requirement applies only to presentment of a request for a Step 2 hearing and not to the presentment of the grievance, itself, this argument exceeds the scope of review permitted the Court in conjunction with an arbitration award. *See*, *infra*, *Quality Custom Distribution Services, LLC,* 131 F.4th at 599-600. Moreover, the Union's argument, itself, creates a completely illogical situation where a Step 2 request for a hearing on a grievance can be made without an underlying grievance being presented. That the Union disagrees with Arbitrator Bales' interpretation of these requirements in applying it to the facts of the underlying case does not eliminate the fact that Arbitrator Bales drew directly from NCLF CBA Article 4 in rendering his decision. No basis exists to find otherwise. Moreover, the difference between 24-hours and 76-hours is self-evident.

---

[7] (Doc. 1, p. 6, ¶ 17),

Keeping in mind that "**[t]he issue for the court is** not whether the contract interpretation is incorrect or even wacky but **whether the arbitrator[] failed to interpret the contract at all**,"[8] summary judgment in Defendant/Counterclaimant's favor must follow as Arbitrator Bales interpreted NCLF CBA Article 4.3 in rendering his decision.

### b. _An arbitrator's factual determination on the purpose of a pre-discharge phone call does not create a basis to overturn an arbitration award, even where the determination is in error or based on insufficient evidence (which it was not)._

The entirety of the Union's case boils down to one miserere – how Arbitrator Bales applied NCLF CBA Article 4 to a December 4, 2023 phone call. (Doc. 1, p. 4, ¶ 9; p. 5, ¶ 15; p. 6, ¶¶ 18 & 19; p. 7,  ¶¶ 21-22).  In the Arbitration Award, Arbitrator Bales addressed this call with great detail and included a detailed analysis of why the Union's argument that the call satisfied all of Article 4's contractual requirements for filing a grievance wholly failed.

Noting how heavily the Union's arguments relied upon the December 4, 2023 phone call, Arbitrator Bales stated he credited "Mr. Deliberto's testimony" about the call "as accurate." (Doc. 1-1, pp. 88-89). Despite this fact, the Union claims Arbitrator Bales erred in how he understood that testimony claiming:

> The Arbitrator's Award is centered on the notion that McGarry on December 4, 202[3] [sic] merely stated Defendant's "intent" to discharge the employees, rather than the decision to do so, and thus that the 24-hour period to protest discharges had not yet commenced. The Arbitrator reached this conclusion without any record testimony from McGarry, let alone any evidence about his purported intent during the December 4 phone call.

(Doc. 1-1, p. 7, ¶ 21). The Union places focus on a factual determination - the intent (i.e., aim or purpose)[9] of the December 4, 2023 call between McGarry (Company representative) and Deliberto (Union representative).

---

[8] (emphasis added.). _Hill v. Norfolk & Western Ry._, 814 F.2d 1192, 1194-95 (7th Cir.1987).
[9] https://www.merriam-webster.com/dictionary/intent

Courts have well-established factual determinations lie within the full authority of an arbitrator under the FAA. "**Courts do not sit to hear claims of factual or legal error by an arbitrator** as an appellate court does in reviewing decisions of lower courts." (emphasis added.).

*Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 101 (7th Cir.1996) (citing *Paperworkers Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987)).

Given this point, the law has firmly settled that:

> **Factual** or legal **errors by arbitrators--even clear or gross errors do not authorize courts to annul awards**.... **[I]nsufficiency of the evidence is not a ground for setting aside an arbitration award under the FAA**. (emphasis added.).

*Flexible Mfg.,* at 100 (citing *Gingiss International, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir.1995)). Accordingly, a court must enforce an arbitration award:

> **So long as the [arbitrator's] interpretation can in some rational manner be derived from the agreement, viewed in the light of its language, its context, and other indicia of the parties' intention**. *Butler Mfg v. United Steelworkers of America, 336 F.3d 629, 632 (7th Cir. 2003) (*citing *Amoco Oil Co. v. Oil, Chem. & Atomic Workers Int'l Union, Local 7-1, Inc.,* 548 F.2d 1288, 1294 (7th Cir.1977); see also *Dean,* 118 F.3d at 1171; *Mobil Oil Corp.,* 679 F.2d at 302. **Otherwise, as we have pointed out in the past, arbitration would just be the first of a series of steps that always culminated in court litigation, and it would lose its *raison d'être*.** See *Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.,* 86 F.3d 96, 100 (7th Cir.1996).

(emphasis added.). *Butler Mfg. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 336 F.3d 629, 632 (7th Cir. 2003). Stated otherwise:

> **Arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party. We will not set aside an arbitrator's award for factual or legal errors, as long as the award contains the honest decision of the arbitrator after a full and fair hearing of the parties**. *Ethyl Corp. v. United Steelworkers of America,* 768 F.2d 180, 183 (7th Cir.1985), cert. denied, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986).

(emphasis added.). *National Wrecking Co. v. International Broth. of Teamsters, Local 731*, 990 F.2d 957 (7th Cir. 1993). Despite this overwhelming legal precedent, the Union presented this court

case and banked on using its disagreement on a factual determination regarding the December 4, 2023 phone call as a basis to annul the award. This position tugs at Fed. R. Civ. P. Rule 11 boundaries and seeks to have this court overstep its bounds under the FAA. The Union's Complaint fails as a matter of law.

  **c.**   _**The Union cannot overcome Arbitrator Bales's application of NCLF CBA Article 4.3's 24-hour grievance and Step 2 presentment timeline to the December 4, 2023 phone call.**_

    **1.**   _**Notification of an intent to discharge does not qualify as "action" under NCLF CBA Article 4.3 – discharge must be formally executed to constitute "action."**_

Arbitrator Bales provided his rationale for finding that the December 4, 2023 phone call did not satisfy the 24-hour grievance timeline in NCLF CBA Article 4.3. He explained his first reason as follows:

> First, **Article 4.3 requires that a grievance be presented "after the time the Union is notified of the Company's action." As of December 4, the Company had not yet taken any discharge action;** it had merely indicated its intent to do so. **The written discharges were not issued until the following day. Mr. McGarry's phone call,** although a helpful courtesy, **did not constitute notification of a completed "action" within the meaning of Article 4.3.** To hold otherwise would create substantial uncertainty in future cases, as it would be unclear when an oral discussion of a potential future discharge becomes sufficient to trigger the Union's 24-hour deadline to grieve. As this case illustrates, oral pre-discharge conversations can create confusion and disagreement over both (1) whether the communication actually occurred, and (2) what was said in that communication. **The better interpretation – consistent with the plain language of Article 4.3 – is that the 24-hour clock begins only when a discharge has been formally executed and communicated to IUOE, not when Republic notifies IUOE of its intent to act.**

(emphasis added.). (Doc 1-1, p. 89). In short, the timeline in Article 4.3 becomes triggered by the notice of the actual discharge action and since the Union received the written discharge notice on December 5, 2023 the grievance had to be filed _after_ that date _and within_ 24-hours. (Id.). Arbitrator Bales also squarely addressed the Union's argument that the December 4 phone call

constituted being notified of action within the meaning of Article 4.3 (which Arbitrator Bales decided it did not). (Id.). Recognizing the potential for two interpretations of Article 4.3 on how to interpret notice of action, Arbitrator Bales explained the better interpretation "consistent with the plain language of Article 4.3" would be treating "action" as taken "only when a discharge has been formally executed and communicated to IUOE." (Id.). He further remarked on the resulting substantial uncertainty of holding otherwise and noted the present case confirms oral communication would create confusion and disagreement on whether a verbal communication occurred and what was said. (Id.). He framed his adopted interpretation as "the better interpretation." (Id.). The Union simply lacks any legal grounds to disturb the interpretation and/or choice Arbitrator Bales made.

**2.   _The NCLF CBA requires grievances to be presented in writing – an oral communication does not satisfy the "presentation" requirement in Article 4.3."_**

Arbitrator Bales also fully tackled the Union's contention that statements it made in the December 4, 2023 phone call sufficed as a "grievance" beginning his analysis as follows:

> Second, even if the December 4 call somehow qualified as notice of Republic's "action", **I find that an oral statement during a phone call does not satisfy Article 4.3's requirement that the grievance be "presented".** IUOE is correct that **Article 4.3** – discharge-related grievances – **does not contain a writing requirement. This contrasts with Article 4.1, Step 1, which does create a writing requirement, and also Article 4.1, Step 2, which creates a writing requirement for Republic's Step 2 answer. Ordinarily, when a requirement appears explicitly in several provisions of a CBA but is omitted from another, that omission reflects the parties' intent that the requirement not apply to the omitted provision. Nonetheless, three factors persuade me that the parties in this CBA intended discharge grievances to be presented in written form.**

(emphasis added.). (Doc. 1-1, pp. 16-17). This excerpt makes clear Arbitrator Bales acknowledged the NCLF CBA contained language in Articles 4.1 and 4.3 that he had to reconcile. (Id.). He painstakingly did so as is evidenced in the Arbitration Award stating:

12

First, Article 4.1 provides that "*All* grievances shall be reduced to writing and submitted to the General Manager." [Emphasis added.] Though this language appears in the provision governing Step 1 of ordinary grievances, the phrase "all grievances" is not expressly limited to grievances initiated under Article 4.1. It is reasonable to conclude that this broad requirement was intended to apply throughout the grievance procedure – including the Step 2 presentation of discharge-related grievances under Article 4.3. Viewed this way, omitting an explicit writing requirement from 4.3 was not intended to signify that the parties found oral grievances acceptable; it indicates instead that the parties saw no need to include a writing requirement in Article 4.3 because Article 4.1 already imposed a writing requirement on "all" grievances.

emphasis added.). (Id. p. 16).

So, Arbitrator Bales recognized the Parties had agreed "all grievances" would be reduced to writing and submitted by the Union under Article 4.1. (Id.). He then acknowledged the plain meaning of "all grievances" had not been limited to ordinary grievances under Step 1 and interpreted the written requirement in Article 4.1 as a "broad requirement [that] was intended to apply throughout the grievance procedure." (Id.). He noted this included the requirement of Step 2 "presentation" of discharge-related grievances under Step 2. (Id.). Consequently, Arbitrator Bales agreed Article 4.3 did not expressly state the grievance had to be in writing but found that decision reflected the Parties not needing to do so (*i.e.*, not needing to restate that requirement) based on the "all grievances" written requirement in Article 4.1.[10] (Id.).

By honing in on Article 4.3, the Union asks the Court to ignore Article 4.1 in its entirety and effectively invalidate Arbitrator Bales's determination that the Parties' intended meaning of

---

[10] The Union may argue that Article 4.2 on Union General Grievances expressly includes a written requirement that is not expressly included in Article 4.3 on Discharge Related Grievances. This difference, however, supports Arbitrator Bales's interpretation. Article 4.1 of the CBA defines "grievance" as "a difference or dispute during the term of this Agreement between an employee and a representative of the Company as to the interpretation and/or application of the express terms of this Agreement." Article 4.1 also requires that "[a]ll grievances shall be reduced to writing . . . ." *Id.* A discharge grievance is still a "grievance". In other words, just because a discharge grievance proceeds directly to Step 2 does not alleviate the need to comply with the written notice requirement set forth for "[a]ll grievances." In contrast, a Union General Grievance does not fall within the definition of grievance set forth in Article 4.1 as it is not a difference or dispute between an employee and a representative of the Company. As such, unlike a discharge grievance, the written requirement applicable to all grievances in Article 4.1 would not apply to a Union General Grievance; therefore, necessitating the need to independently include the written requirement in Article 4.2.

"presentation" necessarily included the writing requirement they memorialized in Article 4.1. The fact of the existence of an alternative contractual interpretation cannot constitute evidence an arbitrator exceeded his authority.

Arbitrator Bales went a step further to draw the Parties' intent on the word "presentation" in Article 4.3 stating:

> Second, the overall structure of Article 4 reflects a heightened degree of formality and urgency for discharge grievances. Discharge-related grievances bypass Step 1 entirely and must be initiated within a compressed 24-hour window, compared to seven days for ordinary grievances. This heightened urgency and importance reinforces the conclusion that the parties intended a clear, formal, and unambiguous method of presentation – namely, written documentation. Allowing oral grievance presentation in the most sensitive and time-limited cases is inconsistent with the overall structure of Article 4, and would invite precisely the sort of factual disputes and uncertainties present in this Arbitration. Indeed, IUOE's reliance on an oral conversation – unmemorialized at the time and not disclosed in any contemporaneous or subsequent communication – is what has led to much of the procedural confusion in this case. IUOE has presented no rationale for why the drafters of Article 4.3 would have intended this counter-intuitive result. IUOE has not presented, and I cannot surmise, any good reason why the parties would have required written presentation of less-important grievances but permitted oral presentation of their most important ones.

(emphasis added) (Id. at pp. 16-17. Looking at the conceptual structure of the Parties' negotiated *Grievance and Arbitration* procedure for resolving their disputes certainly embodies examining the essence of an agreement. The Union presented no legal basis to find otherwise within their Complaint – similar to its inability to provide Arbitrator Bales any rationale for why the Parties would have intended the "counter-intuitive result" of treating the most important discharge grievances with less formality than all other grievances. Arbitrator Bales could not determine any good reason to support such an interpretation and noted that result would be inconsistent with the overall structure of Article 4. Certainly, the existence of a reasonable construction in a case where a Union failed to provide reasons to disregard it does not lend itself to overturning the viable interpretation. Again, the Union only brought interpretation disagreements to the table – none of

which form a legal basis for nullifying the Arbitration Award.

Arbitrator Bales provided a final reason for reconciling NCLF CBA Articles 4.1 and 4.3 as requiring all grievances be presented in writing, stating:

> Third, IUOE's own conduct undermines its position. IUOE ultimately submitted a written Grievance concerning Mr. Claussen's discharge. If IUOE genuinely believed that an oral request sufficed under Article 4.3, the written Grievance would have been unnecessary. That IUOE filed a written Grievance – albeit untimely – demonstrates its recognition that formal documentation is necessary to properly "present" a grievance under Article 4.3. Likewise, IUOE's filing of a written grievance in the Green and Orlando matter (discussed below) likewise demonstrates that the parties have interpreted Article 4.3 as requiring discharge grievances to be in writing. See IUOE Exhibit 20 (written grievances of Green and Orlando).

(emphasis added.). (Id. at p. 17). As the final reason for interpreting "presentation" of a grievance as requiring a written submission, Arbitrator Bales pointed to the Union's own conduct and its inherent implications. (Id.). Specifically, the Union filed Article 4.3 discharge grievances <u>in writing</u>, it provided no evidence otherwise. (Id.). The Union's written discharge-grievance submissions fully aligns with the interpretation Arbitrator Bales ultimately adopted.

From the totality of Arbitrator Bales's analysis, one simply cannot ignore the inescapable fact that Arbitrator Bales literally wrapped NCLF CBA Article 4 into his analysis and interpreted the plain meaning of the words in Articles 4.1 and 4.3 in a manner that logically flowed, reconciled in a manner reflective of the overall structure of the Parties' adopted procedure, and ultimately reflected how the Union, itself, acted to conform with Article 4.3's requirements – it submitted a written grievance – albeit untimely – after notification that a formal discharge had been executed.

## IV.    <u>CONCLUSION</u>

Ironically, the Union seeks to have this Court effectively ignore and/or add to the Arbitration Award. However, the Union has presented no legal support to do so. The Arbitration Award drew its essence from the NCLF CBA Article 4 and Arbitrator Bales acted within the

authority bestowed upon him by the Parties in NCLF CBA Article 4.6.  Specifically, Arbitrator Bales (a) heard all evidence he deemed relevant and admissible; (b) rendered a decision based on the evidence and the Agreement; and (c) satisfied his duty to be bound by the terms and provisions of the NCLF CBA. (Doc. 1-1, p. 39).  This being the case the Arbitration Award must be enforced as a matter of law and the Union's Complaint dismissed with prejudice.

Respectfully Submitted,

*/s/ Steve A. Miller*
Steve A. Miller
Fisher & Phillips LLP
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
Telephone: 312-346-8061
Facsimile 312-346-3179
smiller@fisherphillips.com

and

Richard A. Millisor
*(Pro Hac Vice Motion Pending)*
Fisher & Phillips LLP
200 Public Square, Suite 4000
Cleveland, Ohio 44114
Telephone:  440-838-8800
Facsimile: 440-838-8805
rmillisor@fisherphillips.com

*Counsel for Defendant/Counterclaimant Newton County Landfill Partnership, d/b/a Newton County Landfill aka Republic Services*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of FISHER & PHILLIPS LLP certifies on November 7, 2025, I electronically filed the foregoing **SUPPORTING BRIEF TO MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT/COUNTERCLAIMANT MOTION FOR SUMMARY JUDGMENT WITH SUPPORTING BRIEF FILED BY DEFENDANT (AND COUNTERCLAIMANT)** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record.

*/s/ Steve A. Miller*
Steve A. Miller

*Counsel for Defendant Republic Services, a/k/a Newton County Landfill Partnership, d/b/a Newton County Landfill, a/k/a Lake County C&D Development Partnership, d/b/a Lake County C&D Landfill*