IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| International Union of Operating Engineers, Local 150, AFL-CIO, | ) ) ) |
|     Plaintiff/Counter-Defendant, | ) Case No. 2:25-cv-286-GSL-JEM ) |
| v. | ) Judge: Gretchen S. Lund ) Magistrate Judge: John E. Martin |
| Republic Services, a/k/a Newton County Landfill Partnership, d/b/a Newton County Landfill, a/k/a Lake County C & D Development Partnership, d/b/a Lake County C & D Landfill, | ) ) ) ) ) ) |
|     Defendant/Counter-Plaintiff. | ) |

## LOCAL 150's LOCAL RULE 56-1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff/Counter-Defendant International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150" or "the Union"), submits, pursuant to Local Rule 56-1(a), this statement of material facts in connection with Local 150's Motion for Summary Judgment against Defendant/Counter-Plaintiff Republic Services, a/k/a Newton County Landfill Partnership, d/b/a Newton County Landfill, a/k/a Lake County C & D Development Partnership, d/b/a Lake County C & D Landfill ("Defendant"), which also is known as Republic Services.

1.  In its Complaint, Local 150 seeks to vacate the arbitration award ("Award") of Arbitrator Richard Bales ("Arbitrator Bales") regarding a grievance filed by Local 150 (Complaint ¶ 7, Doc. 1 at Pages 3-4). Local 150 pursued the grievance against Defendant because it terminated a veteran Local 150 operator whom Defendant employed for nearly two decades, in violation of Article 2, Sections 2.2 and 2.3, and any and all other Articles that apply in their collective bargaining agreement (Complaint ¶¶ 7, 15, Doc. 1 at Pages 3-5; Doc. 1-1 at Pages 5-6). Arbitrator

Bales denied the grievance solely on procedural arbitrability grounds, meaning that he did not rule on the parties' arguments on the merits of the grievance as to whether there was just cause for the Local 150 operator's discharge (Complaint, Doc. 1-1 at Page 91). Local 150 seeks that the Court vacate the Award; remand the case to Arbitrator Bales to issue an award addressing the merits of the case, specifically the issue of whether Defendant had just cause to terminate Claussen, and if not, what the remedy shall be; and award such other relief as the Court deems just and proper (Complaint ¶ 17, Doc. 1 at Page 7).

2.  This Court has jurisdiction over this action pursuant to Section 301 of the Labor-Management Relations Act ("LMRA") of 1947, 29 U.S.C. § 185; and the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (Defendant's Answer and Counterclaim ("Def's Ans.") ¶ 1, Doc. 6 at Page 2).

3.  Local 150 is a labor organization representing employees in an industry affecting commerce within the meaning of Sections 2(5), (6), and (7) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 152(5), (6), and (7); and Section 301 of the LMRA, 29 U.S.C. § 185 (Def's Ans. ¶ 2, Doc. 6 at Page 2). Its principal offices are located at 6200 Joliet Road, Countryside, Illinois (Def's Ans. ¶ 2, Doc. 6 at Page 2). Among others, Local 150 represents 40 operators and mechanics employed at Defendant's Newton County Landfill ("NCLF") site (Arbitration Hearing Transcript, Tab 5 at L150_0125-0126).

4.  Defendant is a corporation and an employer in an industry affecting commerce within the meaning of Sections 2(2), (6), and (7) of the NLRA, 29 U.S.C. §§ 152(2), (6), and (7); and Section 301 of the LMRA, 29 U.S.C. § 185 (Def's Ans. ¶ 3, Doc. 6 at Page 3). Defendant's principal offices are located at NCLF, 2266 East 500 South, Brook, Indiana 47922, within the geographic jurisdiction of this Court (Def's Ans. ¶ 3, Doc. 6 at Page 3).

5. NCLF is the largest landfill in Indiana, handling 10,000 tons of waste material daily (Def's Post-Hearing Brief, Tab 4 at L150_0061). NCLF is one of Republic Service's top five landfills nationally based on tonnage (Arbitration Hearing Transcript, Tab 5 at L150_0125). Approximately 400 to 500 trucks deliver waste daily to the one-square-mile NCLF site (Def's Post-Hearing Brief, Tab 4 at L150_0061). The Lake County Landfill ("LCLF") was a much smaller construction and demolition landfill that when open serviced between 15 and 40 trucks on a daily basis (Def's Post-Hearing Brief, Tab 4 at L150_0061).

6. Local 150 and Defendant have entered into several collective bargaining agreements, including two respectively entitled, "Collective Bargaining Agreement By and Between International Union of Operating Engineers, Local 150, AFL-CIO, and Newton County Landfill Partnership, d/b/a Newton County Landfill," effective January 1, 2021, through December 31, 2023 ("the CBA") (Complaint, Doc. 1-1 at Pages 2-32; Def's Ans. ¶ 4, Doc. 6 at Pages 3-4); and "Collective Bargaining Agreement By and Between International Union of Operating Engineers, Local 150, AFL-CIO, and Lake County C & D Development Partnership, d/b/a Lake County C & D Landfill," effective August 1, 2020, through July 30, 2023 ("the Lake County CBA") (Complaint, Doc. 1-1 at Pages 34-64; Def's Ans. ¶ 4, Doc. 6 at Pages 3-4). Local 150 currently does not represent any employees of Defendant at the Lake County C & D Landfill because the site closed around December 2023 (Def's Ans. ¶ 5, Doc. 6 at Page 4).

7. CBA Article 2, Management Rights and Prerogatives, Section 2.3, Discipline and Discharge, states in part (Complaint, Doc. 1-1 at Page 6 *[emphasis added]*):

> The Company shall have the right to discipline, suspend or discharge any member of the bargaining unit but only for just cause. When feasible, particularly preceding a holiday or weekend, the Company *shall notify* the Union of its decision to suspend or discharge an employee no later than the close of business on the day the action is taken but in no case later than the close of business the workday following the day the action is taken.

3

Section 2.3 thus does not state that Defendant shall notify Local 150 "in writing," or anything comparable, of its decision to suspend or discharge an employee (Complaint, Doc. 1-1 at Page 6).

8.  Article 4 of the CBA contains a grievance and arbitration procedure that states, in part (Complaint, Doc. 1-1 at Pages 6-8):

> **4.1  Grievances**.  The term "grievance" means a difference or dispute during the term of this Agreement between an employee and a representative of the Company as to the interpretation and/or application of the express terms of this Agreement.  During the term of this Agreement, whenever a grievance shall arise, such dispute or difference shall be resolved in the following manner:
>
> > **STEP 1** – An effort shall be made to adjust the grievance by and between the steward, the employee having the grievance and the Company.  All grievances shall be reduced to writing and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence.  All written grievances shall bear the name and signature of the aggrieved employee, list the specific nature of the grievance and state the alleged violation of the Agreement.  The Company shall respond to the Union representative of its decision in writing within ten (10) calendar days of the Step 1 meeting. If the answer given by the Company in Step 1 is unsatisfactory to the Union, notification will be sent to the Company, in writing within seven (7) calendar days to process that matter to Step 2.
> >
> > **STEP 2** – A meeting shall be held between the Company and the Union, within seven (7) calendar days. The meeting shall include the Union President-Business Manager or his designee and the Site Manager or his representative to confer on the issue. Either or both parties may, with proper notice, require that witnesses be present or available during this conference. The Company shall give its answer in writing to the Union within ten (10) calendar days after the date of the Step 2 meeting.
>
> **4.2  Union General Grievances**.  Union general grievances involving the overall application or interpretation of the Agreement as it applies to the bargaining unit shall be reduced to writing and proceed directly to Step 2.
>
> **4.3  Discharge Related Grievances**.  Grievances incidental to termination or discharge shall proceed directly to Step 2.  A request for a Step 2 hearing incidental to discharge or termination must be presented within twenty-four (24) hours after the time the Union is notified of the Company's action and the Step 2 hearing shall be held not later than seven (7) calendar days following such notice.

\* \* \*

> **4.6 Arbitrability.** The arbitrator so selected shall hear all evidence he or she deems relevant and admissible and then render a decision based on the evidence and the Agreement. The arbitrator shall be bound by the terms and provisions of the Agreement and shall have authority to consider only grievances presenting an arbitrable issue under this Agreement. The arbitrator shall have no authority to add to, subtract from, modify, or amend any of the provisions of this Agreement.

9. In his Award, discussed in more detail, *infra*, Arbitrator Bales stated that CBA "Article 4.1 provides that '[a]ll grievances shall be reduced to writing and *submitted to the General Manager*.'" (Complaint, Doc. 1-1 at Page 89 *[emphasis added]*).

10. However, that provision in the CBA appears in Step 1, which is a subparagraph of Section 4.1 (Complaint, Doc. 1-1 at Pages 6-7).

11. Further, Step 1 actually states that "[a]ll grievances shall be reduced to writing and *presented to the employee's immediate supervisor* within seven (7) calendar days of its occurrence" (Complaint, Doc. 1-1 at Pages 5-6). Arbitrator Bales substituted his own word, "submitted," for the parties' own collectively bargained word, "presented" (Complaint, Doc. 1-1 at Page 89). Arbitrator Bales also substituted his own phrase, "General Manager," for the parties' own collectively bargained phrase, "employee's immediate supervisor" (Complaint, Doc. 1-1 at Page 89).

12. Section 4.1 defines a "grievance" as a "a difference or dispute during the term of this Agreement between an employee and a representative of the Company as to the interpretation and/or application of the express terms of this Agreement" (Complaint, Doc. 1-1 at Page 6). The parties did not collectively bargain the words "written," "shall be reduced to writing," or anything comparable in the paragraph in Section 4.1 defining a "grievance" (Complaint, Doc. 1-1 at Page 6).

13. CBA Section 4.3 regarding Discharge Related Grievances states that "[g]rievances incidental to termination or discharge *shall proceed directly to Step 2*" (Complaint, Doc. 1-1 at

Page 7 *[emphasis added]*).  The parties did not collectively bargain the words "Step 1" in Section 4.3; thus "Step 1" does not appear in that section (Complaint, Doc. 1-1 at Page 7).  Step 2 does not state any writing requirement for Local 150 when pursuing a grievance—rather, the only writing requirement in Step 2 is imposed on Defendant ("The Company shall give its answer *in writing* to the Union within ten (10) calendar days after the date of the Step 2 meeting") (Complaint, Doc. 1-1 at Page 7 *[emphasis added]*).

14. Section 4.3 regarding Discharge Related Grievances states that "[a] request for a Step 2 hearing incidental to discharge or termination *must be presented* within twenty-four (24) hours…" (Complaint, Doc. 1-1 at Page 7 *[emphasis added]*).  Section 4.3 does not state that a Step 2 hearing request "shall be reduced to writing" or otherwise include the phrase "shall be reduced to writing" (Complaint, Doc. 1-1 at Page 7).  Nor does it require presentation that is "reduced to writing" or otherwise in writing, as required of the Company's answer in Step 2 (Complaint, Doc. 1-1 at Page 7).

15. The only sections of the parties' Grievance and Arbitration procedure in CBA Article 4 that include the phrase "shall be reduced to writing" or anything comparable are Section 4.1, Step 1 covering "ordinary grievances," as Arbitrator Bales called them, as well as Section 4.2 regarding Union General Grievances, i.e., those "involving the overall application or interpretation of the Agreement as it applies to the bargaining unit" (Complaint, Doc. 1-1 at Pages 6-7, 89).  The respective ordinary grievance, Union General Grievance, and Discharge Related Grievance provisions are each in separate sections of Article 4 (Complaint, Doc. 1-1 at Pages 6-7).

16. Section 4.1, Step 1, regarding ordinary grievances includes the phrase, "[a]ll grievances *shall be reduced to writing* and presented" (Complaint, Doc. 1-1 at Page 6 *[emphasis*

6

*added]*). Section 4.2 regarding Union General Grievances states that they "*shall be reduced to writing* and proceed directly to Step 2" (Complaint, Doc. 1-1 at Page 7 *[emphasis added]*). While Section 4.3 regarding Discharge Related Grievances requires that Local 150 "present" a request for a Step 2 hearing to Defendant, Step 1 regarding ordinary grievances states that grievances "shall be reduced to writing *and* presented" to Defendant (Complaint, Doc. 1-1 at Pages 6-7 *[emphasis added]*).

17. While Section 4.3 regarding Discharge Related Grievances requires that Local 150 take action "within 24 hours after the time the Union is notified of the Company's action," Section 4.1, Step 1, regarding ordinary grievances requires that Local 150 act "within seven (7) calendar days of its occurrence" (Complaint, Doc. 1-1 at Pages 6-7). Section 4.2 regarding Union General Grievances does not state any time limit on filing such grievances (Complaint, Doc. 1-1 at Page 7).

18. The 24-hour period in which Local 150 must present a request for a Step 2 meeting commences upon Defendant's notifying Local 150, not the employee or employees in question, of Defendant's termination action (Complaint, Doc. 1-1 at Page 7).

19. Article 19, Entire Agreement of the Parties, of the CBA states in part: "Entire Agreement of the Parties. This represents the entire agreement of the parties, it being understood that there is no other Agreement or understanding, either oral or written" (Complaint, Doc. 1-1 at Page 29).

20. Dalen ("Dale" or "Pickles") Claussen has been a Local 150 operator since 1996 (Arbitration Hearing Transcript, Tab 5 at L150_0111, 0606-0607). In 1996, Claussen commenced work as a Local 150 operator at NCLF for Allied Waste, the company that ran NCLF at the time (Arbitration Hearing Transcript, Tab 5 at L150_00612). He was laid off two years later and then

7

worked elsewhere as a Local 150 operator (Arbitration Hearing Transcript, Tab 5 at L150_00613). Claussen returned to NCLF in 2005, at which point Defendant ran NCLF (Arbitration Hearing Transcript, Tab 5 at L150_00613-00614). During his 18-year tenure with Defendant, Claussen spent approximately 17 of those years based at NCLF and about one year at LCLF—his final year (Arbitration Hearing Transcript, Tab 5 at L150_00614). Defendant terminated Claussen, fellow operator Shaun Motyka, and fellow operator Allen Thomas in December 2023. Local 150 protested each of those terminations via grievances (Def's Ans. ¶¶ 7-10, Doc. 6 at Page 5-7).

21. Pursuant to Article 4 of the CBA, the parties selected Arbitrator Bales to hear the Claussen discharge matter (Def's Ans. ¶ 13, Doc. 6 at Page 7). The parties selected other arbitrators to hear the respective Motyka and Thomas discharges (Def's Ans. ¶ 13, Doc. 6 at Page 7).

22. The hearing regarding Claussen's discharge took place on August 23, December 12, and December 13, 2024, in Fair Oaks, Indiana (Def's Ans. ¶ 7, Doc. 6 at Page 7). The issues that the parties asked the Arbitrator to resolve were: 1) whether the grievance was timely filed under Article 4.3 of the collective bargaining agreement and is therefore arbitrable; and 2) if the grievance is deemed arbitrable, whether Defendant had just cause to discharge Claussen; if not, what is the remedy? (Complaint, Doc. 1-1 at Pages 83, 85). The parties did not ask Arbitrator Bales to address any other issues than these two (Complaint, Doc. 1-1 at Page 85).

23. Of the arbitration hearing's three-day, 812-page transcript, only 35 pages—amounting to 4.3 percent of the transcript—were regarding Defendant's procedural arbitrability objection (Tab 5 at L150_0094-0097, 0116, 0144, 0305-0309, 0869-0885, 0889-0895).

24. The parties submitted their post-hearing briefs on March 19, 2025 (Complaint, Doc. 1-1 at Page 74). Arbitrator Bales issued his Award two weeks later, on April 2, 2025

8

(Complaint, Doc. 1-1 at Page 74). Because Arbitrator Bales found that the grievance protesting Claussen's termination was not timely raised, Arbitrator Bales determined that the parties' arguments on the merits of the grievance were "moot" (Complaint, Doc. 1-1 at Page 91). He thus did not address the issue of whether Defendant had just cause to discharge Claussen (Complaint, Doc. 1-1 at Pages 88, 91).

25. At the arbitration hearing, Local 150 Business Representative Anthony Deliberto testified that Defendant's General Manager, Joshua McGarry, called Deliberto by phone on December 4, 2023 (Def's Ans. ¶ 7, Doc. 6 at Pages 5-6). Defendant did not present McGarry as a witness at the hearing (Def's Ans. ¶ 8, Doc. 6 at Page 6). Regarding the phone call, Defendant admitted "only that a phone call between Mr. McGarry and Mr. Deliberto occurred on December 4, 2023" (Def's Ans. ¶ 7, Doc. 6 at Page 5-6).

26. In its brief, in reliance only on Deliberto's testimony, Defendant wrote that McGarry called Deliberto "as a courtesy to advise Mr. Deliberto that the Company was going to discharge Mr. Claussen" (Tab 4 at L150_0067). Defendant then wrote that, "[a]ccording to Mr. Deliberto, during this courtesy call…," and again cited Deliberto's testimony only regarding the call purportedly being a mere courtesy (Tab 4 at L150_0067). However, Deliberto's unrebutted testimony included no mention of the call being a "courtesy" or that McGarry merely had intended to terminate the employees (Arbitration Hearing Transcript, Tab 5 at L150_0873-0874).

27. Arbitrator Bales acknowledged that Deliberto testified "without rebuttal" about the December 4, 2023 phone call (Complaint, Doc. 1-1 at Page 87). He wrote that, "[a]ccording to Republic's Post-Hearing Brief, the call was a courtesy notification by Mr. McGarry that Republic was planning to discharge the three Operators, not a formal notice of discharge (Complaint,

9

Doc. 1-1 at Page 81). However, Mr. McGarry did not testify at the Arbitration hearing, so Mr. Deliberto's description of the contents of the phone call are unrebutted" (Complaint, Doc. 1-1 at Page 81). Arbitrator Bales thus accepted Deliberto's unrebutted testimony "as true" (Complaint, Doc. 1-1 at Page 89).

28. Local 150 produced Deliberto's work phone log, which was redacted to protect confidential communications between Deliberto and Local 150-represented employees (Tab 1 at L150_0038-0045; Arbitration Hearing Transcript, Tab 5 at L150_0871-0872). The phone log shows an incoming call on Monday, December 4, 2023, at 2:49 p.m., from the phone number 847-514-6054, which belongs to McGarry (Tab 1 at L150_0041; Arbitration Hearing Transcript, Tab 5 at L150_0872). The phone log shows that the call lasted seven minutes (Tab 1 at L150_0041).

29. While Deliberto testified that he did not recall the entire conversation, he stated that he remembered the "important parts" (Arbitration Hearing Transcript, Tab 5 at L150_0873). According to Deliberto's unrebutted testimony, McGarry during this call stated that Defendant was terminating Claussen, Motyka, and Thomas at that time (Arbitration Hearing Transcript, Tab 5 at L150_0873). Deliberto told McGarry that this upset him, particularly because Christmas was coming up (Arbitration Hearing Transcript, Tab 5 at L150_0873-0874). Deliberto said that Local 150 would grieve the terminations and that the parties would need to have a meeting regarding each employee (Arbitration Hearing Transcript, Tab 5 at L150_0874).

30. Local 150 contended that "this phone call constituted both [Defendant's] notice to [Local 150] of the discharges and [Local 150's] timely Step 2 grievance and hearing request under Article 4.3 of the CBA" (Complaint, Doc. 1-1 at Page 80). Deliberto made this request within seconds, or minutes at most, of McGarry's notification of the terminations, thus well within Section 4.3's 24-hour requirement (Complaint, Doc. 1-1 at Page 7). Deliberto testified that

10

because Section 4.3 does not state any writing requirement, he may make Step 2 requests verbally in the event of a discharge notification (Arbitration Hearing Transcript, Tab 5 at L150_0869-0870).

31. During an examination he undertook at the arbitration hearing, Defendant's counsel acknowledged that Motyka was terminated on December 4, 2023 (Arbitration Hearing Transcript, Tab 5 at L150_0835, 0839). Defendant's written termination notices issued to Motyka and Thomas each were signed by Craig Drinski, a manager for Defendant, on December 4, 2023 (Complaint, Doc. 1-1 at Pages 67-68). Drinski signed the written termination notice issued to Claussen on December 5, 2023, as Claussen was not at work on December 4, 2023 (Complaint, Doc. 1-1 at Page 66). After verbally notifying Local 150 of the terminations on December 4, 2023, Defendant additionally emailed written termination notices to Local 150 on December 5, 2023 (Tab 2 at L150_0049).

32. On December 8, 2023, Deliberto issued three written versions of the grievances protesting the respective terminations of Claussen, Motyka, and Thomas (Complaint, Doc. 1-1 at Pages 70-72; Emails Exchanged between the Parties, Tab 2 at L150_0049; Arbitration Hearing Transcript, Tab 5 at L150_0875). Deliberto testified that he did this for "recordkeeping purposes to create a paper trail" (Arbitration Hearing Transcript, Tab 5 at L150_0875-0876). There is no provision in the CBA that prohibits Local 150 from doing so (Complaint, Doc. 1-1 at Pages 6-8; Arbitration Hearing Transcript, Tab 5 at L150_0870).

33. After initially exchanging emails about setting up a meeting, on December 12, 2023, Drinski stated, "[p]lease disregard the request for availability for the Step 2 meeting *[sic]* after reviewing of the CBA, per Section 4.3, the union did not meet the time requirements" (Emails Exchanged between the Parties, Tab 2 at L150_0047). Deliberto replied on December 13, 2023, stating, "If the company refuses to engage in a meeting then the Union

11

herby *[sic]* demands arbitration over the discharge of Dale Claussen, Allen Thomas, and Shaun Motyka" (Emails Exchanged between the Parties, Tab 2 at L150_0047). Drinski replied on December 19, 2023, stating that "the Union was untimely in requesting the Step 2 meeting by its email on Friday, December 8, 2023, under the plain and mandatory language of Article 4.3 of the CBA" (Emails Exchanged between the Parties, Tab 2 at L150_0046).

34. No grievance meetings regarding the discharges subsequently occurred because, by virtue of Defendant's timeliness objection, Defendant "shut down communication [and] refused to meet," according to Deliberto (Arbitration Hearing Transcript, Tab 5 at L150_0876-0877). Deliberto did not reference the December 4 phone call with McGarry in subsequent email communications because Defendant was "not gonna entertain any other meeting…there was no other communication other than go to arbitration" (Arbitration Hearing Transcript, Tab 5 at L150_0891, 0895). Deliberto testified that Local 150 is not required to make its legal argument prior to an arbitration (Arbitration Hearing Transcript, Tab 5 at L150_0895). There is no requirement in the CBA that requires Local 150 to respond to a procedural arbitrability objection made by Defendant prior to arbitration (Complaint, Doc. 1-1 at Pages 6-8).

35. Defendant disputed that Deliberto made the Step 2 meeting request verbally and that Local 150's contention that the 24-hour filing period commenced after the December 4, 2023 phone conversation, rather than Local 150's receipt of the written termination on December 5, 2023 (Tab 4 at L150_0064-0069). Defendant in its post-hearing brief did not rely on or otherwise make any reference to Step 1, let alone its writing requirement, in support of its timeliness objection (Tab 4 at L150_0064-0069). Defendant did not contend in its post-hearing brief that Discharge Related Grievances must be in writing (Tab 4 at L150_0064-0069).

12

36. As stated in Paragraph 27, *supra*, Arbitrator Bales acknowledged that Deliberto testified "without rebuttal" about the December 4, 2023 phone call (Complaint, Doc. 1-1 at Page 87). He acknowledged that it was Defendant in its post-hearing brief, rather than any witness, that contended that "the call was a courtesy notification by Mr. McGarry that Republic was planning to discharge the three Operators, not a formal notice of discharge" (Complaint, Doc. 1-1 at Page 81).

37. Deliberto's unrebutted testimony included no mention of the call being a "courtesy," or anything similar, or that McGarry had stated a mere "intent" or anything similar to terminate the employees (Arbitration Hearing Transcript, Tab 5 at L150_0873-0874). Despite his acknowledgement that Deliberto's testimony was unrebutted and even accepting his account "as true," Arbitrator Bales subsequently stated that McGarry during the call "merely indicated [Defendant's] intent to" terminate the employees and communicated Defendant's "intent to act" (Complaint, Doc. 1-1 at Page 89). Thus, Arbitrator Bales effectively accepted Defendant's misrepresentation of Deliberto's testimony regarding the December 4 phone call, as mentioned in Paragraphs 26 and 27, *supra*, as a mere "courtesy" (Complaint, Doc. 1-1 at Page 89).

38. In reliance on this conclusion that he reached without any supportive testimony, Arbitrator Bales stated that McGarry's phone call "did not constitute notification of a completed 'action' within the meaning of Article 4.3" (Complaint, Doc. 1-1 at Page 89). Without citing any CBA provision in support, Arbitrator Bales stated that "uncertainty," "confusion," and "disagreement" could arise if "oral discussion of a potential future discharge becomes sufficient to trigger the Union's 24-hour deadline to grieve" (Complaint, Doc. 1-1 at Page 89). Defendant did not make this contention in its post-hearing brief (Tab 4 at L150_0064-0069). Arbitrator Bales stated that "[t]he better interpretation – consistent with the plain language of Article 4.3 – is that

13

the 24-hour clock begins only when a discharge has been formally executed and communicated to [Local 150], not when Republic notifies [Local 150] of its intent to act" (Complaint, Doc. 1-1 at Page 89).

39. In reaching the conclusion, *supra*, Arbitrator Bales made no reference to CBA Article 2, Section 2.3, which includes no requirement that Defendant notify Local 150 "in writing," or anything comparable, of its decision to discharge and employee, as discussed, *supra*, in Paragraph 7 (Complaint, Doc. 1-1 at Page 6).

40. Then Arbitrator Bales stated that "an oral statement during a phone call does not satisfy Article 4.3's requirement that the grievance be 'presented'" (Complaint, Doc. 1-1 at Page 89). Defendant did not make this contention in its post-hearing brief (Tab 4 at L150_0064-0069). Arbitrator Bales raised in one breath, and then cast aside in his next, the contract interpretation principle that, as he stated it, "Ordinarily, when a requirement appears explicitly in several provisions of a CBA but is omitted from another, that omission reflects the parties' intent that the requirement not apply to the omitted provision" (Complaint, Doc. 1-1 at Page 89).

41. As discussed, *supra*, in Paragraphs 9 through 11, Arbitrator Bales here misrepresented the CBA's language, claiming that "Article 4.1 provides that '*All* grievances shall be reduced to writing and submitted to the General Manager'" (Complaint, Doc. 1-1 at Page 89 *[emphasis in arbitration award]*). Defendant did not misrepresent this provision in its post-hearing brief (Tab 4 at L150_0064-0069). Rather, under Article 4.1, *Step 1*—regarding what, again, Arbitrator Bales called ordinary grievances, "[a]ll grievances shall be reduced to writing and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence" (Complaint, Doc. 1-1 at Page 6 *[emphasis added]*).

14

42. In relying on his misstated provision contained in Step 1, Arbitrator Bales concluded that Step 1's writing requirement applies to "all grievances…throughout the grievance procedure," not just ordinary grievances (Complaint, Doc. 1-1 at Page 89). Defendant did not make this contention in its post-hearing brief (Tab 4 at L150_0064-0069). In his reasoning that Step 1's writing requirement applies to all grievances, rather than only ordinary grievances, Arbitrator Bales made no reference to Section 4.3, Discharge Related Grievances, proceeding "directly to Step 2," which mandates that such grievances bypass Step 1 entirely (Complaint, Doc. 1-1 at Pages 7, 88-91).

43. In tandem with misstating the language of Section 4.1, Step 1, Arbitrator Bales did not cite the latter half of Step 1's sentence in question in this reasoning regarding the time limit on the filing of ordinary grievances: "within seven (7) calendar days of its occurrence" (Complaint, Doc. 1-1 at Page 6). Section 4.1, Step 1, regarding ordinary grievances has a different filing period from the 24-hour filing period in Section 4.3 regarding Discharge Related Grievances (Complaint, Doc. 1-1 at Page 7).

44. Arbitrator Bales stated that "omitting an explicit writing requirement from [Section] 4.3 was not intended to signify that the parties found oral grievances acceptable; it indicates instead that the parties saw no need to include a writing requirement in Article 4.3 because Article 4.1 already imposed a writing requirement on 'all' grievances" (Complaint, Doc. 1-1 at Page 89). Defendant did not make this contention in its post-hearing brief (Tab 4 at L150_0064-0069). Furthermore, in his reasoning on this point, Arbitrator Bales ignored and did not reference Section 4.2's writing requirement regarding Union General Grievances (Complaint, Doc. 1-1 at Page 89). Arbitrator Bales's explanation thus did not account for the parties' inclusion of, in addition to Section 4.1, Step 1, regarding ordinary grievances, a second explicit writing

15

requirement in Section 4.2 regarding Union General Grievances but not in Section 4.3 regarding Discharge Related Grievances (Complaint, Doc. 1-1 at Page 89).

45. Arbitrator Bales then stated that there is a "heightened degree of formality and urgency for discharge grievances," without citing any record testimony from the parties (Complaint, Doc. 1-1 at Page 89). Rather, he based this conclusion only on the notions that "[d]ischarge-related grievances bypass Step 1 entirely and must be initiated within a compressed 24-hour window, compared to seven days for ordinary grievances," provided no explanation how these provisions supported his conclusion, repeated his personal concerns about verbal grievances, and concluded that Discharge Related Grievances must be in writing (Complaint, Doc. 1-1 at Pages 89-90). Defendant did not contend in its post-hearing brief that Discharge Related Grievances must be in writing (Tab 4 at L150_0064-0069).

46. As an alternative argument that Defendant had waived its right to object to timeliness, Local 150 introduced an exhibit of a single past instance on April 15, 2020, where Local 150 grieved two terminations issued on the same day for the same offense outside of the 24-hour window and Defendant did not raise a procedural arbitrability objection (Tab 3 at L150_0051-0059). Arbitrator Bales seized on this single instance of Local 150 filing two written grievances as evidence that "the parties have interpreted Article 4.3 as requiring discharge grievances to be in writing" (Complaint, Doc. 1-1 at Page 90). Defendant did not make this contention in its post-hearing brief (Tab 4 at L150_0064-0069). Arbitrator Bales also cited this single instance to effectively bar Local 150 from subsequently memorializing a verbal discharge grievance in writing for, as Deliberto testified, for "recordkeeping purposes to create a paper trail" (Arbitration Hearing Transcript, Tab 5 at L150_0875-0876). Defendant also did not make this contention in its post-hearing brief (Tab 4 at L150_0064-0069).

47.     Arbitrator Bales claimed that Local 150 "has not presented, and I cannot surmise, any good reason why the parties would have required written presentation of less-important grievances but permitted oral presentation of their most important ones" (Complaint, Doc. 1-1 at Page 90).  In its post-hearing brief, Defendant neither advanced any reasons that Arbitrator Bales cited in support of his conclusion nor contended that the parties in their CBA required written presentation of both so-called less-important grievances and their most important ones (Tab 4 at L150_0064-0069).  In reaching his conclusion, Arbitrator Bales did not reference, within the context of what he called "a compressed 24-hour window," Deliberto's testimony that he is "in charge of covering about 42 contracts across Illinois and Indiana, about a thousand members, handling grievances, any day-to-day issues with our members.  I'm also tasked with assisting in negotiations, recordkeeping, gathering information" (Arbitration Hearing Transcript, Tab 5 at L150_0845-0846; Complaint, Doc. 1-1 at Page 89).  Arbitrator Bales thus did not consider the obvious likelihood that a busy Local 150 business representative would be able to more easily meet the compressed 24-hour window when able to verbally grieve a termination (Complaint, Doc. 1-1 at Page 89).  On December 4, 2023, alone, for example, Deliberto handled 42 phone calls as part of his responsibilities (Tab 1 at L150_0040-0042; Arbitration Hearing Transcript, Tab 5 at L150_0871-0872).

48.     Arbitrator Bales concluded that, "[h]aving found the Grievance is not arbitrable because it was not timely raised, the parties' arguments on the merits of the Grievance are moot…The Grievance is denied" (Complaint, Doc. 1-1 at Page 91).  Arbitrator Bales thus denied Claussen, a veteran Local 150 operator, a chance of being reinstated to his job, without ruling on the merits of his termination (*see* Complaint, Doc. 1-1 at Page 91).

49. However, prior to ultimately ruling on the procedural arbitrability objection, Arbitrator Bales made several findings indicating that had he denied the objection, he would have determined that there was not just cause for, and thus reversed, Defendant's termination of Claussen (*see* Complaint, Doc. 1-1 at Pages 76-80). Among other things, Arbitrator Bales noted the incredible and uncorroborated testimony of a key Defendant witness, Timothy Atwater, regarding his granting permission, or at best for him his deficient instructions, to the employees regarding their ability remove certain items from the LCLF site in light of its looming closure; Local 150's contention, supported by the record, that the purported time theft of which Defendant had accused Claussen was "a reasonable and efficient operational practice grounded in logistical common sense and managerial directives;" and Defendant's serious due process violation regarding its failure to provide Claussen an opportunity to respond to its allegation of time theft (*see* Complaint, Doc. 1-1 at Pages 76-77, 79, 80).

Dated: November 7, 2025

Respectfully submitted,

By: /s/ Emil P. Totonchi
     One of the Attorneys for Local 150

Attorneys for Local 150:
Dale D. Pierson *(dpierson@local150.org)*
Emil P. Totonchi *(etotonchi@local150.org)*
Local 150 Legal Department
6140 Joliet Road
Countryside, IL  60525
Ph. 708/579-6663
Fx. 708/588-1647

**CERTIFICATE OF SERVICE**

      The undersigned, an attorney of record, hereby certifies that on November 7, 2025, he electronically filed the foregoing with the Clerk of Court using the CM/CM/ECF system, which sent notification to the following:

Steve A. Miller *(smiller@fisherphillips.com)*
Fisher & Phillips LLP
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
Ph. 312/346-8061
Fx. 312/346-3179

The undersigned further certifies that on November 7, 2025, he caused a copy of the foregoing to be served upon the following via electronic mail:

Richard A. Millisor *(rmillisor@fisherphillips.com)*
Fisher & Phillips LLP
200 Public Square, Suite 4000
Cleveland, Ohio 44114
Ph. 440/838-8800
Fx. 440/838-8805

                                    By:  /s/ Emil P. Totonchi
                                            One of the Attorneys for Local 150

Attorneys for Local 150:
Dale D. Pierson *(dpierson@local150.org)*
Emil P. Totonchi *(etotonchi@local150.org)*
Local 150 Legal Department
6140 Joliet Road
Countryside, IL 60525
Ph. 708/579-6663
Fx. 708/588-1647