# TAB 1

**AT&T**
**Phone Number: 7083702808**
**Bill Cycle: Nov 08, 2023 - Dec 07, 2023**
**Total Charges: $0**

| Incoming/Outgoing | Date | Time | Contact | Location | Minutes |
|---|---|---|---|---|---|
| OUTGOING | Dec 07, 2023 | 5:03 pm | | | 12 |
| OUTGOING | Dec 07, 2023 | 4:59 pm | | | 1 |
| OUTGOING | Dec 07, 2023 | 4:59 pm | | | 1 |
| OUTGOING | Dec 07, 2023 | 4:58 pm | | | 1 |
| OUTGOING | Dec 07, 2023 | 4:41 pm | | | 17 |
| INCOMING | Dec 07, 2023 | 4:37 pm | | | 4 |
| OUTGOING | Dec 07, 2023 | 4:35 pm | | | 2 |
| OUTGOING | Dec 07, 2023 | 3:06 pm | | | 6 |
| INCOMING | Dec 07, 2023 | 11:09 am | | | 3 |
| INCOMING | Dec 07, 2023 | 10:54 am | | | 3 |
| OUTGOING | Dec 07, 2023 | 8:52 am | | | 2 |
| INCOMING | Dec 07, 2023 | 8:19 am | | | 9 |
| OUTGOING | Dec 07, 2023 | 8:01 am | | | 19 |
| OUTGOING | Dec 07, 2023 | 7:59 am | | | 1 |
| OUTGOING | Dec 07, 2023 | 7:58 am | | | 1 |
| OUTGOING | Dec 07, 2023 | 6:56 am | | | 9 |
| OUTGOING | Dec 06, 2023 | 6:22 pm | | | 5 |
| OUTGOING | Dec 06, 2023 | 5:14 pm | | | 20 |
| OUTGOING | Dec 06, 2023 | 5:10 pm | | | 4 |
| OUTGOING | Dec 06, 2023 | 5:06 pm | | | 4 |
| INCOMING | Dec 06, 2023 | 4:29 pm | | | 33 |
| INCOMING | Dec 06, 2023 | 4:08 pm | | | 13 |
| INCOMING | Dec 06, 2023 | 3:26 pm | | | 16 |
| INCOMING | Dec 06, 2023 | 2:04 pm | | | 3 |

**Union Ex. 17**

| | | | |
|---|---|---|---|
| INCOMING | Dec 06, 2023 | 1:41 pm | 11 |
| INCOMING | Dec 06, 2023 | 1:34 pm | 3 |
| INCOMING | Dec 06, 2023 | 1:29 pm | 5 |
| INCOMING | Dec 06, 2023 | 1:10 pm | 3 |
| INCOMING | Dec 06, 2023 | 12:35 pm | 24 |
| INCOMING | Dec 06, 2023 | 12:31 pm | 28 |
| INCOMING | Dec 06, 2023 | 12:00 pm | 23 |
| INCOMING | Dec 06, 2023 | 11:47 am | 14 |
| OUTGOING | Dec 06, 2023 | 11:46 am | 1 |
| INCOMING | Dec 06, 2023 | 11:45 am | 16 |
| INCOMING | Dec 06, 2023 | 11:41 am | 3 |
| OUTGOING | Dec 06, 2023 | 11:27 am | 1 |
| OUTGOING | Dec 06, 2023 | 11:26 am | 1 |
| INCOMING | Dec 06, 2023 | 10:40 am | 5 |
| OUTGOING | Dec 06, 2023 | 8:05 am | 21 |
| OUTGOING | Dec 06, 2023 | 7:52 am | 12 |
| INCOMING | Dec 05, 2023 | 7:08 pm | 15 |
| OUTGOING | Dec 05, 2023 | 5:41 pm | 4 |
| INCOMING | Dec 05, 2023 | 4:57 pm | 9 |
| INCOMING | Dec 05, 2023 | 4:41 pm | 10 |
| INCOMING | Dec 05, 2023 | 4:27 pm | 6 |
| INCOMING | Dec 05, 2023 | 4:00 pm | 5 |
| OUTGOING | Dec 05, 2023 | 3:45 pm | 1 |
| OUTGOING | Dec 05, 2023 | 3:45 pm | 1 |
| INCOMING | Dec 05, 2023 | 3:36 pm | 4 |
| INCOMING | Dec 05, 2023 | 3:33 pm | 2 |
| OUTGOING | Dec 05, 2023 | 3:15 pm | 1 |
| OUTGOING | Dec 05, 2023 | 3:05 pm | 7 |
| INCOMING | Dec 05, 2023 | 2:49 pm | 1 |
| OUTGOING | Dec 05, 2023 | 2:30 pm | 4 |

L150_0039

| | | | |
|---|---|---|---|
| OUTGOING | Dec 05, 2023 | 2:30 pm | 16 |
| OUTGOING | Dec 05, 2023 | 2:25 pm | 1 |
| INCOMING | Dec 05, 2023 | 2:16 pm | 10 |
| OUTGOING | Dec 05, 2023 | 2:04 pm | 8 |
| OUTGOING | Dec 05, 2023 | 1:47 pm | 17 |
| INCOMING | Dec 05, 2023 | 1:44 pm | 21 |
| OUTGOING | Dec 05, 2023 | 1:38 pm | 1 |
| OUTGOING | Dec 05, 2023 | 1:36 pm | 1 |
| OUTGOING | Dec 05, 2023 | 1:34 pm | 1 |
| OUTGOING | Dec 05, 2023 | 1:33 pm | 2 |
| INCOMING | Dec 05, 2023 | 11:51 am | 3 |
| INCOMING | Dec 05, 2023 | 11:04 am | 13 |
| INCOMING | Dec 05, 2023 | 10:47 am | 7 |
| OUTGOING | Dec 05, 2023 | 9:29 am | 12 |
| INCOMING | Dec 05, 2023 | 9:17 am | 11 |
| INCOMING | Dec 05, 2023 | 8:55 am | 4 |
| OUTGOING | Dec 05, 2023 | 8:55 am | 1 |
| INCOMING | Dec 05, 2023 | 8:42 am | 13 |
| OUTGOING | Dec 05, 2023 | 7:32 am | 11 |
| OUTGOING | Dec 04, 2023 | 8:00 pm | 17 |
| OUTGOING | Dec 04, 2023 | 7:49 pm | 5 |
| OUTGOING | Dec 04, 2023 | 5:32 pm | 4 |
| OUTGOING | Dec 04, 2023 | 5:30 pm | 2 |
| INCOMING | Dec 04, 2023 | 4:52 pm | 7 |
| OUTGOING | Dec 04, 2023 | 4:47 pm | 4 |
| OUTGOING | Dec 04, 2023 | 4:42 pm | 1 |
| OUTGOING | Dec 04, 2023 | 4:25 pm | 4 |
| OUTGOING | Dec 04, 2023 | 4:16 pm | 10 |
| OUTGOING | Dec 04, 2023 | 4:15 pm | 1 |
| INCOMING | Dec 04, 2023 | 3:39 pm | 36 |

L150_0040

| | | | | | | |
|---|---|---|---|---|---|---|
| OUTGOING | Dec 04, 2023 | 3:34 pm | | | 5 | |
| OUTGOING | Dec 04, 2023 | 3:29 pm | | | 1 | |
| OUTGOING | Dec 04, 2023 | 3:11 pm | | | 9 | |
| OUTGOING | Dec 04, 2023 | 3:11 pm | | | 1 | |
| OUTGOING | Dec 04, 2023 | 3:10 pm | | | 1 | |
| OUTGOING | Dec 04, 2023 | 2:57 pm | | | 1 | |
| ✷ INCOMING | Dec 04, 2023 | 2:49 pm | 847.514.6054 | Incoming | 7 | MONDAY |
| INCOMING | Dec 04, 2023 | 2:37 pm | | | 6 | |
| INCOMING | Dec 04, 2023 | 2:33 pm | | | 3 | |
| OUTGOING | Dec 04, 2023 | 2:30 pm | | | 1 | |
| INCOMING | Dec 04, 2023 | 2:18 pm | | | 7 | |
| OUTGOING | Dec 04, 2023 | 2:17 pm | | | 1 | |
| INCOMING | Dec 04, 2023 | 1:49 pm | | | 13 | |
| INCOMING | Dec 04, 2023 | 1:31 pm | | | 17 | |
| OUTGOING | Dec 04, 2023 | 1:23 pm | | | 2 | |
| OUTGOING | Dec 04, 2023 | 1:22 pm | | | 1 | |
| OUTGOING | Dec 04, 2023 | 12:32 pm | | | 12 | |
| INCOMING | Dec 04, 2023 | 10:55 am | | | 1 | |
| INCOMING | Dec 04, 2023 | 10:49 am | | | 7 | |
| OUTGOING | Dec 04, 2023 | 10:39 am | | | 1 | |
| OUTGOING | Dec 04, 2023 | 10:02 am | | | 11 | |
| OUTGOING | Dec 04, 2023 | 9:20 am | | | 37 | |
| OUTGOING | Dec 04, 2023 | 9:06 am | | | 1 | |
| INCOMING | Dec 04, 2023 | 9:04 am | | | 2 | |
| INCOMING | Dec 04, 2023 | 8:56 am | | | 3 | |
| INCOMING | Dec 04, 2023 | 8:44 am | | | 13 | |
| INCOMING | Dec 04, 2023 | 8:41 am | | | 2 | |
| OUTGOING | Dec 04, 2023 | 8:36 am | | | 1 | |
| OUTGOING | Dec 04, 2023 | 8:24 am | | | 13 | |
| OUTGOING | Dec 04, 2023 | 8:23 am | | | 1 | |

L150_0041

| | | | |
|---|---|---|---|
| OUTGOING | Dec 04, 2023 | 7:57 am | 27 |
| INCOMING | Dec 03, 2023 | 4:09 pm | 1 |
| OUTGOING | Dec 03, 2023 | 3:57 pm | 1 |
| OUTGOING | Dec 03, 2023 | 3:34 pm | 7 |
| OUTGOING | Dec 02, 2023 | 3:59 pm | 2 |
| INCOMING | Dec 02, 2023 | 3:45 pm | 1 |
| OUTGOING | Dec 02, 2023 | 10:52 am | 3 |
| INCOMING | Dec 02, 2023 | 8:49 am | 8 |
| INCOMING | Dec 01, 2023 | 4:11 pm | 7 |
| INCOMING | Dec 01, 2023 | 2:45 pm | 2 |
| OUTGOING | Dec 01, 2023 | 1:55 pm | 2 |
| OUTGOING | Dec 01, 2023 | 1:44 pm | 10 |
| INCOMING | Dec 01, 2023 | 1:35 pm | 4 |
| OUTGOING | Dec 01, 2023 | 1:30 pm | 1 |
| OUTGOING | Dec 01, 2023 | 1:26 pm | 4 |
| INCOMING | Dec 01, 2023 | 1:08 pm | 7 |
| OUTGOING | Dec 01, 2023 | 12:40 pm | 5 |
| OUTGOING | Dec 01, 2023 | 12:30 pm | 10 |
| OUTGOING | Dec 01, 2023 | 12:27 pm | 3 |
| OUTGOING | Dec 01, 2023 | 12:13 pm | 14 |
| OUTGOING | Dec 01, 2023 | 11:40 am | 1 |
| INCOMING | Dec 01, 2023 | 11:12 am | 6 |
| INCOMING | Dec 01, 2023 | 10:52 am | 2 |
| OUTGOING | Dec 01, 2023 | 10:24 am | 4 |
| OUTGOING | Dec 01, 2023 | 9:52 am | 2 |
| OUTGOING | Dec 01, 2023 | 9:26 am | 4 |
| OUTGOING | Dec 01, 2023 | 9:23 am | 3 |
| INCOMING | Nov 30, 2023 | 4:44 pm | 13 |
| OUTGOING | Nov 30, 2023 | 3:58 pm | 2 |
| INCOMING | Nov 30, 2023 | 1:28 pm | 6 |

L150_0042

| INCOMING | Nov 30, 2023 | 1:12 pm | 5 |
| INCOMING | Nov 30, 2023 | 12:44 pm | 4 |
| INCOMING | Nov 30, 2023 | 11:26 am | 12 |
| OUTGOING | Nov 30, 2023 | 11:08 am | 1 |
| OUTGOING | Nov 30, 2023 | 10:52 am | 1 |
| INCOMING | Nov 30, 2023 | 10:36 am | 15 |
| INCOMING | Nov 30, 2023 | 10:22 am | 4 |
| OUTGOING | Nov 30, 2023 | 9:58 am | 10 |
| OUTGOING | Nov 30, 2023 | 9:55 am | 1 |
| INCOMING | Nov 30, 2023 | 9:49 am | 5 |
| OUTGOING | Nov 30, 2023 | 9:49 am | 1 |
| INCOMING | Nov 30, 2023 | 8:42 am | 4 |
| OUTGOING | Nov 30, 2023 | 8:12 am | 4 |
| OUTGOING | Nov 30, 2023 | 8:10 am | 1 |
| OUTGOING | Nov 30, 2023 | 7:45 am | 22 |
| OUTGOING | Nov 30, 2023 | 6:21 am | 1 |
| OUTGOING | Nov 30, 2023 | 6:20 am | 1 |
| OUTGOING | Nov 29, 2023 | 4:57 pm | 6 |
| OUTGOING | Nov 29, 2023 | 4:20 pm | 6 |
| OUTGOING | Nov 29, 2023 | 4:17 pm | 1 |
| OUTGOING | Nov 29, 2023 | 4:13 pm | 4 |
| OUTGOING | Nov 29, 2023 | 4:07 pm | 4 |
| INCOMING | Nov 29, 2023 | 3:35 pm | 8 |
| INCOMING | Nov 29, 2023 | 2:52 pm | 7 |
| OUTGOING | Nov 29, 2023 | 2:47 pm | 1 |
| OUTGOING | Nov 29, 2023 | 2:33 pm | 15 |
| OUTGOING | Nov 29, 2023 | 2:22 pm | 3 |
| INCOMING | Nov 29, 2023 | 2:14 pm | 9 |
| INCOMING | Nov 29, 2023 | 2:06 pm | 9 |
| INCOMING | Nov 29, 2023 | 1:58 pm | 3 |

| | | | |
|---|---|---|---|
| OUTGOING | Nov 29, 2023 | 1:57 pm | 1 |
| INCOMING | Nov 29, 2023 | 1:54 pm | 3 |
| OUTGOING | Nov 29, 2023 | 1:47 pm | 2 |
| OUTGOING | Nov 29, 2023 | 1:33 pm | 14 |
| OUTGOING | Nov 29, 2023 | 12:52 pm | 28 |
| INCOMING | Nov 29, 2023 | 12:41 pm | 10 |
| INCOMING | Nov 29, 2023 | 11:48 am | 7 |
| OUTGOING | Nov 29, 2023 | 11:32 am | 4 |
| INCOMING | Nov 29, 2023 | 11:26 am | 1 |
| OUTGOING | Nov 29, 2023 | 11:08 am | 5 |
| OUTGOING | Nov 29, 2023 | 10:54 am | 14 |
| OUTGOING | Nov 29, 2023 | 10:49 am | 5 |
| OUTGOING | Nov 29, 2023 | 10:25 am | 2 |
| OUTGOING | Nov 29, 2023 | 10:23 am | 2 |
| OUTGOING | Nov 29, 2023 | 10:21 am | 3 |
| INCOMING | Nov 29, 2023 | 9:41 am | 40 |
| OUTGOING | Nov 29, 2023 | 8:59 am | 44 |
| INCOMING | Nov 29, 2023 | 8:23 am | 8 |
| OUTGOING | Nov 29, 2023 | 6:54 am | 16 |
| INCOMING | Nov 28, 2023 | 9:26 pm | 12 |
| OUTGOING | Nov 28, 2023 | 9:09 pm | 18 |
| INCOMING | Nov 28, 2023 | 5:44 pm | 12 |
| OUTGOING | Nov 28, 2023 | 5:24 pm | 1 |
| OUTGOING | Nov 28, 2023 | 4:24 pm | 3 |
| INCOMING | Nov 28, 2023 | 3:44 pm | 3 |
| OUTGOING | Nov 28, 2023 | 3:35 pm | 1 |
| INCOMING | Nov 28, 2023 | 3:05 pm | 8 |
| INCOMING | Nov 28, 2023 | 3:02 pm | 3 |
| OUTGOING | Nov 28, 2023 | 3:02 pm | 1 |
| INCOMING | Nov 28, 2023 | 2:14 pm | 8 |

L150_0044

| | | | |
|---|---|---|---|
| OUTGOING | Nov 28, 2023 | 2:13 pm | 1 |
| INCOMING | Nov 28, 2023 | 2:06 pm | 3 |
| OUTGOING | Nov 28, 2023 | 1:36 pm | 6 |
| OUTGOING | Nov 28, 2023 | 1:09 pm | 2 |
| INCOMING | Nov 28, 2023 | 12:56 pm | 1 |
| INCOMING | Nov 28, 2023 | 12:02 pm | 2 |
| OUTGOING | Nov 28, 2023 | 11:55 am | 7 |
| INCOMING | Nov 28, 2023 | 9:58 am | 4 |
| INCOMING | Nov 28, 2023 | 9:43 am | 1 |
| INCOMING | Nov 28, 2023 | 9:11 am | 23 |
| INCOMING | Nov 28, 2023 | 9:05 am | 2 |
| INCOMING | Nov 28, 2023 | 8:47 am | 2 |
| OUTGOING | Nov 28, 2023 | 8:20 am | 2 |
| OUTGOING | Nov 28, 2023 | 7:20 am | 1 |
| INCOMING | Nov 28, 2023 | 6:43 am | 5 |
| OUTGOING | Nov 27, 2023 | 4:55 pm | 3 |
| OUTGOING | Nov 27, 2023 | 4:37 pm | 15 |
| OUTGOING | Nov 27, 2023 | 3:52 pm | 10 |
| INCOMING | Nov 27, 2023 | 3:50 pm | 1 |
| OUTGOING | Nov 27, 2023 | 3:35 pm | 1 |
| INCOMING | Nov 27, 2023 | 2:13 pm | 27 |
| OUTGOING | Nov 27, 2023 | 2:06 pm | 7 |
| INCOMING | Nov 27, 2023 | 2:05 pm | 1 |
| INCOMING | Nov 27, 2023 | 12:24 pm | 13 |
| OUTGOING | Nov 27, 2023 | 12:03 pm | 9 |
| OUTGOING | Nov 27, 2023 | 11:46 am | 2 |
| OUTGOING | Nov 27, 2023 | 11:29 am | 15 |
| INCOMING | Nov 27, 2023 | 11:11 am | 14 |
| OUTGOING | Nov 27, 2023 | 11:07 am | 1 |
| OUTGOING | Nov 27, 2023 | 11:05 am | 1 |

# TAB 2

**From:** Drinski, Craig <CDrinski@republicservices.com>
**Sent:** Tuesday, December 19, 2023 6:09 PM
**To:** Anthony Deliberto <ADeliberto@local150.org>; Schroeder, Tony <TSchroeder2@republicservices.com>; McGarry, Joshua <JMcgarry@republicservices.com>
**Cc:** John Sorensen <JSorensen@local150.org>; Owens, Krista <KOwens@republicservices.com>; Steve Davidson <SDavidson@local150.org>
**Subject:** RE: 2023-12-1 Thomas, Motyka, & Claussen IUOE Local 150 Discharge Grievances

Tony,

As I indicted, the Union was untimely in requesting the Step 2 meeting by its email on Friday, December 8, 2023, under the plain and mandatory language of Article 4.3 of the CBA.  As such, in the event you desire to arbitrate this matter, the Company will be submitting the issue of arbitrability to the Arbitrator.  If you seek to submit the grievance to Arbitration, please request to FMCS for a panel as required by Article 4.5.

Thank you,

**Craig Drinski**
**Operations Manager**

2266 E 500 S
Brook, IN 47922
**e**  cdrinski@republicservices.com
**o**  219-224-4233
**c**  219-819-2901
**f**  219-224-4217
**w**  RepublicServices.com



Sustainability in Acti

**From:** Anthony Deliberto <ADeliberto@local150.org>
**Sent:** Wednesday, December 13, 2023 5:04 PM
**To:** Drinski, Craig <CDrinski@republicservices.com>; Schroeder, Tony <TSchroeder2@republicservices.com>; McGarry,

1

L150_0046

Joshua <JMcgarry@republicservices.com>
Cc: John Sorensen <JSorensen@local150.org>; Owens, Krista <KOwens@republicservices.com>; Steve Davidson <SDavidson@local150.org>
Subject: RE: 2023-12-1 Thomas, Motyka, & Claussen IUOE Local 150 Discharge Grievances

---

**This Message Is From an External Sender**
This message came from outside your organization.

Report Suspicious

---

Craig,

If the company refuses to engage in a meeting then the Union herby demands arbitration over the discharge of Dale Claussen, Allen Thomas, and Shaun Motyka.

---

**From:** Drinski, Craig <CDrinski@republicservices.com>
**Sent:** Tuesday, December 12, 2023 6:23 PM
**To:** Anthony Deliberto <ADeliberto@local150.org>; Schroeder, Tony <TSchroeder2@republicservices.com>; McGarry, Joshua <JMcgarry@republicservices.com>
**Cc:** John Sorensen <JSorensen@local150.org>; Owens, Krista <KOwens@republicservices.com>
**Subject:** RE: 2023-12-1 Thomas, Motyka, & Claussen IUOE Local 150 Discharge Grievances

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Tony,

Please disregard the request for availability for the Step 2 meeting after reviewing of the CBA, per section 4.3, the union did not meet the time requirements. Regardless, the Company does not intend to change its stance on the three terminations in question. As to your other email sent today 12/12 "request for information", the company is reviewing this request and will get back to you.

Thanks,

**Craig Drinski**
**Operations Manager**

2266 E 500 S
Brook, IN 47922
**e** cdrinski@republicservices.com
**o** 219-224-4233
**c** 219-819-2901
**f** 219-224-4217
**w** RepublicServices.com

L150_0047

**REPUBLIC SERVICES**

Sustainability in Acti

---

**From:** Anthony Deliberto <ADeliberto@local150.org>
**Sent:** Tuesday, December 12, 2023 3:28 PM
**To:** Drinski, Craig <CDrinski@republicservices.com>; Schroeder, Tony <TSchroeder2@republicservices.com>; McGarry, Joshua <JMcgarry@republicservices.com>
**Cc:** John Sorensen <JSorensen@local150.org>; Owens, Krista <KOwens@republicservices.com>
**Subject:** Re: 2023-12-1 Thomas, Motyka, & Claussen IUOE Local 150 Discharge Grievances

---

**This Message Is From an External Sender**
This message came from outside your organization.

[Report Suspicious]

We are not available Thursday or Friday. Are you available early next week?

Get Outlook for Android

**From:** Drinski, Craig <CDrinski@republicservices.com>
**Sent:** Tuesday, December 12, 2023 3:08:14 PM
**To:** Anthony Deliberto <ADeliberto@local150.org>; Schroeder, Tony <TSchroeder2@republicservices.com>; McGarry, Joshua <JMcgarry@republicservices.com>
**Cc:** John Sorensen <JSorensen@local150.org>; Owens, Krista <KOwens@republicservices.com>
**Subject:** RE: 2023-12-1 Thomas, Motyka, & Claussen IUOE Local 150 Discharge Grievances

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Tony,

Do you have availability on Thursday or Friday?

Thanks,

**Craig Drinski**
Operations Manager

2266 E 500 S
Brook, IN 47922
**e** cdrinski@republicservices.com
**o** 219-224-4233
**c** 219-819-2901
**f** 219-224-4217
**w** RepublicServices.com

3

L150_0048

**REPUBLIC SERVICES**

Sustainability in Acti...

---

**From:** Anthony Deliberto <ADeliberto@local150.org>
**Sent:** Friday, December 8, 2023 4:13 PM
**To:** Drinski, Craig <CDrinski@republicservices.com>; Schroeder, Tony <TSchroeder2@republicservices.com>; McGarry, Joshua <JMcgarry@republicservices.com>
**Cc:** John Sorensen <JSorensen@local150.org>; Owens, Krista <KOwens@republicservices.com>
**Subject:** 2023-12-1 Thomas, Motyka, & Claussen IUOE Local 150 Discharge Grievances

| **This Message Is From an External Sender** | Report Suspicious |
|---|---|
| This message came from outside your organization. | |

Craig,

Please see the attached grievances for Dale Claussen, Allen Thomas, and Shaun Motyka.
We will need to set up a step 2 meeting at our Merrillville office.

Tony

---

**From:** Oxley, Starr <SOxley@republicservices.com>
**Sent:** Tuesday, December 5, 2023 11:17 AM
**To:** Anthony Deliberto <ADeliberto@local150.org>
**Cc:** Drinski, Craig <CDrinski@republicservices.com>; McGarry, Joshua <JMcgarry@republicservices.com>
**Subject:** 2023-12-1 Thomas, Motyka, & Claussen Misconduct

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning,

Please see the attached disciplinary actions for Allen Thomas, Shaun Motyka, and Dalen Claussen.

Thank you,

**Starr Oxley**
Operations Clerk

2266 E. 500 S.
Brook, IN 47922
**e** soxley@republicservices.com

4

L150_0049

**o** 219-224-4226
**c** 219-713-1297
**f** 219-224-4217
**w** RepublicServices.com



Sustainability in Acti

L150_0050

# TAB 3

**Anthony Deliberto**

| | |
|---|---|
| **From:** | Oxley, Starr <SOxley@republicservices.com> |
| **Sent:** | Tuesday, April 14, 2020 6:29 AM |
| **To:** | Anthony Deliberto; John Sorensen |
| **Cc:** | McGarry, Joshua; Kelch, Marvin; Brazil, Christina |
| **Subject:** | NCLF Disciplinary Actions / Orlando & Green |
| **Attachments:** | 2020-4-10 Orlando Termination Attendance.pdf; 2020-4-13 Green Termination Attendance.pdf |

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Good morning,

Attached you will find disciplinary actions for Nathan Orlando and Adam Green.

Thank you,

**Starr Oxley**
OperationsClerk/Employee Point of Contact

2266 E 500 S
Brook, IN 47922
e  SOxley@republicservices.com
o  219-224-4226  c  219-713-1297
f  219-224-4217  w  RepublicServices.com



**REPUBLIC**
SERVICES

We'll handle it from here.

**Union Ex. 20**

L150_0051

**REPUBLIC** SERVICES

**EMPLOYEE CORRECTIVE ACTION FORM**

| Employee's Name | Date of Occurrence | Today's Date |
|---|---|---|
| **Nathan Orlando** | **Numerous** | **4/10/2020** |

| Employee I.D. | Company Location | Division #/Department | Position/Job Title |
|---|---|---|---|
| | **Newton County Landfill** | **4718** | **Heavy Equipment Operator** |

The following corrective action has been taken and shall be made part of the official record of this employee.

The Company views progressive corrective action and the issuance of written corrective action as a constructive method of communicating to employees the importance of meeting the performance standards established by the Company. The Company believes that adherence to Company policies, practices, procedures and exemplification of a positive work ethic by all employees is essential in creating a work environment that is satisfying, safe and productive.

The Company believes that progressive corrective action is a mutually beneficial process for both employee and employer. It is the Company's intention to utilize this process, whenever practical, to identify deficiencies in job performance and provide direction to employees for taking corrective measures.

Continued violation of Company policies could result in additional corrective action, leading up to and/or including termination of employment. However, the Company recognizes there are certain offenses that, if committed by an employee, are serious enough to justify immediate termination, thereby, superseding the progressive corrective action process.

**NATURE OF ISSUE**

**Absence/Tardiness**
- [ ] Abuse of lunch/break
- [X] Excessive absence/tardiness
- [X] Unexcused absence/tardiness
- [ ] Leaving/clearing without supv. permission
- [ ] Other: _____

**Job Performance Issues**
- [ ] Customer complaint(s)/loss of account
- [ ] Failure to follow instructions
- [ ] Failure to meet work standards
- [ ] Failure to properly complete required paperwork
- [ ] Housekeeping (work area/assigned vehicle)
- [ ] Unsatisfactory job performance
- [ ] Other: _____

**Safety**
- [ ] Failure to maintain required license/loss of license
- [ ] Failure to report an accident
- [ ] Failure to report an injury
- [ ] Failure to wear personal safety equipment
- [ ] Preventable Accident/Unsafe Act
- [ ] Unauthorized passengers
- [ ] Violation of company Drug and Alcohol Policy
- [ ] Violation of driving rules/procedures
- [ ] Violation of safety rules/procedures
- [ ] Other: _____

**Misconduct**
- [ ] Carelessness
- [ ] Destruction of company property
- [ ] Dishonesty
- [ ] Equipment abuse
- [ ] Falsification of documents/fraud
- [ ] Fighting
- [ ] Improper time reporting
- [ ] Insubordination
- [ ] Personal business in competition with RS
- [ ] Stealing/Salvaging
- [ ] Other: _____

**Details**

[ ] Verbal  [ ] Written  [ ] Suspension  [X] Termination

1. Description of issue:

Nathan accumulated 12.5 points per the Attendance Policy. Dates of attendance points include: 08/22, 09/16, 09/17, 09/18, 09/27, 11/06, 12/27, 12/30, 01/04, 01/15, 01/22, 01/28, 04/03, 04/09, and 3 points for a NC/NS on 04/10.

2. The following standards must be met:

Per the Attendance Policy, "The Company expects good attendance and punctuality on the part of all of its employees. Employees are responsible for being on time for each scheduled work shift. Being "on time" is defined as punched in via the Time Clock (where available at the scheduled start time (not walking into the office/yard, getting a coffee, etc. at the start time). This includes returning from breaks and/or lunch on time".

3. Immediate and sustained action required:

Termination.

**Failure to correct this behavior and/or further violation of Company policy will result in additional corrective action up to and including termination of employment.**

| My signature below acknowledges that I have read and received a copy of this form. | | |
|---|---|---|
| | _Supervisor Signature_ | 04-13-2020 _Date_ |
| | _Approval Signature (Next Level Manager)_ | 4-13-2020 _Date_ |
| Employee's Signature | Date | |
| | Approval Signature (Next Level Manager) | Date |

| Copy Distribution and Review | Employee File [X] | Employee [X] | HR [X] | Revised 07/15/11 |

L150_0052

**REPUBLIC** SERVICES

**EMPLOYEE CORRECTIVE ACTION FORM**

| Employee's Name | | | Date of Occurrence | Today's Date |
|---|---|---|---|---|
| **Adam Green** | | | **Numerous** | **4/13/2020** |
| Employee I D | Company Location | Division #/Department | Position/Job Title | |
| | **Newton County Landfill** | **4718** | **Heavy Equipment Technician** | |

**The following corrective action has been taken and shall be made part of the official record of this employee.**

The Company views progressive corrective action and the issuance of written corrective action as a constructive method of communicating to employees the importance of meeting the performance standards established by the Company. The Company believes that adherence to Company policies, practices, procedures and exemplification of a positive work ethic by all employees is essential in creating a work environment that is satisfying, safe and productive

The Company believes that progressive corrective action is a mutually beneficial process for both employee and employer. It is the Company's intention to utilize this process, whenever practical, to identify deficiencies in job performance and provide direction to employees for taking corrective measures.

Continued violation of Company policies could result in additional corrective action, leading up to and/or including termination of employment. However, the Company recognizes there are certain offenses that, if committed by an employee, are serious enough to justify immediate termination, thereby, superseding the progressive corrective action process

**NATURE OF ISSUE**

**Absence/Tardiness**

| | |
|---|---|
| ☐ | Abuse of lunch/break |
| ☒ | Excessive absence/tardiness |
| ☒ | Unexcused absence/tardiness |
| ☐ | Leaving/clearing without supv. permission |
| ☐ | Other: _____ |

**Job Performance Issues**

| | |
|---|---|
| ☐ | Customer complaint(s)/loss of account |
| ☐ | Failure to follow instructions |
| ☐ | Failure to meet work standards |
| ☐ | Failure to properly complete required paperwork |
| ☐ | Housekeeping (work area/assigned vehicle) |
| ☐ | Unsatisfactory job performance |
| ☐ | Other _____ |

**Safety**

| | |
|---|---|
| ☐ | Failure to maintain required license/loss of license |
| ☐ | Failure to report an accident |
| ☐ | Failure to report an injury |
| ☐ | Failure to wear personal safety equipment |
| ☐ | Preventable Accident/Unsafe Act |
| ☐ | Unauthorized passengers |
| ☐ | Violation of company Drug and Alcohol Policy |
| ☐ | Violation of driving rules/procedures |
| ☐ | Violation of safety rules/procedures |
| ☐ | Other: _____ |

**Misconduct**

| | |
|---|---|
| ☐ | Carelessness |
| ☐ | Destruction of company property |
| ☐ | Dishonesty |
| ☐ | Equipment abuse |
| ☐ | Falsification of documents/fraud |
| ☐ | Fighting |
| ☐ | Improper time reporting |
| ☐ | Insubordination |
| ☐ | Personal business in competition with RS |
| ☐ | Stealing/Salvaging |
| ☐ | Other _____ |

**Details**

☐ Verbal   ☐ Written   ☐ Suspension   ☒ Termination

1. Description of issue:

Adam accumulated 10 points per the Attendance Policy. Dates of attendance points include: 06/09, 06/24, 07/08, 07/29, 08/16, 10/4, 10/05, 10/26, 11/11, 02/03, 02/20, and 04/13.

2. The following standards must be met:

Per the Attendance Policy, "The Company expects good attendance and punctuality on the part of all of its employees. Employees are responsible for being on time for each scheduled work shift. Being "on time" is defined as punched in via the Time Clock (where available) at the scheduled start time (not walking into the office/yard, getting a coffee, etc. at the start time). This includes returning from breaks and/or lunch on time".

3. Immediate and sustained action required:

Termination.

*[handwritten: step 2 phone meeting 4-21-2020 2pm]*   *[handwritten: 2/3 could not get into newkedy 2/20 Fever sicle]*

**Failure to correct this behavior and/or further violation of Company policy will result in additional corrective action up to and including termination of employment.**

| My signature below acknowledges that I have read and received a copy of this form. | | |
|---|---|---|
| | Supervisor Signature | *4-13-2020* Date |
| | Approval Signature (Next Level Manager) | Date |
| Employee's Signature          Date | Approval Signature (Next Level Manager) | Date |
| Copy Distribution and Review   Employee File ☒   Employee ☒ | HR ☒ | |

Revised 07/15/11

L150_0053

# INTERNATIONAL UNION OF OPERATING ENGINEERS

LOCAL 150, 6200 JOLIET ROAD, COUNTRYSIDE, ILLINOIS 60525
(708) 482-8800 · FAX (708) 588-1629



JAMES M. SWEENEY
PRESIDENT – BUSINESS MANAGER

Use Additional Sheets if Necessary

## GRIEVANCE

| Grievant's Name: Union, Adam Green | Date Filed: 4-15-2020 |
|---|---|

### STEP ONE / STEP TWO (If Union Grievance)

**Date of Incident:** 4-14-2020 and On-going

**Article(s) & Section(s) of Contract Violated:** Newton County Landfill Partnership d/b/a/ Newton County Landfill
Article 2.2 (Work Rules)
Article 2.3 (Discipline & Discharge)
Any and all other Articles and Sections that apply

**Brief Statement of Facts:**

**Adam Green was issued 10 points and Terminated under a new attendance policy that is being grieved pursuant to a deferred ULP. The grievance challenges the company's ability to implement the new policy as well as its reasonableness.**

**Remedy Sought:**
Reinstatement Pending settlement discussions.
Any and All relief deemed just.

| Presented To: | Date: |
|---|---|
| Joshua McGarry | 4-15-2020 |
| Robert Klahs | |
| Christina Brazil | |

| Method: | Employee Signature |
|---|---|
| Emailed | *Adam Green* |
| JMcgarry@republicservices.com | |
| Rklahs@republicservices.com | |
| CBrazil@republicservices.com | |

| Location: | Representative's Signature: |
|---|---|
| 2266 East 500 South | |
| Brook, IN 47922 | |

### EMPLOYER'S RESPONSE

| Employer's Representative Signature: | Positions: |
|---|---|
| | |
| **Response Recipient:** | **Date:** |

**Anthony Deliberto**

| | |
|---|---|
| **From:** | Anthony Deliberto |
| **Sent:** | Wednesday, April 15, 2020 11:33 AM |
| **To:** | McGarry, Joshua; DDrenth@republicservices.com |
| **Cc:** | Brazil, Christina; John Sorensen |
| **Subject:** | Local 150 Adam Green  Discharge Grievance |
| **Attachments:** | Adam Green 10 Point Term Grievanve Local 150 4-15-2020.pdf |

Josh,

Please see the attached grievance for Adam Green. Since this is a termination we are required to meet within 5 days. Can you please have Adams's attendance records available including all green slips. Please let me know what dates you have available to meet.

Thank you,
Tony

1

L150_0055

# INTERNATIONAL UNION OF OPERATING ENGINEERS

LOCAL 150, 6200 JOLIET ROAD, COUNTRYSIDE, ILLINOIS 60525

(708) 482-8800 · FAX (708) 588-1629

JAMES M. SWEENEY
PRESIDENT – BUSINESS MANAGER



Use Additional Sheets if Necessary

## GRIEVANCE

| Grievant's Name: Union, Nathan Orlando | Date Filed: 4-15-2020 |
|---|---|

### STEP ONE / STEP TWO (If Union Grievance)

**Date of Incident:** 4-14-2020 and On-going

**Article(s) & Section(s) of Contract Violated:** Newton County Landfill Partnership d/b/a/ Newton County Landfill
Article 2.2 (Work Rules)
Article 2.3 (Discipline & Discharge)
Any and all other Articles and Sections that apply

**Brief Statement of Facts:**

Nathan was issued 12.5 points and Terminated under a new attendance policy that is being grieved pursuant to a deferred ULP. The grievance challenges the company's ability to implement the new policy as well as its reasonableness.

**Remedy Sought:**
Reinstatement Pending settlement discussions.
Any and All relief deemed just.

| Presented To: Joshua McGarry Robert Klahs Christina Brazil | Date: 4-15-2020 |
|---|---|
| Method: Emailed JMcgarry@republicservices.com Rklahs@republicservices.com CBrazil@republicservices.com | Employee Signature *Nathan Orlando* |
| Location: 2266 East 500 South Brook, IN 47922 | Representative's Signature: |

### EMPLOYER'S RESPONSE

| Employer's Representative Signature: | Positions: |
|---|---|
| Response Recipient: | Date: |

**Anthony Deliberto**

| | |
|---|---|
| **From:** | Anthony Deliberto |
| **Sent:** | Wednesday, April 15, 2020 11:33 AM |
| **To:** | McGarry, Joshua; rklahs@republicservices.com; John Sorensen |
| **Cc:** | Brazil, Christina; John Sorensen |
| **Subject:** | Local 150 Nathan Orlando Discharge Grievance |
| **Attachments:** | Nathan Orlando 12.5 Point Term Grievance 4-15-2020.pdf |

Josh,

Please see the attached grievance for Nathan Orlando. Since this is a termination we are required to meet within 5 days. Can you please have Nathan's attendance records available including all green slips for the meeting. Please let me know what dates you have available to meet.

Thank you,
Tony

L150_0057

**Anthony Deliberto**

**Attorney-client privileged**

**From:** Anthony Deliberto <ADeliberto@local150.org>
**Sent:** Friday, May 1, 2020, 2:25 PM
**To:** McGarry, Joshua
**Cc:** Brazil, Christina; John Sorensen
**Subject:** RE: Green/Orlando - Step two meeting follow up

Josh,

We disagree with the response related to Mr. Orlando and Mr. Green and the Union herby demands arbitration regarding their termination.

Tony

1

L150_0058

**From:** McGarry, Joshua <JMcgarry@republicservices.com>
**Sent:** Wednesday, April 29, 2020 5:01 PM
**To:** Anthony Deliberto <ADeliberto@local150.org>
**Cc:** Brazil, Christina <CBrazil@republicservices.com>
**Subject:** Green/Orlando - Step two meeting follow up

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Tony,

We completed the Step Two Meeting on April 21st regarding Mr. Adam Green and Mr. Nathan Orlando and I have included in this email the Company's response. During our meeting it was brought up by Mr. Orlando additional information would be provided. As of this email the company has not received any additional information.  Therefore after careful consideration and all afforded information, we hereby deny the grievances for Mr. Adam Green and Mr. Nathan Orlando and uphold the termination of each.

Additionally per the call it was agreed, at your request and per your email, Robert Allen would move to arbitration with the group sent on April 13th, 2020.

Sincerely,

Josh

**Josh McGarry**
General Manager
Chicago/NWI Post Collections

2400 S. Loomis Street
Chicago,IL 60608
e  jmcgarry@republicservices.com
o  773-299-6282  c  847-514-6054
w  RepublicServices.com



We'll handle it from here.

L150_0059

# TAB 4

**IN THE MATTER OF THE ARBITRATION BETWEEN:**

| | | |
|---|---|---|
| **IUOE LOCAL 150, AFL-CIO** | ) | **ARBITRATOR:** RICHARD A. BALES |
| | ) | |
| **Union,** | ) | **FMCS CASE NO.** 241214-01985 |
| | ) | |
| **and** | ) | **ISSUES:** |
| | ) | PROCEDURAL ARBITRABILITY |
| **REPUBLIC SERVICES,** | ) | DALE CLAUSSEN TERMINATION |
| | ) | |
| **Employer.** | ) | **ARBITRATION DATES:** |
| | ) | AUGUST 23, 2024, DECEMBER 12, 2024, |
| | ) | DECEMBER 13, 2024 |
| | ) | |

---

## EMPLOYER'S POST-HEARING BRIEF

---

Richard A. Millisor, Esq. (0062883)
FISHER & PHILLIPS LLP
200 Public Square, Suite 4000
Cleveland, Ohio 44114
Telephone: 440-838-8800
Facsimile: 440-838-8805
Email: rmillisor@fisherphillips.com

*Counsel for the Employer*

I.    **ISSUES PRESENTED.**

1.   Is the Union estopped from arbitrating its grievance by Collective Bargaining Agreement Article 4.3, which procedurally required the Union to present the grievance at Step 2 "within twenty-four (24) hours after the time the Union is notified of the Company's [employment termination] action"?    *Stated otherwise: Is the grievance procedurally arbitrable?*

2.   If this matter is procedurally arbitrable, whether the Company had just cause for discharging Dale Claussen? If not, what is the remedy?

II.   **RELEVANT CONTRACT PROVISIONS and EMPLOYER HANDBOOK POLICIES.**

A.    **Two Different CBAs Apply: Mr. Claussen Accepts a Transfer from the Newton County Landfill (NC LF) to the Lake County C & D Landfill.**

Due to attrition at Lake County C&D Landfill ("LC LF") and its preparation for closing at the end of 2023, the Company assigned replacement equipment operators from Newton County Landfill ("NC LF") to work at LC LF.  (Tr. p. 44, ll. 13-18). Dale Claussen, followed later in the year by NC LF co-workers, Shaun. Motyka and Allen Thomas, accepted a transfer to the LC LF in late January or early February 2023. (Tr. p. 217, ll. 14-25 [Drinski]; Tr. at p. 528, ll. 18-25, p. 529, ll. 1-6 [Claussen]).  NC LF is the largest landfill in Indiana, handling 10,000 tons daily.  (Tr. p. 39, ll. 5-10).  Approximately 400-500 trucks deliver the daily waste to the one (1) square mile NC Landfill site. (Id. at p. 44, l. 23 – p. 45, l. 1).  The LC LF is a much smaller, less regulated, construction and demolition LF that merely serviced between 15-40 trucks on a daily basis, and ordinarily required only two equipment operators to run the Landfill. (Tr. p. 42, ll. 13-21; p. 43, ll. 1-2;  pp. 441, 547, 657).

As the parties stipulated at hearing, while Mr. Claussen and the other transferred employees received direction from a post-collection Operations Manager, Tony Schroeder, at the LC LF, they remained under the terms of the Newton CBA for all purposes, except that they received the higher

2

L150_0061

wage rate, $34.55, in effect in the Lake County C&D LF CBA. (Tr. p. 211, l. 23 – p. 212, l. 13 [Millisor & Totonchi]; p. 216, ll. 1-9 [Drinski]).

**B.    Relevant Newton County Landfill (NC LF) CBA Provisions.**

Following are the key provisions in the NC LF CBA applicable to this Arbitration:

Article 2.3  Discipline and Discharge.  **The Company shall have the right to discipline, suspend or discharge any member of the bargaining unit but only for just cause**. . .. (emphasis added). (Jt. Ex. 1, at p. 4).

Article 4.3    Discharge Related Grievances.    Grievances incidental to termination or discharge shall proceed directly to Step 2. **A request for a Step 2 hearing incidental to discharge or termination *must* be presented within twenty-four (24) hours after the time the Union is notified of the Company's action** . . . . (emphasis added). (Id. at p. 5).

Article 4.6 Arbitrability. . . . . **The arbitrator shall be bound by the terms and provisions of the Agreement and shall have authority to consider only grievances presenting an arbitrable issue under this Agreement. The arbitrator shall have no authority to add to, subtract from, modify, or amend any of the provisions of this Agreement.** . . .

**If there is an issue as to whether a particular grievance or issue is arbitrable, the arbitrator shall rule on the issue of arbitrability before taking evidence on the merits of the underlying grievance dispute**. (emphasis added). (Id.).

Article 4.7  Time Limits. **Any time limit set forth above may be extended only by the mutual agreement of the parties**. (emphasis added). (Id. at p. 6).

Article 7.7  Lunch Period. Each employee must take a lunch period of one-half (1/2) hour daily, without pay. … (Id.).

Article 7.15 TIME CARD CERTIFICATION
In order to ensure the accuracy of employee time cards, all employees will, for each pay period, review the electronic punch report provided to them by the Company, and electronically attest to, then complete, sign, and return the Company's Time Card Certification, which includes the meal period acknowledgment or the Time Card Correction Request. (Id. at p. 9).

Article 14.11 Technology. The parties agree and understand that current and future technology will be needed to meet customer, operational and competitive demands. As a result, the parties further agree that the Company may, at its discretion, install into its vehicles or facilities, institute and implement any technological observation or other management tool system not involving live video or audio monitoring (in vehicles) that it deems appropriate in furtherance of its business. The Company may use any and all data

collected through the use of technology or equipment installed pursuant to this section for lawful purposes. Such data will be used for training, coaching, and may be considered along with other physical, written, and/or other evidence in conducting and resolving investigations only in cases of accidents, injuries, theft and/or serious safety violations. Disputes regarding the application of new technology to individual cases shall be resolved via the grievance and arbitration procedures of this agreement. The Company will give the Union at least thirty (30) calendar days advance notice before installing and implementing such technological changes. (Id. at p. 21).

**B.    Relevant Employee Handbook Provisions.**

Following are the key provisions in the Employee Handbook applicable to this Arbitration:

**C.** EMPLOYEE STANDARDS OF CONDUCT
. . .
Engaging in conduct the Company deems inappropriate may result in disciplinary action, up to and including termination.

Discipline may range from warnings to immediate discharge depending on the specific action, any prior disciplinary history, and other relevant considerations. To decide on the appropriate discipline, the Company may consider the seriousness of the action, discipline the Company has used for similar actions by other employees, how the action affects customers and other considerations.

The following is a partial list of actions that may result in disciplinary action and, depending on the severity, may be grounds for immediate termination.

> \*\*\*
> o   Defrauding the Company in any manner, including the misuse, abuse or unauthorized use of Company property;
>
> \*\*\*
> o   Improper accounting or representation of hours worked;
>
> \*\*\*
> o   Misuse, sabotage, destruction, tampering, salvaging or unauthorized removal of Company, customer or another person's property;
>
> \*\*\*
> o   Dishonesty regarding any aspect of your employment or Company business, including falsifying any Company record or document or making misrepresentations to the Company (including the omission of relevant, critical information)
>
> R.   Disciplinary Procedures

4

L150_0063

. . .

> . . . Discipline may include informal, verbal discussions or reprimands, which may be confirmed in writing, written warnings, suspensions without pay, or termination of employment. . . .
>
> The discipline given will depend upon the specific issue, policy violation or behavior; any prior disciplinary history; and other relevant circumstances. Some situations are so serious that immediate suspension or termination may be appropriate.

Mr. Claussen admitted he received a copy of the Company's Employee Handbook at a training session. (Tr. p. 634, l. 25 – p. 635, l. 22 [Claussen]).  On March 18, 2019, Mr. Claussen signed an employee handbook training attendance roster and confirmed:

> I have received instructions on the Employee Handbook on this date. I have had the opportunity to ask questions and receive answers on the content of the training presented by the company. I understand the training and agree to abide by the standards presented therein.

(Id.; & Co. Ex. 12). Mr. Claussen also signed an acknowledgement of the Employee Handbook that read:

> I have received a copy of the Republic Services Employee Handbook. I understand and agree that it is my responsibility to read and understand the handbook and comply with the policies and standards stated or summarized therein. I also understand that I am required to comply with other Company policies that are posted at my work location, available on the Company's intranet, and/or available from Human Resources.

(Co. Ex. 16).  At the hearing, Mr. Claussen stated he read the foregoing acknowledgment before signing it (Tr. p. 636, ll. 22-23) and agreed he had been placed on notice through the Employee Handbook that misconduct could result in the Company immediately terminating his employment. (Id. at p. 637, l. 23 – p. 638, l. 1).

## I.   Issue 1:  The Union Did Not Timely Request a Step 2 Hearing Within the CBA's Express and Mandatory Time Requirements, Procedurally Barring the Grievance.

No dispute exists that the Company issued the written discharge to Mr. Claussen on December 5, 2023, at a meeting attended by Mr. Claussen, NC LF Operations Manager, Craig

L150_0064

Drinski, as well as LC LF Operations Manager, Tony Schroeder, and Union Steward, Chrissie Strong. (Tr. p. 220, ll. 10-18 [Drinski]).  Likewise, no dispute exists that on Tuesday, December 5, 2023, at 11:17a.m., HR Generalist Starr Oxley emailed a copy of the termination form (Co. Ex. 5) to Local 150 business agent L.150 BA Deliberto, as required by Article 2.3 of the CBA. (Co. Ex. 1,[1] p. 4; Tr. p. 220, l. 19 – p. 221, l. 15 [Drinski]).  Mr. Deliberto did not email the Company a grievance for Mr. Claussen, and request a Step 2 hearing, until Friday, December 8, 2023, at 4:13p.m., (Co. Ex. 1, p. 4; Tr., p. 221, ll. 16-18 [Drinski]).  Specifically, not until the submission of the Grievance via this email – three days after notice of the discharge by the Company – did Mr. Deliberto request the step 2 hearing:

> Craig,
>
> Please see the attached grievances for Dale Claussen, Allen Thomas, and Shaun Motyka. We will need to set up a step 2 meeting at our Merrillville office.
>
> Tony

(Id.).

The Company could not have more clearly or timely raised and preserved the lack of procedural arbitrability by notifying Mr. Deliberto of its position in December 12, 2023 and December 19, 2023 emails responding to Mr. Deliberto's belated request for a Step 2 meeting:

> Tony,
>
> As I indicted, the Union was untimely in requesting the Step 2 meeting by its email on Friday, December 8, 2023, under the plain and mandatory language of Article 4.3 of the CBA. As such, in the event you desire to arbitrate this matter, the Company will be submitting the issue of arbitrability to the Arbitrator.

---

[1] The parties stipulated to the authenticity and admissibility of Co. Ex. 1. (Tr., p. 222, l. 17 – p. 223, l. 7 [Millisor & Totonchi]).

FP 53842044.3

L150_0065

(Co. Ex. 1, p. 1 & 2; Tr., p. 222, ll. 11-16 [Drinski]) (**"**A request for a Step 2 hearing incidental to discharge or termination **_must_** be presented within twenty-four (24) hours after the time the Union is notified of the Company's action . . . .. Jt. Ex., 1, Article 4.3, p. 5 [emphasis added])

Aware that its failure to meet the CBA's mandatory time requirements in cases of discharge is fatal to the Grievance under Articles 4.3, 4.6 and 4.7 of the CBA, the Union attempted to advance two arguments to save the Grievance: 1) that the Parties had not previously strictly enforced the unambiguous provisions of Article 4.3; and 2) Mr. Deliberto allegedly verbally requested a Step 2 hearing before receiving Mr. Claussen's "discharge action" from Ms. Starr (Co Ex. 1, p 4 ("Please see attached disciplinary actions for Allen Thomas, Shawn Motyka, and Dale Claussen.", email from Oxley Starr to Tony Deliberto on December 5, 2023), purportedly in a telephone conversation with Mr. McGarry on December 4, 2023.

First, the Arbitrator should not even consider the purported evidence of the Party's practice relating to 4.3 in view of the lack of ambiguity, and mandatory nature, of the language employed in CBA. (See, above, Articles 4.3, 4.6, 4.7, Jt. Ex. 1).  But, even if the Arbitrator considers the Union's exhibits and testimony relating to prior discharge grievances, this evidence only serves to underscore the Parties' strict adherence to the requirements imposed on both the Company and the Union in cases of discharge.  Rather than submitting evidence that the time requirements were routinely ignored by the Parties, the Union could only muster a single "discharge related grievance", filed on behalf of Adam Green and Nathan Orlando on April 15, 2020, to support its assertion that the Company did not require compliance with the express and mandatory 24-hour Step 2 request requirement contained Article 4.3. (Un. Ex. 20, pp. 4-7).  The 2020 Green and Orlando Grievance trail submitted by the Union, however, shows the Union requested a Step 2 hearing within one day of being notified of the discharge, albeit 5 hours and 4 minutes beyond the

L150_0066

24-hour requirement (making the Step 2 request on Wednesday, April 15, 2020 at 11:33 a.m., one day after receiving the discharge notices by email on Tuesday, April 14, 2020 at 6:29 a.m. (Id.)). Under these circumstances, the Company can hardly be criticized for deciding not to raise a procedural arbitrability defense to the Green and Orlando April 2020 grievances.  Here, unlike the April 2020 grievances – involving the Union's next day (morning) Step 2 meeting request following receipt of the Company's notice of the discharge actions the preceding morning – the Company promptly, expressly and appropriately raised and preserved the arbitrability issue arising out of the Union's failure to request a Step 2 Meeting until three days (76 hours, and 56 minutes) after receiving Mr. Claussen's "discharge action." (Co. Ex. 1, p. 2, 4, Co. Ex. 4).

Second, the Union advanced the testimony of Mr. Deliberto to show he verbally requested a timely Step 2 Meeting. (Tr. p. 787, ll. 5-25, p. 788, l. 1-18 [Deliberto]). According to Mr. Deliberto's testimony, Mr. McGarry initiated a telephone call on December 4, 2024, at 2:49 p.m., as a courtesy to advise Mr. Deliberto that the Company was going to discharge Mr. Claussen. (Id.) According to Mr. Deliberto, during this courtesy call, he advised Mr. McGarry he was going to grieve the discharge and "we need to have a meeting on each one of these individuals", which was characterized by the Union at the hearing, as a "verbal protest." ([Deliberto], (Tr. p. 788, l. 17-18, Un. Ex. 17).   As a threshold matter, the fact the Union did not raise this alleged conversation, *at any time*, prior to the arbitration hearing should not be overlooked. If Mr. Deliberto thought he had satisfied the strict requirements of Article 4.3 during an alleged call with Mr. McGarry pre-dating the discharge action, why did he not simply say so in response to emails from Mr. Drinski squarely placing this dispositive issue in front of him on December 13, 2023 and, again, on December 19, 2023?   When cross examined on this point, Mr. Deliberto could not provide an answer:

12/13/23 Email (Deliberto to Drinski responding to Company's challenge to arbitrability due to the Union's failure to timely request a Step 2 meeting):

L150_0067

Q: And you responded to that email the next day, approximately 22 and-a-half hours later on Wednesday, December 13th. Correct?

A: Correct.

\*\*\*

Q: There is no reference – there is no mention in this response the union's position regarding Mr. Drinski's statement that the grievance was untimely asserted or the Step 2 meeting was not requested. Correct?

A: Correct?

Q: There is no reference to a verbal conversation that you had with Mr. McGarry. Correct?

A: Correct. (Id. at p. 806, l. 6 – p. 807, l. 5 [Deliberto]).

<u>12/19/23 Email (Drinski to Deliberto responding to 12/13/23 Email and preserving arbitrability issue:</u>
Q: . . . in that communication Mr. Drinski again . . . indicat[ed] in specificity the company's arbitrability defense; is that correct?

A: That's Correct.

Q: Am I correct that . . . you never responded to Mr. Drinski's email on December 19th. Correct?

A: Me? No.

Q: To your knowledge do you know if anyone else responded?

A: Should have been one of our attorneys.

Q: But I've not seen any email communication from an attorney. Are you aware of any?

A: No.

\*\*\*

Q: So, Tony, despite knowing that the company's position at least since December 12th and then reiterated on December 19, 2023, was that the union had not timely requested – or filed a grievance or requested a Step 2 meeting that they were go[ing] challenge arbitrability in this case, as far as you know there has been no communication to the company as to the union – as to the position you made today regarding verbal communication. Correct?

A: Apparently, no.

(Id. at p. 807, l. 9 – p. 808, l. 16 [Deliberto]).    The Company respectfully submits that Mr. Deliberto's recounting of an alleged courtesy phone call by Mr. McGarry – *recounted and raised for the first time 12 months, and 5 days* after the alleged conversation (and over a year after the company timely raised its arbitrability defense) – without any corroborating notes, let alone any

email communication or correspondence, should not be permitted to trump the contemporaneous and time stamped records demonstrating the Union's failure to timely meet the mandatory requirement embedded in Article 4.3.

But, even if the Arbitrator were to credit Mr. Deliberto's testimony (and, for the above reasons, the Company respectfully submits the Arbitrator should not), it does not satisfy the strict requirements of Article 4.3 (Jt. Ex. 1, Article 4.3, A request for a Step 2 hearing incidental to discharge or termination *must* be *presented* within twenty-four (24) hours after the time the Union is notified of the Company's *action* . . . . (emphasis added)).  The Company did not even issue, i.e., sign and deliver, Mr. Claussen's discharge until December 5, 2025. (See Co. Ex. 4, and handwritten signatures of /s/ *Craig Drinski* and /s/ *Josh McGarry* and next to handwritten dates "*12-5-23*" and "*12/5/23*", respectively).  As the Union's own Orlando and Green 2020 grievance chain demonstrates, the Union submits grievances, along with timely *presenting* requests for Step 2 meetings, based on, and after receiving, the actual disciplinary *action* taken by the Company in accordance with the language of Article 4.3. (Compare, Un. Ex. 20 to Co. Ex. 1, each containing emailed Grievances accompanied by Step 2 meeting requests, in response to earlier emailed discharge actions by the Company).  Last, neither Mr. Deliberto, nor any other Union witness, testified that the Company agreed to waive the requirements contained in Article 4.3. See, Article 4.7 ("Any time limit set forth above may be extended only by the mutual agreement of the parties.").

Given the unambiguous and mandatory language the Parties have expressly negotiated relating to the expeditious handling of discharge grievances, the Company respectfully submits the Union failed to timely request a Step 2 meeting and, for this reason alone, the Grievance should be denied.

FP 53842044.3

L150_0069

II.    **Issue 2:  The Company Had Just Cause to Discharge Mr. Claussen Based on Three Separate Grounds, Each of Which Justified His Discharge.**

As testimony by Mr. Claussen, and the Union's own witnesses, establish, the Company had just cause to discharge Mr. Claussen for three independent reasons, any one of which was sufficient to justify his discharge: (1) Mr. Claussen chose to steal a company safe for his own personal use; (2) Mr. Claussen aided another employe in stealing a Company air hose, and then lied about it when questioned during the Company's investigation; and (3) Mr. Claussen took advantage of his independent work environment to receive pay for doing no work for scores of hours despite knowing work needed to be completed, and having his work scheduled expanded, to close the C&D LF – all memorialized as the basis for his just cause discharge. (Co. Ex. 4).

A.    **Mr. Claussen Stole a Company Safe.**

When asked whether he recalled talking with management about removing a Company safe prior to removing it from the LC LF for personal use, Mr. Claussen testified:

Q: Okay. Is it accurate you discussed the safe before the October meeting?

A: No.

(Id. at p. 594, ll. 5-7).  On cross examination, Mr. Claussen confirmed this key point in the following exchange:

Q: I think the record's clear on this point but the safe – is it true that the – that neither Mr. Schroeder or Mr. Atwater specifically discussed the safe with you prior to your removal?

A: No.

Q: Nor did you ask them whether you could remove the safe? Prior to your removal of the safe from the premises?

A: No.

Q: Is that correct?

A: Correct.

(Tr. p. 650, l. 12 – p. 651, l. 6 [Claussen]). Mr. Claussen also specifically denied discussing the LC LF safe with Operations Manager, Mr. Schroeder. (Tr. p. 594, l. 25 – p. 595, l. 2 [Claussen]).

L150_0070

The Union attempted to justify Mr. Claussen's decision to take the safe for personal reasons without asking (or notifying) anyone because he personally believed it was a "non-usable" or "non-working item."  (Id. at p. 595, ll. 3-19 [Claussen]). Specifically, Mr. Claussen claimed Tim Atwater, the Area Post-Collection Manager, told him "items in the shop that's not being used, are not usable, we could take." (Tr. p. 588, ll. 16-17 [Claussen]).  Even crediting this testimony (and this assertion is contrary to the surrounding facts as well as the detailed testimony of Mr. Atwater (See, Tr. p. 79, ll. 18-20 [Atwater])), Mr. Claussen's alleged determination (without consulting management) the safe was allegedly a "non-usable item" is belied by Mr. Claussen's own testimony.  As Mr. Claussen conceded he took the safe for personal use because he believed it was usable, after replacing the "batteries" or making an adjustment of "a relay."  (Tr. p. 592, ll. 3- 23 [Claussen]).  This makes sense.  Why would Mr. Claussen take any item if he did not believe it was usable?  Regardless of the answer, according to Mr. Claussen's own testimony, the safe was not "unusable." Not usable means not "capable of being used" https://www.merriam-webster.com/dictionary/usable.  Additionally, according to Mr. Claussen's own testimony, before removing the safe from the LC LF for his own use, he did nothing to determine whether the safe "was usable" (indeed, he through just the opposite: it was "usable" by simply replacing the batteries or fixing a relay).  (Id. at p. 595, ll. 3-19 [Claussen]).

Mr. Claussen's behavior after being confronted with his removal of the safe also belies his assertion that he had spoken, or unspoken, approval for its removal for his personal use.  After he removed the safe, Mr. Claussen received a call from Mr. Atwater regarding missing LC Landfill property. (Tr. p. 600, ll. 11-14 [Claussen]).  In that conversation, Mr. Claussen denied knowing anything about missing property. (Id. at ll. 23-25 [Claussen]). Later, after that call, Mr. Claussen called Mr. Atwater back, "[t]o let him know I was the one that took the safe." (Id. p. 602, ll. 9-24

L150_0071

[Claussen]). Why would Mr. Claussen feel a crisis of conscious such that he had to "come clean" if he believed Mr. Atwater had given him permission to remove the safe for his personal use? When questioned why he later called Mr. Atwater, Mr. Claussen made a key admission:

> Q: Why did you call him?
>
> A: To let him know I was the one that took the safe.
>
> Q: Okay. **Why did you want to tell him that?**
>
> A: **'Cause I took it.**
>
> Q: Okay. **Did you tell him why you took it?**
>
> A: **'Cause I wanted to, again, use it for personal use.**
>
> Q: Did you mention anything about what you thought the condition was?
>
> A: No.

(emphasis added). (Tr. p. 602, ll. 9-13 & ll. 16-24 [Claussen]).  While Mr. Claussen returned the safe under direction from GM McGarry (Tr. p. 681, ll. 17-23 [Claussen]), this fact did not in any way alter the circumstances or nature of the original unauthorized taking without permission.  (Tr. p. 383, ll. 12-20 [Owens]).  As the Company placed Mr. Claussen on notice when he received the Company's handbook, and as a legion of arbitrators have recognized involving values much smaller than the value of the safe (Un. Ex. 23), Mr. Claussen's decision to take the Company safe home to convert to his own use, provides just cause for his discharge.

**B. Mr. Claussen Aided another Employee in Stealing a Company Air Hose and then Lied about it when Questioned During the Company's Investigation.**

As part of the Company's investigation of possible theft of missing items at the LC LF, Mr. Drinski began reviewing security system video footage, which is expressly permitted by Article 14.11 of the CBA. (Tr. p. 223, ll. 9-25).  Mr. Drinski identified a portion of the video that captured Mr. Claussen backing up the Company's Honda Pilot (used to transport equipment operators around the landfill) and Mr. Thomas exiting that vehicle to take a piece of Company property from it that he then threw into his personal vehicle. (Tr. p. 223, l. 22 – p 226, l. 19, Co

Exs. 6.a, 6.b., 6.c., 7). During his November 30, 2023, interview, Mr. Thomas admitted the video captured him throwing the Company's air hose into his truck. (Co. Ex. 1., p. 2, 5, Tr. p. 373, ll. 11-24 [Owens].).

However, during the same interview on November 30, Mr. Claussen claimed he did not know what Allen was doing on November 10, 2023.  Specifically, on re-direct examination, Mr. Claussen testified:

Q: And **it's your testimony that you did not know what Allen put in the back of his truck; is that correct?**

A: **Correct.**

(emphasis added). (Tr.  p. 652, ll. 18-21 [Claussen]).  On re-cross examination, however, and only after being confronted with the video evidence that showed him pulling the Honda Pilot forward adjacent to the operators' personal vehicles, then backing up, and, again, pulling the Honda Pilot forward adjacent to Mr. Thomas' personal vehicle to allow Mr. Thomas to exit the vehicle to place the air hose in the back of Mr. Thomas' truck, Mr. Claussen changed his story and admitted he *did know* what Mr. Allen was doing on November 10, 2023 and that he had been dishonest during the interview about the air hose during the Company's investigation:

Q: Okay. **You did know that he was taking something out of the back of that Honda Pilot and throwing it in his car; is that correct?**

A: **Yes.**

\*\*\*

Q: What did you believe he was – he opened the hatch and he moved something from the Honda Pilot to take to his vehicle. **What did you believe he was taking to his vehicle?**

A: **The air hose.**

\*\*\*

Q: But that's not what you said **on** November 20 – **November 30, '23, you said – "Do you know what it was that Allen put in the truck?" And you said, "No, I don't." Is that correct?**

A: **Correct.**

14

L150_0073

Q: **But you knew on November 30, 2020 (sic), that he had put the air hose in the back of his truck. Correct?**

A: **Correct.**

(emphasis added). (Tr. p. 691, ll. 10-18 [Claussen], **Co. Ex. 7, Camera 4, Exact Time: 6:09:45 a.m. to 6:11:05 a.m., Compare, Co. Ex. 15 (Claussen Interview).**

Mr. Claussen's reluctant admission, only after being confronted with unequivocal video evidence, of abetting of Mr. Thomas' removal of a Company air hose from the premises, and then lying about his conduct during the ensuing investigation by the Company, both also provide just cause for his discharge.

C. **Mr. Claussen Took Advantage of his Independent Work Environment and Received Pay for Doing No work for Scores of Hours Despite Knowing Important Work Needed to be Completed, and Having his Work Schedule Expanded, to Close the LF.**

1. **The Company Did Not Need to "Investigate" Mr. Claussen's Lack of Work During Paid Time Because Security Camera Video and Time Clock Records Tracked Every Minute of It.**

During the Company's November 2023 investigation into possible theft of missing property at LC Landfill, Mr. Drinski and Josh McGarry, General Manager, each reviewed available security video footage covering the period October 23, 2023, through November 17, 2023.[2] (Co. Ex. 7; Tr. p. 229, ll. 3-7 [Drinski]; Tr. p. 377, ll. 13-20 [Owens]). After Mr. McGarry reviewed the information Mr. Drinski located on footage for November 10, 2023, and both noticed discrepancies between time clocking in and when the operators left the break building in the Honda Pilot to begin their equipment operator work at the LF, Mr. McGarry directed Mr. Drinski to review videotape further to determine whether other incidents like that on November 10, 2023, had occurred. (Tr. p.

---

[2] Mr. Drinski testified the LC Landfill's DVR memory had a 90-day capacity and had been sent to the Company's IT Department to preserve at the beginning of the investigation. (Tr. p. 228, L. 24 – p. 229, l. 7 [Drinski]). Co. Ex. 7 contains the preserved DVR footage. (Tr. p. 228, ll. 2-18 [Drinski]).

FP 53842044.3

L150_0074

234, ll. 16-22 & p. 235, ll. 7-15 [Drinski]; Tr. p. 377, ll. 13-20 [Owens]).  Mr. McGarry's directive

was in full accord with the NC LF CBA, in which the Parties squarely addressed the Company's

right to use technology observation systems in such investigations:

> Article 14.11 Technology. The parties agree and understand that current and future technology will be needed to meet customer, operational and competitive demands. As a result, the parties further agree that the Company may, at its discretion, install into its vehicles or facilities, institute and implement any technological observation or other management tool system not involving live video or audio monitoring (in vehicles) that it deems appropriate in furtherance of its business. **The Company may use any and all data collected through the use of technology or equipment installed pursuant to this section for lawful purposes**. **Such data will be used for** training, coaching, **and may be considered along with other physical, written, and/or other evidence in conducting and resolving investigations** only **in cases of** accidents, injuries, **theft** and/or serious safety violations. **Disputes regarding the application of new technology to individual cases shall be resolved via the grievance and arbitration procedures of this agreement.** The Company will give the Union at least thirty (30) calendar days advance notice before installing and implementing such technological changes. (Id. at p. 21).

(emphasis added). (Jt. Ex. 1(a), p. 21). Moreover, and contrary to the Union's assertion that the

Company's investigation did not satisfy due process, Mr. Claussen testified each time he appeared

in the Company's parking lot as captured on the security video footage of that area.  Mr. Claussen

knew where the LC Landfill's security cameras were located – an undisputed point. (Tr. p. 599, l.

20 – p. 600, l. 6 [Claussen]).  Mr. Claussen parked his silver truck in the parking lot covered by

Camera 4. (Tr. p. 62, ll. 19-22 [Claussen]). He also rode in the Company's Honda Pilot (or UTV

vehicle) from the same parking lot covered by Camera 4 up the hill to the active work site and

back to the break room building, back-and-forth every single workday. (Tr. p. 621, l. 4 – p. 622, l.

8 [Claussen]). The captured security footage shows what Mr. Claussen did and is the best and

undisputed direct evidence on his comings and goings between the break/shop building and the

active work site. Indeed, Mr. Claussen, himself, testified he had no reason to dispute any of the

L150_0075

information contained in Co. Ex. 9, painstakingly documented over the course of several days by Mr. Drinski, from the security video preserved in Co. Ex. 7 (Tr. p. 633, ll. 3-7 [Claussen]).

The Newton CBA also placed a very specific time record certification requirement on all employees to ensure pay accuracy, which described each employee's affirmative obligation as follows:

> . . . **for each pay period, [to] review the electronic punch report . . . and electronically attest to, then complete, sign, and return the Company's Time Card Certification**, which includes the meal period acknowledgement or the Time Card Correction Request.

(emphasis added). (Jt. Ex. 1(a), Article 7.15, p. 9). The Union and Company acknowledged employees accurately reporting their work hours to be of the highest importance to them by codifying the primary principle at the heart of the employment relationship (i.e., employer pays employee for hours worked) in Article 7.15. (Jt. Ex. 1). Mr. Claussen testified each pay period when he reviewed and certified his timecard electronic punch report – a work requirement acknowledged in Newton CBA Article 7.15. On this basis, the Kronos time records for Mr. Claussen must also be afforded the full weight due them as direct evidence of when Mr. Claussen represented to the Company he was working, certifications the Company relied upon in paying him for purported work *he did not do* as an equipment operator, down to the minute reflected in Co. Ex. 9. Using Company 9 and the higher applicable hourly wage contained in the LC LF CBA and fringe benefit rates in the NC LF CBA, Mr. Drinski developed Exhibit 10, showing – even allotting for up to 15 minutes for post-shift VSR and inspection paperwork – and limited to the four weeks reviewed by Mr. Drinksi, the Company paid Claussen $2,535.12 for working time during which he did no work and just sat in the breakroom.

> **2. Mr. Claussen does not dispute his failure to commence work to perform essential dirt coverage, even after Mr. Schroeder extended his schedule to facilitate this work essential to closing the LF.**

Despite the landfill only being open to receive garbage trucks from 6:00 a.m. to 2:00 p.m. (Tr.  p. 146, ll. 1-6 [Schroeder]; Tr. V.III, p. 661, ll. 9-15 [Claussen]), it is not disputed that Mr. Schroeder extended Mr. Claussen's start time from 5:30 a.m. to 5:00 a.m. and, subsequently, his end time from 2:30 p.m. to 4:00 p.m. for one reason: the need for Mr. Claussen and his co-workers to operate equipment at the LC LF outside of the Landfill's normal operating hours of 6:00 a.m. to 2:00 pm.to excavate and haul additional dirt[3] to cover the landfill necessary for closing: [4]

> Start time: 8/8/23 – changed from 5:30 a.m. to 5:00 a.m. (Monday through Friday)
> *Mr. Claussen confirmed his start time changed on 8/8/23 from 5:30 a.m. to 5:00 a.m. (Tr. p. 665, l. 22 – p. 666, l. 7 [Claussen]).*

> End time: 10/16/23 – changed from 2:30 p.m. to 3:30 p.m. (Monday through Friday) (Co. Ex. 14, p. 4). *Mr. Claussen confirmed his end time changed on 10/16/23 from 2:30 p.m. to 3:30 p.m. (Tr. p. 670, ll. 3-17 [Claussen]).*

> 10/24/23 – changed from 3:30 p.m. to 4:00 p.m. (Monday through Friday) (Co. Ex.  8, p. 1). *Mr. Claussen confirmed his end time changed on 10/24/23 from 3:30 p.m. to 4:00 p.m. (Tr. p. 670, l. 18 – p. 671, l. 17 [Claussen]).*

> Saturdays: When worked, 6:00 a.m. (start time) – 12:00 p.m. end time.

(Co. Ex. 8 and 14; Tr. p. 145, ll. 9-25 [Schroeder]; Tr. p. 344, ll. 4-18 [Drinski]); Tr. pp. 665-671 [Claussen]; Tr. p. 474, l. 8 – p. 475, ll. 4, 16-21 [Barkey]).  Mr. Claussen, himself, admitted the schedule changes had been made to support work needed to close the landfill – e.g., as to the 10/16/23 end time change from 2:30 p.m. to 3:30 p.m. Mr. Claussen testified:

> Q: And you also understood that when you were in the process of closing the landfill. Correct?
> A: Yes.
> Q: That is why your schedule changed from a 2:30 end time to a 3:30 end time. Correct?

---

[3] Specifically, an excavator loaded cover soil into a haul truck which drove the clay dirt to the cover area where a bulldozer spread it over the waste layer. (Tr. p. 207, ll. 14-22 [Schroeder]).

[4] After the start time schedule change, Mr. Schroeder instructed the equipment operators to punch in at 5:00 a.m. and then proceed to the worksite together in the Company SUV. (Tr. 184. 24-25, 185, 1-3 [Schroeder]). Mr. Schroeder confirmed the equipment operators had no work-related reason to remain in the break room after punching in to work at 5:00 a.m. (Tr.  p. 167, ll. 8-17 [Schroeder]) and that he did not give any employee permission to do so.  (Id.).

18

L150_0077

A: Correct

(Tr. p. 668, ll. 18-22 [Claussen]). As to workdays after 10/24/23 that Mr. Schroeder directed Mr. Claussen to work past 4:00 p.m., Mr. Claussen also confirmed he knew that additional time was to move more dirt to support closure of the landfill:

Q: Were there days that you were required to work past 4:00 p.m.?

A: Yes.

Q: . . . And how would you know that you were required to work past 4:00 o'clock p.m.?

A: Tony Schroeder..

Q: **Again, that was so you could complete the extra dirt coverage that was required in connection with the increased volume as well as the closure of the landfill. Correct?**

A: **Yes.**

(Tr. p. 671, ll. 10-17 [Claussen]). Mr. Motyka, another Union witness, also confirmed Mr. Schroeder specifically instructed all three operators in late October 2023 "to first thing, start hauling dirt in the morning:"

Q: Besides this instance do you recall any other occasions where Tony instructed you to perform specific work?

A **Yes. He asked me to, first thing, start hauling dirt in the morning.**

Q: **When did he tell you that?**

A: **It was probably around that same time, late – mid to late October**.

Q: **And was anyone else present for this conversation?**

A: **Dale Claussen and Allen Thomas.**

(emphasis added) (Tr. p. 712, 10-14 [Motyka]).

The record confirms – and Mr. Claussen does not deny – the Company modified Mr. Claussen's daily scheduled work hours well beyond the 6:00 a.m. to 2:00 p.m. open hours when customer trucks unload garbage at the CL LF, which grew from February 2023 through his

FP 53842044.3

L150_0078

termination date as shown in the chart below to accommodate the extra equipment operator work required to "move dirt" as part of closing the CL Landfill:



**Added Work Hours – 8/8/23 – Termination Date**

(Co. Exs. 6, 7, 14). The nine (9) hour core workday ran from 5:30 a.m. to 2:30 p.m. and included a ½ hour unpaid lunch. (Id.). The additional time in columns 2, 3, and 4 show the total added time as of each of those dates, from a total extra 30 minutes to a total 90 minutes to a total 120 minutes.

Despite having his work shift extended for the purposes of excavating and hauling additional dirt needed for coverage essential to the closing of the CL LF, confronted with his time clock entries and evidence from video Camera 4, Mr. Claussen was forced to admit that he placed himself in pay status at 5:00 a.m., but waited until after 6:00 a.m. – or, in some instances, almost until 7 a.m. when he knew Mr. Schroeder may appear at the LC Landfill[5] – before leaving the

---

[5] While Mr. Schroeder, provided site specific direction to the operators through regular and daily phone calls, he only frequented the LC Landfill at least two to three times a week. (Tr. p. 140, l. 17 – p. 142, l. 11 [Schroeder]). Mr. Claussen further acknowledged that Mr. Schroeder did not arrive at the LC Landfill until **between 7:00 a.m. and 9:00 a.m.** (Tr. p. 661, l. 3 – p. 662, l. 10; p. 686, ll. 9-21 [Claussen]).

Honda Pilot to go up the hill to commence his equipment operator work, and, then, only after observing the first customer truck arriving at the LC LF. (Tr. (Tr. p. 29, l. 11 – p. 30, l. 8 [Totonchi]; Tr. p. 631, l. 11 to p.632, l. 4).[6]

### 3. The Union's "Firefighter" analogy, and "darkness" and "idle" time excuses are unsupported by the record, including Mr. Claussen and his co-worker's own testimony.

Unable to explain by any other means the chasm of time Mr. Claussen remained in the break building doing no work while being paid – the Union was forced to take an illogical position in this case that Mr. Claussen and his fellow CL LF co-workers were more akin to "firefighters", ready to take action when a garbage truck appeared,[7] then equipment operators who were paid to operate equipment.  Aside from the weakness of this assertion given the job classifications contained in the Parties CBA (Jt. Ex. 1, Article 11, p. 14), the forced "firefighter" analogy cannot explain a critical undisputed fact in this case:  Mr. Schroeder expanded Mr. Claussen's schedule well beyond the open hours of the CL LF to facilitate the extra work needed to close the CL LF. The Company respectfully submits, as Mr. Motyka acknowledged, Mr. Claussen was well aware that Mr. Schroeder's decision to extend his work hours in the fall of 2023 was not driven by a desire to provide "extra money or extra hours" to Mr. Claussen to remain in breakroom (Tr. p. 551, ll. 14-25), rather it was to fulfill his duties as an equipment operator needed to excavate and haul dirt for the additional coverage needed for the impending closure of the CL LF, for which Mr. Claussen was paid $34.55 per hour, plus hourly based fringe benefits of $26.50 per hour.  (Jt. Exs. 1 and 1.A, Co. Ex. 10, See, also Appendix A).

---

[6] It is undisputed that the Mr. Claussen did not leave the break area to start his workday until 6:41 a.m. (video time of 6:48 a.m.), and 6:48 a.m. (video time 6:55 a.m.) on November 7 and 8, 2023. (Tr. p. 628, l. 13 , p. 629, l. 2, p. 631, l. 11 – 632, l. 4;  Co. Ex. 9, Co. Ex. 7, Camara 4, November 7 and 8, 2023).

[7] Mr. Claussen conceded the operators used the first customer truck arrival and last customer truck departure to determine when to start and end their physical presence at their work location on top of the hill, as well as after lunch. (Tr.  p. 572, ll. 15-19, 576, ll. 14-18 (*end time*) [Claussen]).

FP 53842044.3

L150_0080

Aside from the unsupported firefighter analogy, the only other explanations offered by the Union for Mr. Claussen's conduct were: 1) the "darkness" of the LF during the extended hours provided to haul dirt to cover the LF; and 2) a directive from his time at the NC LF not to "idle" equipment. Mr. Claussen's own testimony, as well as the testimony of his co-workers, however, are fatal to both assertions.

> ### a. As Mr. Claussen and his co-workers acknowledged, his equipment possessed head-lights, enabling him to haul dirt before sunrise, just as he had done for years at the NC Landfill.

Before accepting an assignment to CL LF, Mr. Claussen, a long-time experienced equipment operator with seventeen (17) years tenure, had primarily worked at NC LF where his workday began at 4:30 a.m. with a fifteen to twenty (15-20) minute meeting. (Tr. p. 528, ll. 4-13 and p. 550, ll. 12-15 [Claussen]). By his own testimony, Mr. Claussen began operation of machines between 4:45 a.m. and 4:50 a.m. every day he worked at NC Landfill from 2005 until his transfer to the LC Landfill in February 2023. (Id.). Given the operations at the NC LF and LC LF materially differed only in the type of waste stored and size of operations/number of equipment operators, the record confirms Mr. Claussen worked prior to sunrise for the entirety of his tenure – not just at LC LF as suggested. (Tr. p. 432, l. 16 - p. 436, l. 16, p. 538, ll. 19-22, p. 538, 1. 25 – p. 539, l. 9 p. 540, l 1-3, 547, ll. 15-16, p. 657, ll. 1-4, P 709, ll. 10-12). Moreover, as several Union witnesses conceded, all the equipment that existed at the LC LF had working head lights, to facilitate operation before sunrise and after dark:

> Q: And from 5:00 a.m. to 6:00 a.m. when the first truck arrived you could have one – there was – when you worked there, there was always at least three operators, correct, at the landfill . . .
>
> A: Yes, sir.
>
> Q: From I think you said beginning of October to December 4th when you were separated. Correct?
>
> A: Yes, sir.

L150_0081

Q: And between 5:00 a.m. and 6:00 a.m. there could be one of the operators in the haul truck and another operator in the excavator. Correct?

A: There could be, yes.

Q: In the morning to haul dirt?

A: Yes.

Q: To excavate dirt and then to haul it to the working face. Correct?

A: Yes.

\* \* \*

Q: And both of those vehicles were equipped with working headlights. Correct?

A: Working, yes.

Q: Headlights. Correct?

A: Yes.

(Tr. V.III, p. 748, l. 24 – p. 749, l. 25 [Claussen]).  Each piece of heavy equipment used by the operators had operational lights. (Tr. V.II, p. 480, ll. 21-24 (*excavator has lights*) [Barkey] and Tr. V.III, p. 749, ll. 8-25 [Motyka]; p. 480, l. 25 – p. 481, l. 1 (*haul truck has lights*) [Barkey] and Tr. p. 749, ll. 8-25 [Motyka]; Id. at ll. 2-3 (*bulldozer has lights*) [Barkey]; Tr.  p. 511, ll. 11-15 (*haul truck has lights*) [Perrin]; 16-19 (*excavator has lights*) [Perrin]; Id. at ll. 20-23 (*bulldozer has lights*) [Perrin]). In addition, the LC Landfill had a light plant on site that the equipment operators moved with an excavator and chain to illuminate areas where they drove heavy equipment and moved soil. (Tr. p. 501, l. 20 – p. 502, l. 24 [Perrin]).  As Tom Perrin[8] further confirmed on cross, the light plant could be moved anywhere on site and provided additional light to that produced by the heavy equipment to support moving dirt while it was dark outside. (Tr. p. 512, l. 22 – p. 513, l. 17 [Perrin]).

---

[8] Tom Perrin, a 25+ year member of Local 150 member, worked for Frank's Equipment as a mechanic since 2005. (Tr. p. 482, ll. 9-10, 21-22 and p. 482, l. 25 – p. 483, l.5 [Perrin]).  The Company utilized Frank's Equipment as a vendor at its various sites to repair equipment. (Id. at p. 483, l. 13 – p. 484, l. 8 [Perrin]). Mr. Perrin appeared voluntarily to testify for the Union, without a subpoena. (Id. at p. 483, ll. 9-12 [Perrin]). Similarly, Mr. Motyka voluntarily testified for the Union, without a subpoena (Tr. p. 747, ll. 2-4 [Motyka]).

FP 53842044.3

L150_0082

**b.    Equipment operated to haul dirt is not idling, its operational.**

Likewise, Mr. Claussen's excuse that he stayed in the break building to avoid equipment "idle time" (Tr. p. 561, l. 19 – p. 562, 1-11 [Claussen]) is defied by the most basic axiom that equipment that is being actively operated to excavate and haul dirt is operational, and, therefore, is not idling – as Mr. Claussen was forced to concede on cross-examination:

> Q: Okay. By the way, the haul truck, the excavator and the compactor are not idling when they are actually being operated and are in movement. Correct?
>
> A: Correct.
>
> Q: They are only idling when they are in park –
>
> A: Correct.
>
> Q: - is that correct? So if a[n] equipment operator is using the excavator to pick up dirt and put it into the haul truck, it would not be in idle. Correct?
>
> A: Correct, it would be in power if it's in a power mode.
>
> Q: And when a haul truck is moving up the hill to – dump dirt, it would not be in idle. Correct?
>
> A: Correct.

(Tr. p. 748, l. 24 – p. 749, l. 25 [Claussen]).

**4.    The Union's Purported Comparators are not Similarly Situated; Conversely Union Ex. 5 Establishes that the Company has Issued Discharge for Similar Conduct.**

The Union advanced written disciplinary actions issued to several NC Landfill employees for failing to take a 30-minute meal period, in violation of the Company meal period policy, a singled incident of sleeping on the job, and an isolated incident of an employee who failed to clock-out after completing work, and later reported to his supervisor an incorrect end-of-day time.  (Un. Ex. 5, pp. 1-10).  Even putting aside Mr. Claussen's stealing of a Company safe, and aiding a co-worker in taking an air-hose and lying about it during the ensuing investigation that justified the Company's discharge decision, here, failing to take a mandatory lunch break or isolated incidents of sleeping on the job and reporting an incorrect end of day time, is <u>not</u> remotely similar to the

facts here, where Mr. Claussen *regularly* clocked-in for work and stayed in a break area doing no work, and then certified his time cards as accurate so he would – and did – get paid for the no-work time.

The Union also advanced a discharge of an employee (Jason Parker) who had been found to have illegally entered the LC Landfill to dump a personal trailer of contents. (Un. Ex. 5, p. 9). This disciplinary action actually d*emonstrates* the Company's consistency as it shows the Company has a zero tolerance for deliberate stealing/salvaging acts – in this instance, stealing waste disposal resources. As Mr. Drinski testified, the nature of the conduct involved in Mr. Parker's discharge was like Mr. Claussen's conduct in removing the safe from Company property for personal use. (Tr. p. 313, ll. 9-21 [Drinski]).

### 5. Mr. Claussen's Seniority and The Independence The Company Granted Him Militate Against Him.

Contrary to the Union's assertion in its opening statement, Mr. Claussen's seniority and the independence from in person supervision granted him as a senior operator militate against Mr. Claussen. As Ryan Barker, a former employee who had worked as an equipment operator at the NC LF (Nov. 2003 – 2018) and LC Landfill (2018 – July 2023) (Tr. p. 412, ll. 2-5 [Barkey]) testified, LC LF had no need for a daily supervisor on site or start-of-shift meeting as operators knew what needed to be performed based on their experience and surveyor-placed grade posts. (Tr. p. 412, II, 2-5, 432, l. 16 – p. 436, l. 16 [Barkey]; *See* also, Tr. p. 709, ll. 10-12 "I mean between the three of us operators, we had 15 years' experience so, I mean, we knew what to do at a landfill, so." [Motyka]). Moreover, according to Mr. Motyka, he viewed Mr. Claussen as the most senior of the LC Landfill's operators and Mr. Motyka admitted he "looked for [Mr. Claussen] . . . if I had any questions he would be the one I would go to." (Id. at p. 723, l. 14 – p. 754, l. 10 [Motyka]). Knowing Mr. Schroeder would not physically appear at the LC LF until 7:00 a.m., Mr. Claussen

L150_0084

not only took advantage of the lack of supervision to remain in the break building for, in some cases, almost two hours after clocking in, his behavior facilitated the same conduct by his less experienced and more recent transferred operators from NC LF.  Notably, the Company discharged Mr. Motyka and Mr. Allen for their misconduct.  Those grievances are pending arbitration.

### 6. Mr. Claussen's Disciplinary Suspension for Insubordination Also Defeat's Any Basis to Mitigate the Company's Discharge Decision.

As appropriately considered by the Company in deciding to discharge Mr. Claussen, Mr. Claussen's active suspension for insubordination on November 21, 2022 further defeats any argument to mitigate the Company's discharge decision. (Tr. p. 298, ll. 7-19 and p. 346, ll. 5-8 [Drinski]; Co. Ex. 13).   Specifically, in November 2022, within a few months of moving to LC LF, Mr. Claussen had been issued a multi-day suspension for insubordination after refusing to work on an excavator and, subsequently, a compactor when directed by his supervisor. (Co. Ex. 13; Tr. p. 640, ll. 7-17 [Claussen]).  On cross-examination, Mr. Claussen conceded that he was qualified to operate both pieces of equipment and that other employees performed the work he had been assigned using those machines without incident that day. (Co. Ex. 13; Tr. p. 642, l. 16 – p. 645, l. 3 [Claussen]).  Although Mr. Claussen's conduct described over three days of testimony, justified his discharge for cause, standing alone, the fact this conduct occurred on the heels of a suspension for direct insubordination removes any question relating to the appropriateness of the discharge penalty issued by the Company.

FP 53842044.3

L150_0085

## V. **Conclusion**.

The Company respectfully requests the Arbitrator deny the grievance based on procedural arbitrability.  In the event the Arbitrator determines the arbitration contractually permissible, the Company respectfully submits it had just cause, under any standard applied by the Arbitrator, to terminate Mr. Claussen's employment based on his stealing of a Company safe, abetting his co-worker in theft of a Company air hose, and then lying about it during the Company's ensuring investigation, and his conscious decision to take advantage of his independent work environment to receive a significant amount of pay for doing no work for scores of hours despite knowing the importance of work need to be completed – conduct Mr. Claussen deliberately undertook despite the existence of an active progressive disciplinary suspension for outright insubordination.  For each and all the foregoing reasons, the Company respectfully submits the Grievance should be denied, in its entirety.

Respectfully submitted,

_____

Richard A. Millisor

Date: March 19, 2025

27

L150_0086

# TAB 5

Page 1

1   In the Matter of Arbitration Between:

2

3

    IUOE LOCAL 150, AFL-CIO,          )
4                                      )
                        Union,        )
5                                      ) Volume I
    and                               )
6                                      )
                                       )
7   REPUBLIC SERVICES,                )
                        Employer,  )
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
9

              Date:    Friday, August 23, 2024
10

              Time:    9:16 a.m.
11

              Place:  Fairfield Inn
12                     708 North 600 East
                       Fair Oaks, Indiana 47943
13

14

    Before Michelle Soffa, Court Reporter
15  Notary Public, LaPorte County, Indiana

16

17

18

19

20

21

22

23

24

25

Page 2

1   Present:

MR. RICK BALES
2               Professor of Law/Arbitrator
Ohio Northern University
3               The Claude W. Pettit
College of Law
4               525 South Main Street
Ada, Ohio 45810
5               r-bales@onu.edu
6               The Arbitrator;
7               MR. EMIL P. TOTONCHI
International Union of
8               Operating Engineers
Local Number 150
9               6140 Joliet Road
Countryside, Illinois 60525
10              etotonchi@local150.org
11              on behalf of the Union;
12              MR. RICHARD A. MILLISOR
Fisher Phillips
13              200 Public Square, Suite 4000
Cleveland, Ohio 44114
14              rmillisor@fisherphillips.com
15              on behalf of the Company;
16
17
18   Also Present for the Union:
19   Anthony Deliberto
20   Dalen Claussen  (Grievant)
21   Also Present for the Company;
22   Krista Owens
23
24
25

Page 6

1           assigned to the Lake County C and D

2           landfill here in Northwest Indiana.  The

3           other two individuals, I don't know if

4           you'll hear from them or not, were also

5           equipment operators at the landfill, all

6           three were terminated for the same

7           reason -- or discharged, I should say,

8           for the same reason for conducts that a

9           legion of arbitrators have repeatedly

10          held constitutes just cause for

11          discharge, that is, misappropriation,

12          taking, theft, if you will, of company

13          property without authorization as well as

14          and really -- and, again, that the

15          company believes is more than just cause

16          for discharge.

17               But while the company was

18          investigating that theft or that

19          misappropriation of properties without

20          authorization, the company discovered

21          that the grievant and his two coworkers

22          were also taking time.  And as you will

23          see taking time not just a trifling

24          amount but up to 10 hours a week and

25          equating to over $2,500 in wages and

Page 7

```
 1              union health and welfare and pension

 2              contributions.  You know, of course, even

 3              if the arbitrator would conclude that the

 4              amount was 50 percent or less it would

 5              still be just cause for discharge.

 6                   But before we -- also apart from

 7              just cause notions relating to the

 8              intentional misconduct at issue in this

 9              case, that not only justifies but

10              necessitated the company's action, the

11              parties themselves have recognized the

12              seriousness of that conduct in the

13              article 9.3 of the contract which deals

14              with the forfeiture of vacation.  The

15              parties have agreed that that theft is on

16              equal footing with willful destruction of

17              company property as well as other

18              unlawful acts.  And as you will hear

19              today regardless of what standard you

20              apply to this case, the company

21              respectfully submits that there was more

22              than just cause to discharge the

23              grievant.

24                   But before I get to the merits, you

25              will need to decide and want to address
```

1          an issue of arbitrability, which the

2          company absolutely contests is

3          dispositive of this arbitration.  There

4          is no ambiguity and it might be

5          worthwhile, I'm not gonna take long in my

6          opening statement but it might be

7          worthwhile to take a look at Joint

8          Exhibit 1A, while these people -- while

9          the grievant and his two coworkers were

10          assigned to Lake County C and D, they

11          were actually governed by the Collective

12          Bargaining Agreement at Newton County

13          Landfill Partnership and that is marked

14          as Joint Exhibit 1A.  And the parties had

15          negotiated, frankly, somewhat, in my

16          experience, an unusual contract provision

17          and it really addressed -- stems from the

18          importance of -- of timely considering

19          discharges.

20               So the company under 2.3 of Joint

21          Exhibit 1A is required to notify the

22          union on the same day but no later than

23          the next day of a -- of a discharge.

24          Likewise in Article 4.3, the parties

25          negotiated, without any ambiguity, that

Page 9

1          discharges shall proceed to Step 2 and

2          the parties, again, not ambiguous

3          language, provided a request under 4.3, a

4          request for a Step 2 hearing incidental

5          to discharge or termination must be

6          presented within 24 hours after the time

7          the union is notified of the company's

8          actions and the step two hearing shall be

9          held no later than seven calendar days

10         following such notice.  I don't think

11         there is any ambiguity in that language.

12         The company is -- the union is required

13         to request a step two hearing on a

14         discharge within 24 hours of notice of

15         the discharge decision.

16              Also you will see in 4.7 that any

17         time limits set forth above may be

18         extended only by mutual agreement of the

19         parties, which the company will submit

20         there was no such mutual agreement.  And

21         the paper trail actually acknowledges

22         that.  As I said in a -- before we went

23         on the record, there is also a provision

24         in 4.6 of the contract which states that

25         if there is an issue, it's further to the

Page 10

1                left on page five, if there is an issue

2                as to whether a particular grievance or

3                issue is arbitrable, the arbitrator shall

4                rule on the issue of arbitrability before

5                taking evidence on the merits of

6                underlying grievance in dispute.

7                    The parties have stipulated that in

8                the interest of arbitrable economy that

9                they -- that the company is willing to

10               proceed on the merits subject to the

11               stipulation given the distance some of us

12               have traveled and the time commitment

13               involved and the seriousness of

14               discharge, the company -- the parties

15               have stipulated that the company's

16               willingness to proceed to the merits of

17               the case should not be construed as

18               either a waiver or somehow minimizing or

19               limiting the company's belief that the

20               arbitrability issue is ultimately

21               dispositive of this case.  Is that fair,

22               Emil?

23                  MR. TOTONCHI:  I would characterize

24               it the same way, yes.

25                  MR. MILLISOR:  Thank you.  So with

Page 11

```
 1              that as you'll see I will put on evidence
 2              of the arbitrability, probably through my
 3              last witness, but as you will see -- or
 4              second to last witness -- that the
 5              company strongly believes that this case
 6              is not arbitrable.
 7                   If however the arbitrator does
 8              address the merits, let me give you just
 9              a little bit of background to help you to
10              process the testimony you're about to
11              hear.  The grievant, with his two
12              coworkers, whose names were Shaun Motyka.
13                   THE ARBITRATOR:  Will you spell it?
14                   MR. MILLISOR:  Yes, I will,
15              M-O-T-Y-K-A.
16                   MR. TOTONCHI:  Correct.
17                   THE ARBITRATOR:  M-O-T --
18                   MR. MILLISOR:  Y-K-A, I don't know
19              if I'm pronouncing that right, Motyka.
20                   THE ARBITRATOR:  And Shaun is
21              spelled?
22                   MR. MILLISOR:  S-H-A-U-N.
23                   MR. TOTONCHI:  Correct.
24                   MR. MILLISOR:  And also there is a
25              second gentleman, whose name was Allen
```

Page 12

1           Thomas.

2                   THE ARBITRATOR:  Allen?

3                   MR. MILLISOR:  Thomas.

4                   MR. TOTONCHI:  A-L-L-E-N.

5                   THE ARBITRATOR:  Thank you.

6                   MR. MILLISOR:  There were

7           assigned -- actually, the grievant, Dale

8           Claussen, was assigned first in the first

9           half of 2023 to -- from Newton County

10          Landfill, where they were employed and

11          covered by the Collective Bargaining

12          Agreement to Lake County C and D

13          Landfill.  The Lake County C and D -- C

14          and D stands for construction and --

15          sorry, construction and I don't know,

16          someone knows over there but anyway it's

17          not solid -- it's not municipal solid

18          waste, so it does not have the byproducts

19          that municipal solid waste has.  So

20          because it's construction and

21          demolition -- sorry, construction and

22          demolition, because it's construction and

23          demolition, it is a much less heavier

24          regulated landfill and we will talk about

25          what that means, it's somewhat material

Page 13

1        here.

2             But the other thing about the Lake

3        County Landfill, C and D Landfill is it

4        was getting to its useful life or its

5        maximum permitted life by 2023.  And all

6        of the -- and the employees, including

7        the grievant, Mr. Claussen, as well as

8        the company, everyone was well aware that

9        it was going to be closing.  And so, in

10       fact, the permit only permits a certain

11       level of waste and once that maximum

12       level is used, you're required to close

13       it.  And so by the fall of 2023 it was

14       well known that the landfill was going to

15       be closing.  As a result there was more

16       work to do for the three coworkers,

17       including the need to not only do

18       immediate cover but intermediate cover

19       and additional dirt moving to get the

20       landfill ready to close.  As a result the

21       grievant and his coworkers were permitted

22       to clock in early.  And as you'll see and

23       hear today that they did clock in

24       beginning at 5:00 a.m. in the morning as

25       opposed to a later start of 6:00 a.m.

Page 23

```
 1              15 minutes a day would be -- result in a

 2              over $2,500 of stolen time.  Again, even

 3              a fraction of that would warrant

 4              discharge.

 5                   So in all due respect you'll see and

 6              hear -- and I'll be done making an

 7              opening statement but the company did an

 8              extremely thorough investigation, they

 9              respect that Mr. Claussen was a

10              relatively longterm employee, they did

11              not rush to judgment, he was interviewed

12              two times, including with the person next

13              to me, Krista Owens, who is the company's

14              human resources manager.  The company

15              painstakingly reviewed lots of video over

16              several days and reached a rock solid

17              conclusion, you also have grievant's own

18              admission of his misconduct, video

19              evidence.  So this is not a case of rush

20              to judgment.  This is a case where the

21              company acted slowly and deliberately and

22              only was forced to act after getting all

23              the facts and presented all those facts

24              it really had no choice but to take the

25              action it did and the company
```

Page 24

1          respectfully submits when you hear all

2          the evidence you will conclude that

3          company acted justly and the grievance

4          should be denied in its entirety.

5              MR. TOTONCHI:  Good morning, Mr.

6          Arbitrator.  I'm Associate General

7          Counsel Emil Totonchi of IUOE Local 150.

8          Thanks for agreeing to assist the parties

9          in this dispute.  It's a very important

10         case, not only for Dale Claussen, the

11         term -- terminated operator here today

12         but also for the dozens of Local 150

13         represented Republic employees at Newton

14         County Landfill.  So your decision made

15         does have wide-ranging implications for

16         the parties' relationship going forward,

17         particularly in relation to disciplinary

18         matters.

19             The principals of just cause and

20         lack of respect for them lay at the heart

21         of this arbitration.  Here Republic

22         completely ignored several of the

23         well-established tenets of just cause

24         with respect to Dale.  These include, but

25         are not limited to, not providing clear

Page 25

1          guidance to him or other employees

2          regarding how work was to be performed at

3          the Lake County site and insufficient and

4          unfair investigation that presumed guilt

5          rather than innocence, an inappropriate

6          level of discipline administered and a

7          lack of proof really at any standard but

8          certainly nothing reaching the higher

9          standard required here as the dispute

10         before you today involves a summary

11         discharge, this is not a progressive

12         discipline case.  There are also serious

13         due process issues present in the case

14         that the union will address during its

15         case.

16             I'd like to briefly introduce you to

17         the grievant, Dalen Claussen, he goes by

18         Dale or Pickles.  Doug (sic) worked for

19         Republic for over 18 years prior to his

20         termination.  He started in 2005 as an

21         operator.  He was a Local 150 operator

22         before that.  He worked hard and

23         performed his job over the years in a way

24         he understood was the right way.  He had

25         a good disciplinary record, he was never

L150_0111

Page 26

1          disciplined for any infractions remotely

2          close to those that provide the basis for

3          the company's termination.  He spent most

4          of his time with Republic at the Newton

5          County Landfill.  Newton County Landfill

6          is a massive operation involving

7          approximately 40 operator -- 40 Local 150

8          represented operators as well as other

9          employees with high volume.  It's the

10         virtual opposite of the Lake County

11         Landfill, a small operation involving a

12         few operators with lower volume.

13         Managers were everywhere at Newton.

14              While in the years prior to Lake

15         County's closure, Republic stationed no

16         permanent daily full-time manager there.

17         Instead Republic opted to assign a

18         manager there during those final years

19         that occasionally stopped by for brief

20         periods of time and gave operators

21         little, if any, guidance on what to do.

22         Despite this lack -- and this was after

23         years of stationing a full-time permanent

24         manager at the site, the most recent one

25         being Jesse Follett, I believe J-E-S-S-E

Page 27

1              F-O-L-L-E-T-T, but I am not sure.

2                  Despite this lack of direction from

3          management, the operators kept Lake

4          County humming all the way all up until

5          its closure.  Operators liked the pace of

6          Lake County compared to Newton County.

7          Operators not only never heard about

8          complaints from customers or about lack

9          of productivity but also re -- received

10         recognition for how well they ran Lake

11         County.

12                 The company's case is exceedingly

13         narrow and displays its ignorance of

14         what's really going on here.  The case

15         isn't about 24 days in October and

16         November 2023 where employees allegedly

17         stole time and took items without

18         authorization as the company contends,

19         rather it's about how the site has been

20         successfully run for years without --

21         with little supervision.  It's about how

22         Dale Claussen as well as the other Local

23         150 operators on-site conducted

24         themselves in line with how the site had

25         been run before their arrival.

Page 28

```
 1              Mr. Arbitrator, you will see that at the
 2              heart of Republic's termination of these
 3              employees was management's complete
 4              misunderstanding and lack of appreciation
 5              for the work the employees did at Lake
 6              County and how unclear or lacking
 7              communication from management regarding
 8              its expectation can put employees in a
 9              difficult situation.  That's exactly what
10              happened here.
11                  The union admits as Lake County
12              closure loomed, Dale and two other
13              employees removed certain items from the
14              Lake County site for nonwork use.  This
15              was because they were told they could so.
16              At worst it was because of management's
17              unclear communication.  No written
18              communication was issued in connection
19              with the topic of property removal.  The
20              union also admits there were periods
21              where employees spent time in the shop at
22              the beginning, middle and end of each
23              day.  However the co -- the union
24              completely rejects the company's notion
25              that this meant they were not working.
```

Page 29

1           The company's contention that the

2           employees were not working unless they

3           were out of the shop and up on the hill

4           is baseless and displays the company's

5           ignorance of how the site was run.

6               The record will show that the

7           employees not only performed work-related

8           functions in the shop but most

9           importantly while in the shop they were

10          game ready to take action whenever

11          customers showed up.  Many firefighters

12          work 24-hour shifts.  They certainly

13          regularly find themselves on the road

14          responding to both emergencies and

15          routine calls.  However, a great deal of

16          firefighters during their shifts find

17          themselves at the firehouse.  Being at

18          the firehouse is still working, they are

19          on-site ready to take action.  While the

20          nature of their work is different from

21          that of firefighters, Republic operators

22          at Lake County are similar in that while

23          in the shop they were, at minimum, game

24          ready to take action once called upon,

25          for example, when a truck would show up

Page 30

1           within the start and end times required

2           by the company.  Buying into the

3           company's argument that the Republic

4           employees were not working while at the

5           shop would also mean that firefighters

6           are not working while they are at the

7           firehouse.  That's completely

8           preposterous.

9               A quick note regarding the company's

10          baseless arbitra -- arbitrability

11          objection, without getting into

12          specifics, the union will -- will show

13          that it met the 24-hour requirement.  The

14          company has stated that, you know, any

15          percent of its allegations that it's --

16          that it's charged Mr. Claussen and other

17          employees with would be enough for just

18          cause but that flies in the face of the

19          basic tenet that a termination must stand

20          or fall based on the reasons given at the

21          time of discharge.  There is two legs,

22          two wobbly legs to the termination here.

23          If one falls, everything falls.

24              Both -- both -- the union asks Mr.

25          Arbitrator to find that Doug (sic)

Page 31

1          Claussen's termination was not for just

2          cause and order Republic to rescind the

3          termination and make him whole in every

4          way Mr. Arbitrator deems appropriate.

5               A quick note about the

6          investigation, the record will show Mr.

7          Claussen was not asked a single question

8          regarding the allegation that he stole

9          time during the investigation.  Had the

10         company not had such a narrow mindset and

11         presumed his guilt, it may have asked

12         questions that would have led it to

13         understand the case more from the Union's

14         perspective.  If the arbitrator

15         determines that there was just cause for

16         some level of discipline, the union asks

17         him to convert the termination to an oral

18         warning, the same level of punishment the

19         company has divvied out in situations of

20         misappropriation of time, which we will

21         show, and otherwise still make Dale whole

22         as just described.

23              Thank you again for your time and

24         assistance to the parties in this matter.

25              THE ARBITRATOR:  Thank you.  Are you

Page 32

1                    ready to call your first witness?

2                         MR. MILLISOR:  Yes, I am.

3                         MR. TOTONCHI:  I understand I called

4                    Dale Doug, my apologies.

5                         THE ARBITRATOR:  Sure.  What was the

6                    formal name you gave?

7                         MR. TOTONCHI:  Dalen, D-A-L-E-N.

8                         THE ARBITRATOR:  Why don't we take a

9                    five-minute break?

10                   (A short break was held.)

11                        TIMOTHY ATWATER,

12              called as a witness by the Company,

13              having been first duly sworn, was examined

14              and testified as follows:

15                        THE ARBITRATOR:  Would you start by

16                   saying and spelling your name?

17                        THE WITNESS:  Timothy Atwater,

18                   T-I-M-O-T-H-Y.  Last name is

19                   A-T-W-A-T-E-R.

20                        THE ARBITRATOR:  Thank you.

21                   DIRECT EXAMINATION

22    BY MR. MILLISOR:

23    Q    Tim, what is your current position?

24    A    I am a midwest area post collection manager for

25         Republic Services.

Page 36

```
 1   A   Newton County Landfill.  So I was at Newton County,
 2       started off there as an operations supervisor,
 3       moved into the OM role just under a year --
 4   Q   Hold on, what is the OM?
 5   A   Operations manager.
 6   Q   Let me just stop for a minute.  What is the Newton
 7       County Landfill?
 8   A   Newton County Landfill, it's a post collection
 9       asset for Republic Services it's where we take in
10       the waste that is picked up, whether it be
11       residential, whether it be commercial, we take in
12       all the waste there at the landfill and we're very
13       environmentally savvy about what we do with that
14       waste.  So we place it essentially in a lined cell,
15       we compact the waste, we cover the waste and then
16       we cap the waste once the useful life of the
17       landfill has exceeded.
18   Q   Is the Newton County Landfill, it takes in
19       municipal solid waste; is that correct?
20   A   Correct.  It's an MSW landfill, it also takes in
21       special waste, not to be confused with hazardous
22       waste, it is not a hazardous waste landfill,
23       however, it does take in special waste.
24   Q   Slow down.  The court reporter is gonna struggle.
25       It's fine, Tim.
```

Page 37

1              MR. TOTONCHI:  She's a way faster

2          typer than you, I wouldn't worry about

3          it.

4              MR. MILLISOR:  She keeps looking at

5          me that's why I'm saying it.

6    BY MR. MILLISOR:

7    Q    All right.  We are just getting through this

8         introduction so I understand.

9             Who is the highest ranking manager at the

10        Newton County Landfill?

11   A    Today?

12   Q    Yes.

13   A    Currently it is the general manager and that would

14        be Josh McGarry.

15   Q    And did Josh hold that position in the fall of

16        2023?

17   A    Correct, yes, he did.

18   Q    Okay.

19              THE ARBITRATOR:  What was the last

20          name?

21              MR. MILLISOR:  McGarry, M-C-G-A-R --

22              THE WITNESS:  R-Y.

23              THE ARBITRATOR:  Two Rs?

24              THE WITNESS:  Yes.

25

Page 38

1    BY MR. MILLISOR:

2    Q    And could you just briefly -- you kind of talked

3         about it, the management structure for the

4         landfill?

5    A    Yeah, for the landfill specifically I'll start from

6         the top and work down, you have the general manager

7         who is overall responsible for the site, the people

8         within site and overall just big picture of what

9         the landfill looks like, not necessarily the

10        day-to-day but what it looks like 10 years from

11        now.

12             After the GM you have the operations manager,

13        who is essentially the second in charge.  The

14        operations manager sees out the plans from the

15        general manager or from the area, he takes care of

16        the day-to-day, he is responsible for taking care

17        of the team on-site and anything else that the

18        general manager directs him to do.  After the ops

19        manager there are four supervisors at Newton County

20        Landfill, operations supervisors.  They kind of see

21        the -- what the plan is, they supervise, they take

22        care of any personnel issues with the team outside,

23        they ensure that the operation is not being put

24        into a safety risk, so on and so forth.

25             And then after that you have an environmental

Page 39

1      manager who ensures our permit compliance, we

2      actually have two of those at Newton now but back

3      in 2023 there was only one.

4  Q   And is -- how large is the Newton County Landfill?

5  A   The Newton County Landfill is a top five landfill

6      for Republic Services so roughly today they are

7      averaging around 10,000 tons a day.  So it is a --

8      from a -- from a tonnage perspective top five

9      overall in the company.  From a Indiana perspective

10     it is absolutely the largest landfill in Indiana.

11 Q   And how many equipment operators work at the

12     landfill?

13 A   Today I believe their head count is 31.

14 Q   And are the equipment operators organized by Local

15     150?

16 A   Correct, yes.

17 Q   And does Local 150 also represent other employees

18     at the landfill?

19 A   Yes.

20 Q   Who are those?

21 A   They are the -- they are the vacuum truck

22     technicians now, we recently in the past year had

23     an acquisition where we acquired ACV Environmental.

24     Since then ACV Environmental is now merged with

25     Republic Services so they have a Local 150 CBA as

Page 40

```
 1        well just like the operators.  And then I'm not
 2        sure if you loop in the mechanics as operators as
 3        well but they also -- the mechanics on-site are
 4        also 150.
 5   Q    Okay.  And equipment operators actually -- well,
 6        just briefly what to they do?
 7   A    Operate all the heavy equipment at the site.  So
 8        we, as part of the Collective Bargaining Agreement,
 9        we agreed that the equipment operators will operate
10        any piece of equipment at the site as directed by
11        the ops manager.
12   Q    Okay.  I'm gonna show what's been marked as Joint
13        Exhibit 1-A and I do consider the mechanics to be
14        different.
15   A    Okay.
16   Q    But could you -- on page 14 is there a -- is there
17        a class of equipment operators, class one?
18   A    Correct, yeah, class one is typically your front
19        line equipment, moving equipment, your dozers or
20        backhoes and that's accu -- an accurate list of
21        what class ones are.
22   Q    Okay.  Was -- when you worked as a supervisor and
23        then as an operations manager at Newton County
24        Landfill, did you know Dale Claussen?
25   A    I did.
```

Page 41

1    Q   Did you also know Allen Thomas?

2    A   I did.

3    Q   And did you know Shaun Motyka?

4    A   Yes, I did.

5    Q   How would you describe your relationship with the

6        three of them?

7    A   I probably have a better relationship with Dale and

8        Allen just because I worked with them a little bit

9        longer.  I did hire Shaun Motyka when I -- during

10       my time as the operations manager there and so we

11       had less time in doing that transition.  After I

12       hired him was when I got promoted to the role I

13       currently have.

14   Q   Not that it's totally germane but what is -- how

15       would you describe your relationship with Mr.

16       Claussen?

17   A   Pretty good I thought from a working relationship,

18       had a mutual understanding, never had an issue with

19       Dale.

20   Q   And when were you promoted from operations manager

21       in Newton County to the area post collections

22       manager?

23   A   October of 2022.

24   Q   And just briefly can you describe to the arbitrator

25       what you -- what that job entails?

Page 42

1    A    Yeah.  So as the midwest area post collection

2         manager I am responsible for the site support of 10

3         landfills, 11 if you include Lake County C and D,

4         which is now a closed site, so 10 active landfills

5         from the five different states, Wisconsin,

6         Minnesota, Iowa, Indiana and Illinois.  I also am

7         in charge of the same site support in operations

8         day-to-day making sure the equipment's up for 38

9         transfer stations in those same five states.

10   Q    Is that the position -- I think you already said

11        this -- that you currently hold today?

12   A    Correct.

13   Q    You mentioned the Lake County Landfill was closed

14        now.

15             Do you know when the decision was made to

16        start closing it?

17   A    I do not know exactly when the decision was made.

18        I know that I received word that the site was

19        closing sometime in 2023 and that I needed to come

20        up with a plan on what was gonna happen with the

21        equipment at the site.

22   Q    Okay.  And it's -- Joint Exhibit 1B is called the

23        Lake County C and D Landfill, is it also organized

24        by Local 150?

25   A    Yes.

Page 56

1        only train on the pre- and post-trip but to verify

2        the accuracy of the pre- and post-trip inspections

3        every single day.

4                    MR. MILLISOR:  You want to withdraw

5                your objection or do you still keep it

6                on?

7                    MR. TOTONCHI:  I'll keep --

8                    THE ARBITRATOR:  Overruled.

9    BY MR. MILLISOR:

10   Q    So is it possible to do the physical pre-inspection

11        from the break room?

12   A    Negative.

13   Q    Why is that?

14   A    Because there is checks that you have to actually

15        check on the machine itself to be able to do it and

16        it's kind of hard to grease a machine from inside

17        of the break room if you're greasing a unit.

18   Q    Where is the equipment located?

19   A    Should be out in the working face, in the active

20        area as we call it.

21   Q    Are you familiar with how equipment operators move

22        from the break -- where is the time clock, by the

23        way?

24   A    Inside the break room.

25   Q    How do equipment operators move from the time clock

Page 57

1     area in the break room to the working face?

2  A   They had a Kubota side by side there at the site

3     that they could use then there was also a service

4     truck that was there that they can use.  At one

5     point in time there was a Honda Pilot that we had

6     at the site and that's what they were using.  So

7     they had their means of transportation to get to

8     and from the active area.

9  Q   They would actually have to leave the break room,

10     enter into one of those vehicles and then drive to

11     the top to the working face?

12  A   Yes.

13  Q   Where their equipment was located?

14  A   Yes.

15  Q   To conduct a pre-trip?

16  A   Yes, sir.

17  Q   And is it possible to do a post-trip inspection

18     from the break room?

19  A   No.

20  Q   Could you explain that?

21  A   Same concept, there were things on that list that

22     you only can do from being inside the cab of the

23     machine.

24     (Exhibit C2 was marked for identification.)

25  BY MR. MILLISOR:

Page 58

1   Q    Okay.  I'm gonna show you what's been marked as

2        Company Exhibit 2.

3                    THE ARBITRATOR:  Did I miss

4                something, what's Company 1?

5                    MR. MILLISOR:  Oh, Company 1 is

6                the -- sorry, Company Exhibit 1 is the

7                grievance trail that goes to

8                arbitrability.

9                    THE ARBITRATOR:  You just haven't

10               introduced it yet?

11                   MR. MILLISOR:  I haven't introduced

12               it yet.

13                   MR. TOTONCHI:  And before he goes

14               into this, I have to raise an objection.

15               We sent -- I sent an information request

16               regarding this case on July 31st.

17               It's -- I'll disseminate it now if you'd

18               like, it's Union Exhibit 14, request 10

19               was all reports, memoranda, emails,

20               letters, photographs, logs, videos or

21               documents that the employer may use as

22               exhibits during the arbitration hearing.

23               Employer's Exhibit 2 was not provided to

24               the union.

25                   MR. MILLISOR:  Yeah, I'll just add,

Page 59

```
 1                    I didn't obtain Exhibit 2 until

 2               yesterday.  So we provided all the

 3               exhibits that we were going to use, this

 4               is not a controversial document, it's a

 5               pre-trip and post-trip inspection so if

 6               the Union wants to take a minute to look

 7               at it that's fine but we have been very

 8               forthcoming with all our exhibits, this

 9               is something I just obtained.

10                    THE ARBITRATOR:  You want to take a

11               look at it quick?  Just take a quick look

12               tell me if you want to continue with --

13               continue the objection.

14                    MR. TOTONCHI:  Yeah, I will continue

15               the objection.  We have a due process

16               issue.

17                    THE ARBITRATOR:  I agree with you,

18               sustained.  You can testify as to the

19               contents but I am not going to admit it

20               if it hasn't been shared with the union

21               before the hearing.

22   BY MR. MILLISOR:

23    Q   Okay.  So you can testify to the contents.  Is

24        the -- can you describe the pre-trip and post-trip

25        inspection?
```

Page 60

```
 1   A    Yeah.  So the form is a Republic document.  We
 2        typically review the document regularly for any
 3        updates, for instance, recently with heavy
 4        equipment our largest OEM manu -- our largest
 5        manufacturer for heavy equipment is Caterpillar.
 6        Caterpillar has since with the new goals of
 7        sustainability, greenhouse gas, reduction of
 8        greenhouse gas emissions they have gone to what's
 9        called a tier four system, regen -- a regen system
10        that essentially minimizes its CO2 content into the
11        atmosphere so with that there was an update on
12        their machines that we had to go back and redo our
13        pre- and post-trip.  It was just an added diesel
14        exhaust fuel line that was on there, however, that
15        has -- there's a provision date on the bottom of it
16        that says when it was revised last.
17   Q    Is the pre-trip -- let me just ask, is the pre-trip
18        and post inspection form on the same document?
19   A    Yes.
20   Q    And if are there -- is there lists that a driver is
21        supposed to check?
22   A    Yes.
23   Q    And is there a --
24                  MR. TOTONCHI:  Objection, leading.
25                  MR. MILLISOR:  These are not
```

```
 1         over different sites and he didn't have visibility
 2         to those operators in his system.
 3    Q    If there were disciplinary issues would you be
 4         involved as the operations manager?
 5    A    Yes.
 6    Q    If you don't know that's fine, do you recall when
 7         Mr. Claussen was transferred from the Newton County
 8         Landfill to Lake County C and D?
 9    A    I don't recall exactly.  I believe it was mid to
10         late spring of that year.
11    Q    Were you involved in the transfer of Mr. Thomas and
12         Mr. Motyka?
13    A    Yes.
14    Q    Okay.  Could you describe to the arbitrator how
15         that came about that they were -- ended up in Lake
16         County?
17    A    When Tony needs somebody to assist up there or
18         backfill a position, he would reach out to me and
19         ask for an operator.  I would typically attempt to
20         go through the seniority list and ask for
21         volunteers based on skill and ability and
22         ultimately landed with Mr. Motyka and Mr. Thomas
23         going up.
24    Q    They volunteered?
25    A    Correct.
```

Page 218

1   Q   Do you know if that was the case with Mr. Claussen?

2   A   I don't know, I wasn't a part of that decision.

3   Q   Fair enough.  When employees get transferred -- and

4       I think the contract speaks to this, but when they

5       get transferred to Lake County, what wages do they

6       receive?

7   A   The prevailing wage, the higher wage.

8   Q   The higher wage between the two contracts?

9   A   Correct.

10   Q   And do you know what benefits they receive?

11   A   They receive Newton County benefits, you know,

12       based on Newton County --

13   Q   That includes health and welfare, pension and

14       retirement?

15   A   Yep.

16   Q   Did you have involvement at all in ensuring that

17       the Lake County C and D was come -- was finished in

18       terms of its useful permit life, in closing --

19   A   Towards the very end I was asked to help support up

20       there when Tony didn't have the bandwidth to visit

21       the site.

22   Q   Do you know -- do you recall when that was?

23   A   October timeframe.

24   Q   Okay.  I'm gonna take this out of order.  Were you

25       involved in the decision to ultimately separate or

Page 219

1           discharge Mr. Claussen?

2      A   I was.

3           (Exhibit C5 was marked for identification.)

4   BY MR. MILLISOR:

5      Q   Okay.  What is Company Exhibit 5, please?

6      A   That's an employee corrective action form.

7      Q   Okay.  But what is it specifically?  Take a minute

8           to look at it.

9      A   Specifically it was the corrective action form that

10          was generated for the termination of Dale.

11     Q   Okay.

12                    MR. TOTONCHI:  What's the exhibit

13               number?

14                    MR. MILLISOR:  Company Exhibit 5, I

15               believe.

16                    MR. TOTONCHI:  Okay.

17  BY MR. MILLISOR:

18     Q   I do have a color photograph somewhere.

19          Did you complete this?

20     A   I did.

21     Q   And did you sign it?

22     A   I did.

23     Q   Was it reviewed by others before it was --

24     A   It was.

25     Q   Do you know who?

Page 220

| | | |
|---|---|---|
| 1 | A | Our HR department. |
| 2 | Q | Do you know who in HR? |
| 3 | A | Krista. |
| 4 | Q | Krista Owen? |
| 5 | A | Yes. |
| 6 | Q | Owens, sorry.  And you said -- could you tell the |
| 7 | | arbitrator where your signature is? |
| 8 | A | I printed my name on the first line on the right |
| 9 | | lower box and my signature on the second line. |
| 10 | Q | It is signed on 12/5.  Why is it signed on 12/5? |
| 11 | A | That is the date it was issued. |
| 12 | Q | How was it issued? |
| 13 | A | In person. |
| 14 | Q | Okay.  Who was present? |
| 15 | A | Myself, Tony Schroeder, Dale Claussen and Chrissie |
| 16 | | Strong. |
| 17 | Q | Anyone else? |
| 18 | A | Not that I recall. |
| 19 | Q | Give me one second me, please, give me one second. |
| 20 | | I am gonna hand you what's been marked Company |
| 21 | | Exhibit 1.  Just flip to the -- I think it's a one, |
| 22 | | two, three, four, four-page exhibit. |
| 23 | | Are you familiar with this email chain? |
| 24 | A | Yes. |
| 25 | Q | Who is Starr Oxley? |

Page 221

1    A    She is currently our HR generalist.

2    Q    Okay.  And are you familiar with that first email?

3    A    I'm sorry?

4    Q    Are you familiar with this email?

5    A    Yes.

6    Q    And is this her conveying the disciplinary actions

7         to Mr. Deliberto?

8    A    Yes.

9    Q    I think we all know this by now but who is Mr.

10        Deliberto?

11   A    He is the business agent.

12   Q    For Local 150?

13   A    Yes.

14   Q    You were copied on that communication?

15   A    I was.

16   Q    What is the communication on December 8th?

17   A    December 8th is the communication of the grievance

18        in reference to the corrective action.

19                   MR. TOTONCHI:  I'll offer to

20              stipulate the authenticity of this, Rich.

21                   MR. MILLISOR:  That's fine.  I

22              accept the stipulation. I just want to

23              ask him a couple questions about it.

24   BY MR. MILLISOR:

25    Q    This is an email from Mr. Deliberto to yourself; is

Page 222

```
 1       that right?

 2   A   Yes.

 3   Q   The individuals copied, we'll stipulate to the

 4       authenticity of that.  Mr. Deliberto says, "We will

 5       need to set up a step 2 meeting at our Merrillville

 6       office."

 7           The question is had there been any requests

 8       for a step two meeting or a grievance prior to

 9       December 8th?

10   A   No.

11   Q   And, again, we can stipulate to the authenticity of

12       Company Exhibit 1 but in this email chain did you

13       preserve, in response, the company's arbitrability

14       defense based on untimeliness of the request for

15       the step two grievance?

16   A   Yes, I did.

17                    MR. MILLISOR:  Just so the record's

18                clear we are stipulating to the

19                authenticity, admissibility of everything

20                written in that?

21                    MR. TOTONCHI:  Yeah, obviously, I

22                have the right to argue relevance and

23                raise whatever objections I want but,

24                yeah, I have no objection --

25                    MR. MILLISOR:  I don't need to take
```

Page 223

1              him through the entire exhibit is what

2              you're saying?

3                      MR. TOTONCHI:  That's what I am

4              saying, yes.

5                      THE ARBITRATOR:  Thank you.

6                      MR. MILLISOR:  Thanks.

7                      MR. TOTONCHI:  Uh-huh.

8    BY MR. MILLISOR:

9    Q   At some point, Craig, did you learn that there

10       were, in the fall of 2023, that there were items

11       missing from the coun -- from the Lake County C and

12       D Landfill?

13   A   Yes.

14   Q   And how did you learn that?

15   A   My boss informed me of it.

16   Q   Okay.  And your boss is?

17   A   Josh McGarry.

18   Q   Okay.  What did you -- what did he inform you of?

19   A   He told me they had identified some things that

20       were missing out of the shop area at Lake County C

21       and D.

22   Q   Okay.  And were you asked to do anything in

23       connection with that -- with that situation?

24   A   Yeah.  I was a part of initially looking at the

25       videotapes.

Page 224

1   Q   Okay.

2   A   To try and identify when they left.

3   Q   And what were you able to determine?

4   A   We did see some things leaving the site.

5   Q   We will mark these as Exhibits 6 A, B and C.  I

6       should have probably stapled them together.

7                   MR. TOTONCHI:  Could you give me

8               labels, too, please, given the black

9               background?

10    (Exhibits C6A-C were marked for identification.)

11                  MR. MILLISOR:  Let me just give

12              everyone 6A first, 6B.  This is 6B if you

13              want to label it.

14  BY THE ARBITRATOR:

15  Q   Have you seen Exhibits 6A, B and C before?

16  A   Yes.

17  Q   Okay.  And when did you see these -- or what are

18      these?  Let me start there.

19  A   These are photographs of the actual video footage

20      from Lake County C and D.

21  Q   And I think I got them out of order.  In

22      chronological order can you explain how the video

23      works?

24  A   Yes.  Six B is when the employees were backing out

25      of the shop area in the company vehicle.  Six A is

Page 225

```
 1        when they are backed up to Mr. Claussen's pickup
 2        truck.  And 6C is when Mr. Thomas threw what was
 3        later identified as the air house in the back of
 4        his truck.
 5   Q    What is -- what is the vehicle in front of 6 -- you
 6        called it 6B chronologically?  The --
 7   A    On top?
 8   Q    Yes.
 9   A    That's the company vehicle they used to move up to
10        the top of the hill.
11   Q    Is that a Honda Pilot?
12   A    Yes.
13   Q    And then what does 6A show?
14   A    Six A is when they backed up next to the dumpster
15        and beside Dale's pickup truck.
16   Q    When you say "they," do you know who they were?
17   A    The operators.
18   Q    Who, do you know?
19   A    Dale and Allen.
20   Q    Dale Claussen?
21   A    Yes.
22   Q    And Allen Thomas?
23   A    Allen Thomas, yes.
24   Q    Who was, if you know, driving the vehicle?
25   A    It appears to be Dale.
```

Page 519

1      Republic Services authorized to give you work

2      assignments; is that correct?

3    A    Luke Mueller did, too.

4    Q    Okay.  Anyone else?

5    A    Sometimes Tim Atwater would ask me to do things.

6    Q    Anyone else?

7    A    No.

8                MR. MILLISOR:  Okay, thank you.

9              Nothing further, thank you.  Than, you

10             for being here and I'm sorry to hear

11             about your spouse.

12               THE WITNESS:  That's okay.  God

13             doesn't give you any more than you can

14             handle.

15               MR. MILLISOR:  I know.  She is lucky

16             to have a husband like you.

17               THE WITNESS:  Thank you.

18               THE ARBITRATOR:  I'll second that.

19               MR. TOTONCHI:  I don't have any

20             questions.

21               THE ARBITRATOR:  Thank you for being

22             here.

23          (A short break was held.)

24               DALEN CLAUSSEN,

25        called as a witness by the Union,

```
                                                    Page 520

 1            having been first duly sworn, was examined

 2            and testified as follows:

 3                      DIRECT EXAMINATION

 4   BY MR. TOTONCHI:

 5     Q    What is your name?

 6     A    Dalen Claussen.

 7     Q    Can you spell your name, please?

 8     A    D-A-L-E-N C-L-A-U-S-S-E-N.

 9     Q    Is there a name that you go by?

10     A    Dale.

11     Q    How old are you?

12     A    Fifty-three.

13     Q    Has Republic Services ever employed you?

14     A    Yes.

15     Q    When did you start working for Republic?

16     A    2005.

17     Q    When did your employment with Republic end?

18     A    2023.

19     Q    Were you terminated?

20     A    Yes.

21     Q    Are you a member of a union?

22     A    Yes.

23     Q    What union?

24     A    Local 150 Operators.

25     Q    What year did you become a member of Local 150?
```

Page 521

```
 1    A    1996.
 2    Q    Dale, how are you feeling about testifying today?
 3    A    Nervous.
 4                   THE ARBITRATOR:  Perfectly normal.
 5   BY MR. TOTONCHI:
 6    Q    Have you ever testified as a witness at an
 7         arbitration before?
 8    A    No, sir.
 9    Q    Have you ever testified as a witness at any other
10         legal proceeding?
11    A    No.
12    Q    How do you feel testifying -- how do you feel about
13         testifying in front of the people in this room?
14    A    Anxious, nervous.
15    Q    Do you typically speak to a group of people this
16         size?
17    A    No.
18    Q    So a group or seven or eight people?
19    A    No.
20    Q    Who do you live with?
21    A    Wife.
22    Q    Anyone else?
23    A    No.
24    Q    Do you enjoy large social occasions?
25    A    No, I don't.
```

Page 522

1    Q    Would you say you live a quiet life?

2    A    Yes.

3    Q    Why would you say that?

4    A    I like it just me and my wife.

5    Q    Have you ever attended a Local 150 membership

6         meeting?

7    A    One time.

8    Q    How many people were there?

9    A    Three hundred, 400 people.

10   Q    Have you since gone back to a membership meeting?

11   A    No.

12   Q    Why not?

13   A    Too many people.

14   Q    Do you have a medical condition that may impact

15        your testimony today?

16   A    Yes.  I have anxiety disorder.

17   Q    And when were you first diagnosed with an anxiety

18        disorder?

19   A    Around 10 years ago.

20   Q    After you were diagnosed did you receive any

21        treatment?

22   A    Yes.  I take -- they call it Sertraline, it's the

23        generic form of Zoloft.

24   Q    For the record is it S-E-R-T-R-A-L-I-N-E?

25   A    Yes.

Page 523

1    Q    And how long have you taken Sertraline?

2    A    Ten years.

3    Q    How often do you take it?

4    A    Once a day.

5    Q    Do you ever skip days?

6    A    No.

7    Q    Have you taken it today?

8    A    Yes.

9                    THE ARBITRATOR:  Probably needed a

10               double dose for today.

11   BY MR. TOTONCHI:

12   Q    Does Sertraline help your anxiety?

13   A    It relieves the symptoms a little, yes.

14   Q    Like what symptoms?

15   A    Well, I -- the butterfly feeling, the pounding in

16        my chest, I don't -- I notice when I started

17        rocking but I have another tic where I rub my

18        fingers when I start getting agitated.

19   Q    Okay.  How are you aware that you do the tics?

20   A    My wife.

21   Q    Does she bring it to your attention?

22   A    Yes.

23   Q    Do you ever make any facial movements?

24   A    Yeah.  I do something with my lip, I don't know how

25        to explain it.

Page 524

1    Q    We might see it, though, today?

2    A    Yes.

3    Q    Why do you believe that your anxiety disorder for

4         which you're taking medication may impact your

5         testimony?

6    A    Nervous to give the correct answer.

7    Q    Okay.

8    A    Or not give it.

9    Q    Are you ever told to speak up by people?

10   A    Yes.

11   Q    Do you understand that on occasion today you might

12        be asked to speak up every now and then?

13   A    Yes.

14   Q    What impact might that have on you?

15   A    It will catch me offguard for a second but I should

16        go a little higher octave.

17   Q    Okay.

18   A    For a little bit then I'll be asked to speak up

19        again.

20   Q    You understand the importance of trying to speak

21        up?

22   A    Yes.

23   Q    Are you able to proceed with your testimony?

24   A    Yes.

25   Q    Does your anxiety disorder impact your ability to

Page 525

1       operate heavy equipment?

2    A    No.

3    Q    Prior to your termination did you ever disclose

4         this to anyone at Republic?

5    A    No, I didn't.

6    Q    Why not?

7    A    It's something I wanted to keep to myself.

8                        THE ARBITRATOR:  Quick aside before

9              you ask another question, if you need a

10             break for any reason just say so.

11                       THE WITNESS:  All right.

12                       MR. TOTONCHI:  And just for the

13             record, Mr. Claussen attempted to obtain

14             a doctor's letter confirming some of

15             these things he stated so far, we have

16             not received one.  He has not received

17             one.

18                       THE ARBITRATOR:  I don't need one.

19                       MR. TOTONCHI:  You don't need one.

20             Does the company need one?

21                       MR. MILLISOR:  No.

22    BY MR. TOTONCHI:

23    Q    Let's get back to the time starting as a Local 150

24         member in 1996.  Okay?

25    A    Yes.

Page 526

1   Q   What was your first employer as a Local 150 member?

2   A   In 1996 was Allied Waste.

3   Q   Where was -- where were you located?

4   A   That was located in Brook, Indiana, Newton County

5       Landfill.

6   Q   Is it the same Newton County Landfill currently run

7       by Republic?

8   A   Yes.

9   Q   How long did you work for Allied Waste?

10  A   Two years.

11  Q   Did you operate heavy equipment there?

12  A   Yes.

13  Q   What heavy equipment did you operate there?

14  A   Haul truck, tipper, water truck.

15  Q   Did you operate the scraper?

16  A   Yes, scraper, yes, I did.

17  Q   What's a haul truck?

18  A   The haul truck is the six-wheel truck, big dump bed

19      that the excavator loads the dirt in that we would

20      either use it for daily cover or road building,

21      road building, haul sand, gravel for roads.

22  Q   What's daily cover?

23  A   Is to -- at the Newton County Landfill for the

24      daily cover of the trash that is brought in.

25  Q   Okay.  What was your first position when you were

Page 527

```
 1        there?
 2   A    First position?
 3   Q    When you were working for Allied Waste at Newton
 4        County?
 5   A    Truck driver, haul truck driver.
 6   Q    Did your position ever change while you were there?
 7   A    It bounced around from the water truck, tipper,
 8        scraper.
 9   Q    Okay.  Do you -- you said you were there for two
10        years, why did your employment end there?
11   A    I got laid off.
12   Q    Did you ever return to Newton County Landfill to
13        work?
14   A    Yes, in 2005.
15   Q    We'll come back to that in a moment.
16             Did you work anywhere between 1999 and 2005?
17   A    Yes.  I worked at U.S. Steel in Gary, Indiana for
18        Gary Works.
19   Q    Did you remain a Local 150 member during this time?
20   A    Yes.
21   Q    What was your position there?
22   A    Started out as a laborer then I moved to what was
23        called a plant truck driver so basically a Euclid.
24   Q    Okay.  So when you -- do you recall when you came
25        back to Newton County was Allied Waste still there?
```

Page 528

| | | |
|---|---|---|
| 1 | A | No.  It was Republic Services. |
| 2 | Q | Do you know when Allied left? |
| 3 | A | No, I don't. |
| 4 | Q | From 2005 to 2023 how many Republic sites did you |
| 5 | | work? |
| 6 | A | Two. |
| 7 | Q | Which sites? |
| 8 | A | Newton -- Newton County and Lake County, Lowell. |
| 9 | Q | Lowell, Indiana? |
| 10 | A | Lowell, Indiana. |
| 11 | Q | And when you started working for Republic at which |
| 12 | | site did you work? |
| 13 | A | Newton County and Brook, Indiana. |
| 14 | Q | During your 18-year tenure at Republic how much |
| 15 | | time did you spend at Newton vis-a-vis Lake County? |
| 16 | A | Probably 17 at Newton and about a year at Lake |
| 17 | | County. |
| 18 | Q | Were you ever employed at Lake County on a regular |
| 19 | | basis? |
| 20 | A | At the end of my -- before I got terminated. |
| 21 | Q | When did you start regularly -- |
| 22 | A | Oh. |
| 23 | Q | -- working at Lake County? |
| 24 | A | It was early January -- not early, I'm sorry, late |
| 25 | | January, early February. |

Page 529

1    Q    Of 20 --

2    A    Twenty-three.

3    Q    Okay.  Prior to that time late January,

4         February 2023 did you have any temporary stints at

5         Lake County?

6    A    There was a couple.

7    Q    Do you know precisely when these temporary stints

8         were?

9    A    No, I don't.

10   Q    Were they closer in time to the beginning of your

11        tenure with Republic in 2005 or closer to the later

12        part of your tenure?

13   A    I'd say it would be closer to the later part.

14   Q    And how long were these stints?

15   A    Two days to a week.

16   Q    Tell me about Newton County Landfill.

17        Approximately how many employees are represented by

18        Local 150?

19   A    I believe at the time when I was there, there was

20        close to 40.

21   Q    To your knowledge are there other employees at

22        Newton that are not represented by Local 15050?

23   A    Yes.  The company is called SCS they monitor the

24        gas lines.

25   Q    Okay.  Are there SCS employees that regularly work

Page 530

1    on-site?

2    A    Yes.

3    Q    Approximately how many?

4    A    Twenty to 30.

5    Q    To your knowledge are they represented by a union?

6    A    No.

7    Q    Besides the Local 150 represented employees and the

8         SCS employees are there any other employees at

9         Newton County?

10   A    We have your operators, your mechanics, Local 150

11        mechanics, the SCS people and I don't know the

12        correct name of it, it's the -- like a PT plant, it

13        breaks down the leachate water before they ship it

14        out.

15   Q    Okay.  Let's talk about the Local 150 represented

16        employees.

17             What types of employees are there?

18   A    You have your 150 mechanics and then your machine

19        operators.

20   Q    What equipment do the operators run?

21   A    Anywhere from haul trucks, grader, dozer,

22        compactors.  Say them all?  Be excavators, I'm

23        gonna probably repeat myself.

24   Q    That's okay.

25                     MR. MILLISOR:  Can I just interject

Page 747

1    A    Yes, sir.

2    Q    And you were not subpoenaed to be here today.

3         Correct?

4    A    No, sir.

5    Q    And as you testified earlier in your direct

6         examination by Emil, you were directed by Tony

7         Schroeder to haul dirt after you clocked in at 5:00

8         a.m.  Correct?

9    A    Yes, sir.

10   Q    And, in fact, Mr. Claussen was present when that

11        direction was made?

12   A    Yes, sir.

13   Q    You indicated that you were reticent to do that,

14        let me make sure I got this testimony correct,

15        because you didn't want to slip or fall when you

16        were going from the excavator to the haul truck; is

17        that correct?

18   A    Yes, sir.

19   Q    Between 5:00 and 6:00 a.m. there are no garbage

20        trucks coming into the landfill.  Correct?

21   A    No, sir.

22   Q    Is that correct?

23   A    Yes, sir.

24   Q    You said no, sir that's why I asked.

25   A    Yes, sir, I -- no, sir, there is no garbage but,

Page 748

```
 1        yes, sir, that's the correct answer.
 2   Q    Thank you.  Again, by the way, on the record thank
 3        you for your service to our country.
 4   A    Thank you, sir, I appreciate it.
 5   Q    To haul dirt for cover you need to operate both the
 6        excavator and the haul truck.  Correct?
 7   A    Yes, sir.
 8   Q    Okay.  By the way, the haul truck, the excavator
 9        and the compactor are not idling when they are
10        actually being operated and are in movement.
11        Correct?
12   A    Correct.
13   Q    They are only idling when they are in park --
14   A    Correct.
15   Q    -- is that correct?
16           So if a equipment operator is using the
17        excavator to pick up dirt and put it into the haul
18        truck, it would not be in idle.  Correct?
19   A    Correct, it would be in power if it's in a power
20        mode.
21   Q    And when a haul truck is moving up the hill to --
22        to dump dirt, it would not be in idle.  Correct?
23   A    Correct.
24   Q    And from 5:00 a.m. to 6:00 a.m. when the first
25        truck arrived you could have one -- there was --
```

Page 749

```
 1        when you worked there, there was always at least
 2        three operators, correct, at the landfill from
 3        second -- your second stint?
 4   A    Yes, sir.
 5   Q    From I think you said beginning of October through
 6        December 4th when you were separated.  Correct?
 7   A    Yes, sir.
 8   Q    And between 5:00 a.m. and 6:00 a.m. there could be
 9        one of the operators in the haul truck and another
10        operator in the excavator.  Correct?
11   A    There could be, yes.
12   Q    In the morning to haul dirt?
13   A    Yes.
14   Q    To excavate dirt and then to haul it to the working
15        face.  Correct?
16   A    Yes.
17   Q    If that were the case no one would ever have to
18        step out of either the excavator or the haul truck.
19        Correct?
20   A    Correct.
21   Q    And both of those vehicles were equipped with
22        working headlights.  Correct?
23   A    Working, yes.
24   Q    Headlights.  Correct?
25   A    Yes.
```

Page 750

1   Q   Going back to Company Exhibit 15, it's the

2       interview on November 30th, you were asked towards

3       the middle bottom of the page you were asked why

4       there was an hour difference between your time when

5       you arrived at the shop and when you clocked out

6       for the day.  Do you see that?

7   A   Yes, sir.

8   Q   And you said "I was doing paperwork."  Correct?

9   A   Yes, sir.

10  Q   Mr. McGarry asked you, "Does paperwork usually take

11      an hour at the end of the day?"  Correct?

12  A   Yes, sir.

13  Q   And you said "Yes."  Correct?

14  A   Yes.

15  Q   That is untrue, it doesn't -- it does not take one

16      hour; is that correct?

17  A   Correct.

18  Q   You were dishonest to Mr. McGarry?

19              MR. TOTONCHI:  Objection,

20          argumentative.

21  BY MR. MILLISOR:

22  Q   You weren't hon -- you weren't -- that was not a

23      truthful answer?

24              MR. TOTONCHI:  Objection,

25          argumentative.

Page 751

```
 1              THE ARBITRATOR:  Hold on.  You have

 2         asked the question I'd like to hear your

 3         answer.

 4   A   I was not 100 percent truthful, no.  I didn't

 5       elaborate on everything else that was done down

 6       there during that hour.

 7   BY MR. MILLISOR:

 8   Q   I won't beat a dead horse.

 9         When you were -- sorry, Company Exhibit 4.  Do

10       you see that?  Do you have a copy of that?

11         To your knowledge while you worked at Lake

12       County C and D Landfill, what of those items do you

13       believe were not usable or not -- not a working

14       condition, if any?  I'm looking, I'm sorry, the

15       last page of the list of items on Company Exhibit

16       4, sorry.

17   A   The last page?

18   Q   It's the page you're looking at.

19   A   Okay.  And my opinion what, again, sir?

20   Q   Based on -- based on your knowledge --

21   A   Yes, sir.

22   Q   -- when you were working at Lake County C and D

23       Landfill, which of those items were not in working

24       function, if any?

25   A   The one that I know 100 percent sure of is the shop
```

Page 752

1        vac.

2    Q   Anything else?

3    A   Some of this stuff I've never even seen while being

4        there so.

5    Q   The only one you know of is the shop vac?

6    A   Yes.

7    Q   Did you ever test the safe to see if it was in

8        working condition?

9    A   No, sir.

10   Q   Did you ever see Mr. Claussen test it to see if it

11       was working condition?

12   A   I seen him play with it, yes.

13   Q   Did you ever see him change out the battery in the

14       safe?

15   A   No, sir.

16   Q   Do you know if the safe was battery operated?

17   A   I have no clue, sir.

18   Q   You were aware that the landfill was being closed

19       in December, I think you testified on direct?

20   A   I didn't know an exact date but I knew it was being

21       closed.

22   Q   Okay.  As a result of that there was an increase in

23       the amount of garbage being delivered to the C and

24       D -- or not garbage, I should say construction and

25       demolition waste.  Correct?

Page 753

1    A    Yes, sir.

2    Q    There were more garbage trucks.  Correct?  Or I

3         should say, not garbage trucks, semi -- semi

4         tractors coming -- if you don't know that, that's

5         -- 'cause you didn't start til October so let me

6         just withdraw that question.

7              You knew as a matter -- you knew -- I'm

8         talking about the period between October and

9         December 4th when you were separated from

10        employment you knew that there was additional

11        cover, dirt cover that had to be hauled to

12        facilitate the closing.  Correct?

13   A    Yes, sir.

14   Q    By the way, Mr. Claussen was the most senior of the

15        operators at the C and D Landfill when you and

16        Mr. Allen joined him at the landfill; is that

17        correct?

18   A    Yes.

19   Q    Do you know how long he had been an operator for

20        Republic Services?

21   A    Not exact number, no, sir.

22   Q    You knew he was more senior than yourself?

23   A    Yes, sir.

24   Q    And also Mr. Thomas.  Correct?

25   A    Yes.

Page 754

1   Q   And he also had been working at the C and D
2       Landfill for a longer period of time.  Correct?
3   A   Yes.
4   Q   Would you consider -- did you consider him to be
5       sort of the lead operator at the C and D landfill?
6   A   I wouldn't say he was the lead operator, no.
7   Q   Did you consider him to be the more experienced,
8       did you look to him for more direction?
9   A   I looked for him for -- yes, if I had questions he
10      would be the one I would go to.
11                      MR. MILLISOR:  Nothing further.
12                   REDIRECT EXAMINATION
13  BY MR. TOTONCHI:
14  Q   Okay.  You were asked about whether there were
15      working headlights on the vehicles?
16  A   Yes, sir.
17  Q   What was the condition of the headlights?
18  A   Somewhat faded, foggy.  They were nonadjustable so
19      they weren't very -- so you got to climb up a big
20      hill up a dirt road, a big hill sometimes it would
21      be wet so, you know.  Another discrepancy (sic) of
22      not wanting to do it between 5:00 and 6:00 a.m. in
23      the morning was lack of lighting of -- from the
24      vehicle itself, the haul truck itself didn't have
25      the greatest tires, they weren't gonna bring us

Page 755

1       another haul truck out there, so.

2    Q   Okay.  What was the lighting like on the hill

3       before sun -- the sun rose?

4    A   We had one of those generated telescopic light --

5       light plants that I think maybe three of the lights

6       worked on.

7    Q   Okay.  And in your opinion did that -- between the

8       headlights and the light plant, didn't that enable

9       you to move dirt --

10   A   No.

11   Q   -- in the morning?

12   A   No.

13                   MR. MILLISOR:  Objection to -- that

14             is argumentative the way you asked that.

15                   THE ARBITRATOR:  Overruled.

16   BY MR. TOTONCHI:

17   Q   You were asked some questions about the

18       November 30th, 2023 notes, which is Company Exhibit

19       15?

20   A   Yes.

21   Q   Can you state -- you were asked by I believe both

22       myself and Mr. Millisor some questions about this.

23       Correct?

24   A   Yes.

25   Q   I believe when Mr. Millisor was asking you

Page 781

1    Q    Did the topic of alleged theft of time, did Mr.
2         McGarry raise it with you before he raised it with
3         any of the employees?
4    A    No, he did not.
5    Q    Okay.  Did Krista Owens?
6    A    No.
7    Q    Just to refresh our memory, did Tony Schroeder and
8         Krista Owens tell you before the November 20th
9         meeting that they wanted to ask about -- ask
10        operators about missing items?
11   A    Before the 20th?
12   Q    Yeah.
13   A    Yeah, Tony reached out to me and asked me -- he
14        wanted to have an interview with employees on site
15        about missing items.
16   Q    As the representative of Republic employees, how
17        many investigatory interviews have you participated
18        in, approximately?
19   A    I don't know, 10, 15.
20   Q    Besides November 30th, do you recall any occasion
21        where prior to the interview the Republic manager
22        did not inform you of the topics that would be
23        brought up during the interview?
24   A    No.
25   Q    Did you write your notes during the interviews?

Page 782

1   A   Yes.

2   Q   And immediately after the interviews concluded?

3   A   Yes, during.

4   Q   Are they fair and accurate copies of your notes?

5   A   Yes.

6               MR. TOTONCHI:  Move for admission.

7               MR. MILLISOR:  For what they are

8           worth, no objection.

9   BY MR. TOTONCHI:

10  Q   Take a look at Joint Exhibit 1A, I don't know if

11      you have a copy there, it's the Collective

12      Bargaining Agreement.

13              MR. TOTONCHI:  Mr. Arbitrator, do

14          you have a copy for yourself?

15              THE ARBITRATOR:  He's got it, that's

16          fine, don't worry about it.  I assume

17          you're gonna have him refer to the

18          critical language.

19              MR. TOTONCHI:  I'm gonna give you my

20          copy.

21              THE ARBITRATOR:  I'd rather -- I'd

22          rather look --

23              MR. TOTONCHI:  Okay, you're gonna

24          look with him?  No problem.

25

Page 783

1    BY MR. TOTONCHI:

2    Q    Please turn to Article 4, Grievance Arbitration

3         Procedure, which is page four.

4              Do you see that?

5    A    Yes.

6    Q    Let's actually go to the next page, page five.

7              Do you see Section 4.2?

8    A    Yes.

9    Q    Could you read that provision?

10   A    Four point two is Union General Grievances.  Union

11        general grievances involving the overall

12        application or interpretation of the agreement as

13        it applies to the bargaining unit shall be reduced

14        to writing and proceed directly to Step 2.

15   Q    Now there has been some discussion of this, I think

16        maybe in the opening statements but go to Section

17        4.3 please.  Could you read that, please?

18   A    Section 4.3, Discharge Related Grievances.

19        Grievances incidental to termination or discharge

20        shall proceed directly to Step 2.  A request for

21        Step 2 hearing incidental to discharge or

22        termination must be presented within 24 hours after

23        the time the Union is notified of the Company's

24        action and a Step 2 hearing shall be held not later

25        than seven calendar days following such notice.

Page 784

1   Q    Does this provision state that these requests must

2        be in writing?

3   A    No, it does not.

4   Q    Okay.  Is it your understanding that they can be

5        verbal?

6   A    Yes.

7   Q    If you initially protest a termination verbally

8        within the 24 hours, does anything in the grievance

9        procedure prohibit you from subsequently filing a

10       written grievance?

11  A    No, it does not.

12  Q    Besides union general grievance and discharge

13       related grievances, do other kinds of grievances

14       need to be in writing pursuant to Step 1, which is

15       on the prior page?

16  A    Yes, everything else.

17  Q    Take a look at Step 1.  Does that Step 1 cover

18       everything -- all other grievance besides --

19  A    Yes.

20  Q    -- union general grievances and discharge related

21       grievances?

22  A    Would you like me to read this, too?

23  Q    Does it require these types of grievances to be in

24       writing?

25  A    Yes.

Page 785

1    Q    I'm gonna show you -- put that to the side for now.

2         I'm gonna distribute Union Exhibit 17.

3              (Exhibit U17 was introduced.)

4    BY MR. TOTONCHI:

5    Q    What's Union Exhibit 17?

6    A    This is my work phone call log.

7    Q    Okay.  Covering what period?

8    A    Covering the period of November 8th, 2023, through

9         December 7th, 2023.

10   Q    Does that show every call you made or received

11        using this phone during these dates?

12   A    Yes.

13   Q    Does it provide the date and time of each call?

14   A    Yes.

15   Q    And the length of each call in minutes?

16   A    Yes.

17   Q    Now, you see the columns that state "Contact" and

18        "Location"?

19   A    Yes.

20   Q    Are those columns, with the exception of one call

21        in this, redacted?

22   A    Yes.

23   Q    Why are they redacted?

24   A    There is a lot of numbers on here for the members I

25        service, union members phone numbers, personal

Page 786

```
 1      phone numbers that don't pertain to this.
 2   Q  Okay.  Does it have anything to do with privacy?
 3   A  Absolutely.
 4   Q  Let's go to the -- let's go to December 4th.
 5         Do you see, December 4th at 2:49 p.m., do you
 6      see that call?
 7   A  Yes, asterisk there.
 8   Q  Do you see there's an asterisk next to it?
 9   A  Yes.
10   Q  Who wrote that asterisk?
11   A  I did.
12   Q  Just at -- was it an incoming or outgoing call?
13   A  It was an incoming call at December 4th, 2023, at
14      2:49 p.m.
15   Q  There is a phone number.  Correct?
16   A  That's correct.
17   Q  Whose phone number is that?
18   A  That is Josh McGarry's phone number.
19   Q  How do you know it's Josh McGarry's phone number?
20   A  I have his number saved in my phone.
21   Q  And it states "INCOMING" next to it.  Correct?
22   A  Correct.
23   Q  And then there is a number "7."
24         Does that indicate the length of the phone
25      call?
```

Page 787

1    A    Correct.  That is the amount of time on the phone

2         call.

3    Q    Okay.  And "Monday" is written?

4    A    I wrote that, just for my purposes of tracking.

5    Q    Okay.  To your knowledge was anyone else -- did you

6         have a phone call with Josh McGarry at this time

7         for this amount of time?

8    A    Yes.

9    Q    On December 4th, 2023?

10   A    Yes.

11   Q    And who -- was any -- to your knowledge was anyone

12        else besides you and Josh McGarry on this phone

13        call?

14   A    To my knowledge it was just myself and him.

15   Q    Okay.  And who called whom?

16   A    Josh McGarry called me.

17   Q    Do you recall the entire conversation?

18   A    Not all of it but the important parts.

19   Q    Okay.  What do you recall him saying?

20   A    Josh called me and told me that they were -- he was

21        deciding to terminate Dale Claussen, Shaun Motyka

22        and Allen Thomas' employment at that time.

23   Q    What else do you recall?  Did you have a reaction

24        to that?

25   A    Yes.  I was -- I was upset that he is calling me on

Page 788

1       the phone to tell me that he was discharging three
2       of our operators on this -- at this time and I was
3       just -- I was upset 'cause, you know, Christmas is
4       20 days away or 25 days away, right before the
5       holidays.
6    Q  Did you state that to him?
7    A  Yes.  And I told him that I'm gonna grieve each one
8       of these terminations and we need to have a meeting
9       on each one of these individuals.
10   Q  Okay.  Do you recall anything else from that
11      conversation?
12   A  No.
13   Q  Okay.  In your opinion did this fulfill the
14      requirements of the CBA to protest these
15      terminations?
16   A  Yes.
17   Q  And was this a verbal protest?
18   A  Absolutely.
19   Q  This was within 24 hours of being notified of the
20      termination?
21   A  Correct.
22   Q  Was the first time you were notified of those
23      terminations on that phone call with Josh McGarry?
24   A  Yes.  I was informed by Josh McGarry by telephone
25      and I believe a day later it was followed up by

L150_0874

Page 789

1       email from their operations clerk.

2   Q   Okay.  Did you file written grievances protesting

3       the terminations?

4   A   Yes.

5            (Exhibit U3 was introduced.)

6   BY MR. TOTONCHI:

7   Q   Disseminating Union Exhibit 3.

8            Did you send these grievances to the company?

9   A   Yes.

10  Q   On what date?

11  A   This would be -- date filed was December 8th, 2023,

12      right-hand corner.

13  Q   If you had requested -- since you requested the

14      meeting over the phone with McGarry, why did you

15      file these grievance in writing?

16                  MR. MILLISOR:  Objection to the

17              extent it mischaracterizes his

18              testimony -- prior testimony.

19                  MR. TOTONCHI:  How so?

20                  MR. MILLISOR:  You can ask him the

21              question, I'm just noting my objection.

22                  MR. TOTONCHI:  It didn't

23              mischaracterize it.

24                  MR. MILLISOR:  Yes, he did.

25                  MR. TOTONCHI:  It didn't.

```
                                            Page 790

 1                    THE ARBITRATOR:  Doesn't matter.

 2                    MR. MILLISOR:  I think he did.

 3    A   This is for recordkeeping purposes to create a

 4        paper trail, normal practice.

 5    BY MR. TOTONCHI:

 6    Q   Okay.  Are these fair and accurate copies of the

 7        grievances you filed?

 8    A   Yes.

 9                    MR. TOTONCHI:  Move for admission.

10                    MR. MILLISOR:  No objections.  I

11              think he's already said everything is

12              admitted unless there is an objection.

13                    MR. TOTONCHI:  That's right.  I was

14              gonna say the same thing about the phone

15              records but I don't need to.

16    BY MR. TOTONCHI:

17    Q   Did you desire to have a grievance meeting over --

18        grievance meetings over these terminations?

19    A   Yes.

20    Q   Did any grievance meetings over these discharges

21        occur?

22    A   They did not.

23    Q   Why not?

24    A   I attempted to set up grievance meetings trying to

25        coordinate dates because there is multiple people
```

Page 791

1          involved and the company shut down communication,

2          refused to meet.

3     Q    Okay.  Do you have Company Exhibit 1 in front of

4          you, looks like this?  Take a look at it.

5     A    I do not have that.

6     Q    You don't have it yet?

7                    MR. MILLISOR:  Here is another copy.

8                    MR. TOTONCHI:  Thank you, Rich.

9     BY MR. TOTONCHI:

10    Q    Let's go to the -- let's go to the last page of the

11         exhibit.  Those grievances that you filed -- I'm

12         sorry, yeah.  You mentioned that you received the

13         written disciplinary notices from Starr Oxley.

14         Correct?

15    A    Correct.

16    Q    Was it via this email at the bottom of page four of

17         Company Exhibit 1?

18    A    Correct.

19    Q    And then you mentioned you filed grievances, the

20         written grievances.  Correct?

21    A    Correct.

22    Q    Was it attached to the email at the top of page

23         four of Company Exhibit 1?

24    A    Yes.

25    Q    Okay.  And then you mentioned wanting to set up a

Page 792

1       meeting.  Correct?

2   A   Correct.

3   Q   Then go to the page three, did Craig Drinski reply

4       to that?

5   A   Yes.  I asked for availability on Thursday and

6       Friday and then he replied that we are not

7       available.  So him and his team are not available

8       Thursday and Fridays and then responded and asked

9       me --

10  Q   Let's go back, take a look at the emails.  Make

11      sure you're sure who is saying what.

12  A   Okay.

13  Q   You filed grievances on the top of page four.

14      Right?

15  A   Correct.

16  Q   If you go to the bottom of page three --

17  A   Yes.  So he's --

18                      THE ARBITRATOR:  Hold on, give me a

19              second, I'm just catching up.  So 12/8

20              you filed; is that right?

21                      THE WITNESS:  Yes.  Twelve, eight is

22              a email and the paper grievance.

23  BY MR. TOTONCHI:

24   Q   Okay.  And then what was the communication after

25       that?

Page 793

1    A    I would like to go back and just make sure it's

2         clear for the record.  So the phone call from Josh

3         McGarry was on December 4th.

4                        THE ARBITRATOR:  Hold on a second.

5                   Okay.

6    A    The correspondence from the operations clerk

7         occurred on December 5th.

8                        THE ARBITRATOR:  You said

9                   correspondence, which correspondence is

10                  that.

11                       THE WITNESS:  Notifying me via email

12                  of a copy of the discharge slips for

13                  Allen Thomas, Shaun Motyka and Dale

14                  Claussen.

15                       THE ARBITRATOR:  Just a second.

16                  Okay.

17   A    Then responded via email on December 8th with the

18        paper grievances in response to their -- the

19        company's paper discharge slips.

20                       THE ARBITRATOR:  Give me a second

21                  here.  Okay, thanks.

22   A    Then on December 12, response from Craig Drinski

23        asking me do I have availability to meet on

24        Thursday or Friday.

25

Page 803

1    Q   Is that yes?

2    A   Yes.

3    Q   Thank you.  Company Exhibit 1, I'm almost done, I'm

4        not belaboring anything here.  Let's go first to

5        Union Exhibit 20.

6            You received the discharge notices on Tuesday,

7        April 14, 2020, of Mr. Orlando and Mr. Green from

8        Starr Oxley -- sorry, on April 14, 2020; is that

9        correct?

10   A   That's correct.

11   Q   At 6:29 a.m.?

12   A   Correct.

13   Q   You also -- referring now to the fifth page, you

14       sub -- you submitted the grievance and requested

15       the Step 2 meeting in writing on the very next

16       morning, Wednesday, April 15, 2020.  Correct?

17   A   Correct.

18                    THE ARBITRATOR:  Hold on just a

19              second.  My mistake, I just made a

20              mistake in my notes, that's all.  Thank

21              you.

22   BY MR. MILLISOR:

23   Q   On Wednesday, April 15, 2020 at 11:33 a.m.

24       Correct?

25   A   Correct.

Page 804

```
 1    Q    So while your counsel pointed out it was maybe

 2         20 -- 28 and-a-half hours, 29 hours after, it

 3         was -- it was the next morning.  Correct?

 4    A    Yes, outside 24 hours.

 5    Q    Okay.  I'm not gonna respond to that.

 6              That's also true with respect to your filing

 7         of the grievance and request for a Step 2 meeting

 8         on behalf of Mr. Orlando, correct, the next morning

 9         within 29 hours.  Correct?

10    A    Correct.

11    Q    Refer to Company Exhibit 1, please.  It's the

12         grievance trail, sorry.

13              Do you have it, Tony?

14    A    Yes.

15    Q    I'm gonna ask you a couple questions on this,

16         sorry.  One, you -- you did receive Starr Oxley's

17         email with the discharge notices for Mr. Thomas and

18         Mr. Motyka and Mr. Claussen on Tuesday,

19         December 5th, 2023, at 11:17 a.m.; is that correct?

20    A    That's correct.

21    Q    And it is true that you didn't respond with a

22         grievance, says on behalf of Mr. Claussen as well

23         as Mr. Allen Motyka (sic) until December 8; is that

24         correct?

25    A    In writing, correct.
```

Page 805

1   Q   Okay.  And you said in that email which was

2       directed to Craig Drink -- this is your email to

3       Craig Drinski, Tony Schroeder and Josh McGarry,

4       quote, we will need to set up a step 2 meeting at

5       our Merrillville office.  Correct?

6   A   Yes.

7   Q   There is no reference of any prior verbal

8       communication, correct, in this email?

9   A   There is not.

10  Q   Then December the -- December 12th there is an

11      exchange a few days later on December 12th that

12      your counsel asked you about.  Correct?

13  A   Correct.

14  Q   Then going to page two you were advised on December

15      12th, 2023, by Mr. Drinski in an email directed to

16      you, Tony Schroeder and Mr. McGarry with a carbon

17      copy to John Sorensen -- and who is John Sorensen?

18  A   He's a lead negotiator.

19  Q   Do you report to Mr. Sorensen?

20  A   No, we are colleagues, we work together on things.

21  Q   And with a cc to Krista Owens, Mr. Drinski advised

22      you of the company's position in this case that

23      you're untimely requesting this filing a grievance

24      and requesting a Step 2 meeting.  Correct?

25  A   Correct.

Page 806

1    Q    In fact, he said Tony, please disregard the request

2         for availability for the Step 2 meeting.  In review

3         of the CBA per Section 4.3, the union did not meet

4         the time requirements.  Correct?

5    A    That was their position.

6    Q    And you responded to that email the next day,

7         approximately 22 and-a-half hours later on

8         Wednesday, December 13th.  Correct?

9    A    Correct.

10   Q    You -- and this time do not only send it to Mr.

11        Drinski, Mr. Schroeder and Mr. McGarry but -- and

12        cc or carbon copy John Sorensen and Krista Owens

13        you also carbon copy Steve Davidson.  Correct?

14   A    Correct.

15   Q    Who is Mr. Davidson?

16   A    He's one of our attorneys at Local 150.

17   Q    You said "Craig, if the company refuses to engage

18        in a meeting then the Union hereby demands

19        arbitration over the discharge of Dale Claussen,

20        Allen Thomas...Shaun Motyka."  Correct?

21   A    Correct.

22   Q    There is no reference -- there is no mention in

23        this response the union's position regarding Mr.

24        Drinski's statement that the grievance was untimely

25        asserted or the Step 2 meeting was not requested.

Page 807

1      Correct?

2   A  Correct.

3   Q  There is no reference to a verbal conversation that

4      you had with Mr. McGarry.  Correct?

5   A  Correct.

6   Q  There is then a follow-up meeting from -- a

7      follow-up email from Craig Drinski on the first

8      page on Tuesday, December 19, 2023 at 6:09 p.m. and

9      in that communication Mr. Drinski again now

10     carbon -- directing the email to the same

11     individuals including carbon copying Steve Davidson

12     indicating in specificity the company's

13     arbitrability defense; is that correct?

14  A  That's correct.

15  Q  Am I correct that Mr. Drinski -- you never

16     responded to Mr. Drinski's email on December 19th.

17     Correct?

18  A  Me?  No.

19  Q  To your knowledge do you know if anyone else

20     responded?

21  A  Should have been one of our attorneys.

22  Q  But I've not seen any email communication from an

23     attorney.

24         Are you aware of any?

25  A  No.

Page 808

1              MR. MILLISOR:  Okay.  I think I

2         might be done, just give me a minute.

3              THE ARBITRATOR:  Five minutes off.

4         (A short break was held.)

5    BY MR. MILLISOR:

6    Q    So, Tony, despite knowing that the company's

7         position at least since December 12th and then

8         reiterated on December 19, 2023, was that the union

9         had not timely requested -- filed a grievance or

10        requested a Step 2 meeting that they were gonna

11        challenge the arbitrability in this case, as far as

12        you know there has been no communication to the

13        company as to the union -- as to the position you

14        made today regarding verbal communication.

15        Correct?

16   A    Apparently, no.

17              MR. MILLISOR:  Nothing further.

18              REDIRECT EXAMINATION

19   BY MR. TOTONCHI:

20   Q    Why didn't you follow up stating that, stating the

21        union's position that you had verbally requested a

22        Step 2 meeting?

23   A    Once we demand arbitration, it's passed off to our

24        legal department.

25   Q    I believe you tested some -- testified something

Page 809

1         about the company stopping communication?

2    A    Yes.

3    Q    Did that have anything to do with --

4                   MR. MILLISOR:  Leading.

5    BY MR. TOTONCHI:

6    Q    Okay.  Why --

7    A    I made -- I made a -- well, I received a phone call

8         from Josh McGarry, who was the operations

9         manager -- or general manager so he's the highest

10        boss so after the discussion with him and the

11        correspondence, the email they were not gonna

12        entertain any other meeting it was -- there was no

13        other communication other than to go to

14        arbitration.

15   Q    Okay.  Do you understand that the union's required

16        to state its legal position prior to an

17        arbitration?

18   A    Yes.

19   Q    It is required to state its legal -- make its legal

20        argument prior to arbitration?

21   A    No.

22                   MR. TOTONCHI:  Okay, no further

23              questions.

24                   MR. MILLISOR:  Nothing further.

25                   THE ARBITRATOR:  Thank you very

Page 810

1                much.

2                     MR. MILLISOR:  Thanks, Tony.

3                     THE ARBITRATOR:  Before we leave can

4                we go through all the exhibits.

5                     MR. TOTONCHI:  Are we done?

6                     MR. MILLISOR:  Yes, we're done.

7                     MR. TOTONCHI:  We still on the

8                record?

9                     THE ARBITRATOR:  We are.  Actually

10                I guess I should ask, .do you have any

11                further witnesses?

12                     MR. TOTONCHI:  The union rests.

13                     THE ARBITRATOR:  Any rebuttal

14                witnesses?

15                     MR. MILLISOR:  Company rests.

16                     THE ARBITRATOR:  Can we go off the

17                record for a moment then?

18           (A short discussion was held.)

19                     THE ARBITRATOR:  We are on the

20                record.  The parties have agreed to

21                submit post-hearing briefs on

22                February 28.  They can give themselves,

23                with the consent of the other side, an

24                extension but I have requested that the

25                extension not go on for months

Page 811

1          indefinitely so that it's still somewhat

2          fresh in my mind when I start working on

3          the award.  I have sent the -- both

4          parties an email with kind of the Rick

5          Bales' post-hearing brief tip sheet, for

6          what that's worth, just things that I

7          tend to find fairly useful.

8              I will ask that the parties submit

9          their post-hearing briefs to me by email

10         only, not hard copy and that the parties

11         email me a pdf and a Word copy of their

12         briefs.  And I will -- once I receive the

13         briefs from both sides I will exchange

14         the pdfs and I will use the Word copies

15         to copy and paste material into the

16         aware.  Anything else?  I think that's

17         it.

18     (Arbitration was Concluded at 2:25 p.m.)

19

20

21

22

23

24

25