UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 150,
AFL-CIO,

     Plaintiff,

     v.

REPUBLIC SERVICES,

     Defendant.

Case No. 2:25-CV-286-GSL-JEM

## OPINION AND ORDER

This is a labor case in which Plaintiff/Counter-Defendant, International Union of
Operating Engineers, Local 150, AFL-CIO ("Local 150"), seeks to set aside an underlying
arbitration award dismissing Local 150's grievance concerning the termination of one of its
members by Defendant/Counterclaimant, Republic Services d/b/a Newton County Landfill
Partnership d/b/a Newton County Landfill d/b/a Lake County C&D Landfill Partnership d/b/a
Lake County C&D Landfill ("Company" or "Republic Services").[1] The parties cross-moved for
summary judgment [DE 15; DE 18]. Both motions were fully briefed [*see* DE 16–17; DE 19–24]
and are now ripe for ruling. Local 150 also moved to supplement the record [DE 28]. That
motion was also fully briefed [DE 28–30] and is likewise ripe for ruling. An oral hearing was
held on April 8, 2026, to discuss all three motions [DE 31]. For the reasons stated below, the

---

[1] According to Defendant, Newton County Landfill Partnership is the only party to the governing collective
bargaining agreement and thus the only appropriately named defendant in this suit. [*See* DE 15 at 1 n.1 (citing DE 6
at 2 n.1)]. "Republic Services," however, is sometimes used as a d/b/a in connection with Newton County Landfill
Partnership, [*see id.*], specifically because Newton County Landfill Partnership is a subsidiary of Republic Services.
[*See* DE 31 (explaining the parties' backgrounds at the summary judgment hearing)].

Court **GRANTS** the Company's motion for summary judgment, **DENIES** Local 150's motion for summary judgment, and **DENIES** Local 150's motion to supplement the record.

**BACKGROUND**[2]

### A. Parties and the CBA

Republic Services is a national waste management and environmental services company operating multiple waste disposal facilities throughout Indiana. [DE 23 at ⁋ A1]. This includes both the Newton County Landfill (NCLF) and the since-closed Lake County Construction & Demolition Landfill (LCLF). [3] [*Id.* at ⁋ A2]. Local 150 is a labor organization representing a bargaining unit comprised of equipment operators at NCLF and, until its closure, at LCLF. [*Id.* at ⁋ A3]. The Company and Local 150 entered into a collective bargaining agreement (CBA) covering the LCLF bargaining unit, effective August 1, 2020, through July 30, 2023, as well as a separate CBA governing the NCLF bargaining unit, effective January 1, 2021, through December 31, 2023. [*Id.* at ⁋⁋ B1–B2]. The NCLF CBA, which governed the underlying arbitration, remains the operative agreement for purposes of this case. [*Id.* at ⁋ B3].

---

[2] In addition to the statements of material facts submitted by the parties, the Court also looks to the factual findings made in the arbitration record to assess the relevant factual background. This is because the Court, in resolving disputes about the application of a collective bargaining agreement where arbitration is at play, is bound by the arbitrator's factual findings. *See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Specifically, and as explained by the United States Supreme Court in *United Paperworkers*, "[c]ourts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Id.* at 37–38. Rather, "an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them." *Id.* at 38.

[3] NCLF is both the largest landfill in the State of Indiana and one of the Company's top five landfills nationally based on tonnage, handling approximately 10,000 tons of waste daily from 400 to 500 trucks. [DE 20 at ⁋ 5; DE 23 at ⁋ A2]. At the time of the arbitration decision, NCLF was staffed by thirty-one equipment operators and several full-time managers operating a variety of heavy equipment, including haul trucks, bulldozers, tippers, and excavators. [*See* DE 1-1 at 76]. In contrast, LCLF was a much smaller and less-regulated landfill processing only fifteen to forty-five trucks per day, accepted only non-household construction debris, and operated with only two or three equipment operators at reduced hours. [*Id.*; DE 20 at ⁋ 5]. Local 150 has not represented any of the Company's employees at LCLF since the site's closing in December 2023. [DE 20 at ⁋ 6].

2

Relevant to the matter at hand, the NCLF CBA contains the following language governing the Company's right to discipline, the grievance procedure, and arbitration:

## ARTICLE 2
## MANAGEMENT RIGHTS AND PREROGATIVES

**2.3 Discipline and Discharge.** The Company shall have the right to discipline, suspend or discharge any member of the bargaining unit but only for just cause. When feasible, particularly preceding a holiday or weekend, the Company shall notify the Union of its decision to suspend or discharge an employee no later than the close of business on the day the action is taken but in no case later than the close of business the workday following the day the action is taken. The parties shall mutually agree on an attendance policy. Any changes to the discipline and discharge policy during the term of this Agreement must be mutually agreed upon between the parties.

***

## ARTICLE 4
## GRIEVANCE AND ARBITRATION

**4.1 Grievances.** The term "grievance" means a difference or dispute during the term of this Agreement between an employee and a representative of the Company as to the interpretation and/or application of the express terms of this Agreement. During the term of this Agreement, whenever a grievance shall arise, such dispute or difference shall be resolved in the following manner:

> **STEP 1** - An effort shall be made to adjust the grievance by and between the steward, the employee having the grievance and the Company. All grievances shall be reduced to writing and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence. All written grievances shall bear the name and signature of the aggrieved employee, list the specific nature of the grievance and state the alleged violation of the Agreement. The Company shall respond to the Union representative of its decision in writing within ten (10) calendar days of the Step 1 meeting. If the answer given by the Company in Step 1 is unsatisfactory to the Union, notification will be sent to the Company, in writing within seven (7) calendar days to process that matter to Step 2.

> **STEP 2** - A meeting shall be held between the Company and the Union, within seven (7) calendar days. The meeting shall include the Union President-Business Manager or his designee and the Site Manager or his representative to confer on the issue. Either or both parties may, with proper notice, require that witnesses be present or available during this conference. The Company shall give its answer in writing to the Union within ten (10) calendar days after the date of the Step 2 meeting.

> **4.2 Union General Grievances.** Union general grievances involving the overall application or interpretation of the Agreement as it applies to the bargaining unit shall be reduced to writing and proceed directly to Step 2.

> **4.3 Discharge Related Grievances.** Grievances incidental to termination or discharge shall proceed directly to Step 2. A request for a Step 2 hearing incidental to discharge or termination must be presented within twenty-four (24) hours after the time the Union is notified of the Company's action and the Step 2 hearing shall be held not later than seven (7) calendar days following such notice.

> \*\*\*

> **4.5 Arbitration.** If the Union is not satisfied with the Company's Step 2 answer, the Union may, within seven (7) calendar days after receipt of the Company's Step 2 answer, notify the Company, in writing, of its desire to submit the grievance to arbitration.

> \*\*\*

> **4.6 Arbitrability.** The arbitrator so selected shall hear all evidence he or she deems relevant and admissible and then render a decision based on the evidence and the Agreement. The arbitrator shall be bound by the terms and provisions of the Agreement and shall have authority to consider only grievances presenting an arbitrable issue under this Agreement. The arbitrator shall have no authority to add to, subtract from, modify, or amend any of the provisions of this Agreement. A decision of the Arbitrator on any grievance within the scope of the issue submitted shall be final and binding on the Company, the Union and the employee or the employees involved.

[DE 1-1 at 5–7]. The entirety of the parties' intent was also encapsulated in Article 19, Section 19.1, which states, "This represents the entire agreement of the parties, it being understood that there is no other Agreement or understanding, either oral or written." [*Id.* at 29].

4

### B. Discharge and Grievance Process

Dalen "Dale" Claussen,[4] the relevant grievant in this matter, was a long-serving equipment operator represented by Local 150. [DE 20 at ¶ 20]. Mr. Claussen has been a member of Local 150 since 1996 and worked for the Company from 2005 until his termination in December 2023. [*Id.*; DE 23 at ¶ C1]. While he spent the majority of his tenure at NCLF (approximately eighteen years), he worked occasional temporary assignments at LCLF before transferring there full-time around February 2023, at which time he became the senior operator. [DE 1-1 at 75; DE 20 at ¶ 20; DE 23 at ¶ C2]. At the time of Mr. Claussen's transfer, LCLF was preparing to close by the end of the calendar year.

Alongside Mr. Claussen, LCLF also employed Shaun Motyka and Allen Thomas (collectively, "the LCLF employees") as equipment operators, both of whom, like Mr. Claussen, had transferred from NCLF during the lead-up to LCLF's closure. [DE 1-1 at 75]. While these individuals ordinarily reported to a supervising operator at NCLF, no operations supervisor was present on-site at LCLF, both because of its reduced size and because of the facility's imminent closure. [*Id.*]. As a result, their direct report for purposes of site operations was Operating Manager Anthony Schroeder who, in addition to overseeing LCLF, was responsible for four other transfer stations, rendering his presence at LCLF intermittent. [*Id.* at 74–75]. Their direct report for employment-related purposes was Craig Drinski, the Operating Manager for NCLF. [*Id.*]. Given the limited supervision at LCLF, the LCLF employees generally relied on their extensive experience and on communication with one another to determine how to carry out their duties. [*Id.* at 76].

---

[4] Mr. Claussen is referred to in both the parties' briefing and in the arbitration record as "Dalen," "Dale," or "Pickles." [*See, e.g.*, DE 20 at ¶ 20].

On October 18, 2023, Timothy Atwater, the Company's Midwest Area Post-Collection Manager, and Mr. Schroeder visited LCLF to assess the site in preparation for its closure. [*Id.*]. During the visit, an informal meeting was held with the LCLF employees regarding the removal of property from the site. [*Id.*]. Although the parties disputed what was said during the meeting, Mr. Atwater testified that he clearly instructed the LCLF employees that no equipment, tools, or items present at LCLF, whether deemed usable or scrap, were to be removed without prior approval from him.[5] [*Id.*]. In contrast, Mr. Claussen and Mr. Motyka testified that Mr. Atwater gave what they understood to be broad permission to begin cleaning and clearing the site, including the removal of items perceived as junk, and that Mr. Atwater said something to the effect of, "any items in the shop that's not being used, are not usable, we could take." [*Id.* at 77]. Independent of this conversation, the LCLF employees and management also discussed the removal of working items from LCLF, such as a large grass mower. [*Id.*]. Everyone understood clearly that, regarding the removal of usable equipment from LCLF following its closure, some of this equipment would be moved to other sites while other equipment would be auctioned off, and that Mr. Schroeder would discuss with the LCLF employees the status of any remaining equipment. [*Id.*].

In the days immediately following the October 18 meeting, the LCLF employees removed from the site items they believed were either broken or unusable. [*Id.*]. Mr. Claussen removed an unused and non-working safe, which he believed he could fix. [*Id.*]. Mr. Motyka

---

[5] In the arbitration award, the arbitrator noted that Mr. Atwater's testimony may not have been as clear as he believed. [DE 1-1 at 77]. Specifically, he noted inconsistencies in both his testimony at the arbitration hearing and a description of the meeting that Mr. Atwater wrote several months later, the latter of which was submitted as evidence in the arbitration record. [*Id.* at 76–77]. Specifically, the written description of the meeting states that Mr. Motyka asked whether he could take a "swamp cooler AC" unit, and that Mr. Atwater explained that when the site closed, "if no other site needed that item and we got to the point that we would end up throwing it away, we would discuss if he could have it." [*Id.* at 77]. The arbitrator further pointed out Mr. Schroeder's testimony regarding his lack of memory surrounding the meeting. [*Id.*].

removed an AC unit and a broken shop vac. [*Id.*]. Mr. Thomas allegedly removed an air hose he believed was broken, but later returned it. [*Id.*]. Mr. Claussen and Mr. Motyka testified[6] that they believed the items were scrap, were effectively abandoned, and that they acted in good faith based on their understanding of the instructions issued during the October 18 meeting. [*Id.* at 77–78].

In November 2023, Mr. Schroeder noticed that several pieces of equipment were missing. [*Id.* at 78]. None of the items originally identified as missing were the same ones described as having been taken by the LCLF employees. [*Id.*]. Mr. Schroeder inquired with Mr. Atwater as to whether he had given permission for the missing items to be removed. [*Id.*]. Having determined that Mr. Atwater had not given permission for the items' removal, Mr. Schroeder then contacted Mr. Claussen to ask about the missing items, to which Mr. Claussen revealed that he did not know but that he had taken the nonworking safe. [*Id.*]. Mr. Schroeder testified that he was unaware of the safe's existence until Mr. Claussen revealed that it had been removed. [*Id.*]. Mr. Claussen testified that he returned the safe shortly after learning that Mr. Atwater had not intended to give permission for its removal. [*Id.*]. Mr. Motyka likewise testified about returning the shop vac and AC unit. [*Id.*]. Mr. Drinski, the LCLF employees' supervisor for employment matters, was called about the missing items and assigned the task of reviewing video footage from LCLF to ascertain how the items went missing. [*Id.*].

On November 20, 2023, the LCLF employees were interviewed about the missing items. [*Id.*]. Immediately following the interviews, Mr. Schroeder and Anthony Deliberto, Local 150's Business Representative, walked the LCLF grounds to locate the missing items. [*Id.*]. They

---

[6] Mr. Thomas did not testify during the arbitration hearing. [*See* DE 1-1 at 77].

7

discovered the allegedly missing items had not been removed but instead had been relocated to the LCLF garage and to other locations on the LCLF premises. [*Id.*].

Around this time, Mr. Drinski observed on the video footage that Mr. Thomas appeared to be throwing something in the back of his truck while Mr. Claussen and Mr. Thomas were nearby. [*Id.* at 79]. Mr. Drinski also observed what he believed to be discrepancies between the times the LCLF employees were clocking in and the times they were leaving the shop to head toward the work site. [*Id.*]. Mr. Drinski took still shots of the video and provided them to Josh McGarry, the General Manager of the Chicago-area Post Collection Business Unit overseeing the LCLF site, who instructed Mr. Drinski to investigate further. [*Id.* at 75, 79]. A second round of interviews took place on November 30, 2023, in which Mr. Thomas was asked about what he had thrown into his truck. [*Id.*]. The LCLF employees were also asked about the time discrepancies, although Mr. Deliberto testified there was no discussion in Mr. Claussen's interview of alleged time discrepancies or time theft. [*Id.*]. Mr. Drinski simultaneously reviewed four weeks of LCLF video footage to determine the approximate clock-in and clock-out times of the LCLF employees. [*Id.*]. Following adjustments for lunches, breaks, and time at the end of the day performing miscellaneous tasks off the work site, as well as multiplying the time differences by the employees' hourly rate plus benefits, Mr. Drinski concluded that the employees had collectively defrauded the Company by a total of $2,539 over the four-week period. [*Id.*].

Mr. Drinski reported his findings to Mr. McGarry and, upon consulting with the Company's human resources team, the Company decided to discharge the LCLF employees for stealing Company property and for time theft.[7] [*Id.*]. On December 4, 2023, a seven-minute

---

[7] The arbitrator noted in the decision that the Company never provided Mr. Claussen a pre-discharge opportunity to explain his side of the time-theft issue. [DE 1-1 at 79]. During the arbitration hearing, Local 150 witnesses testified that the LCLF employees were engaged in duties consistent with long-established work routines, including

phone call took place between Mr. Deliberto and Mr. McGarry where the matter of the LCLF employees' termination was discussed. [*Id.* at 80]. Mr. Deliberto testified that Mr. McGarry informed him of the Company's intent to discharge the employees. [*Id.*; DE 20 at ⁋⁋ 25–27]. The parties disputed the substance of the December 4 phone call. According to the Company, the call was merely "a courtesy notification by McGarry that Republic was planning to discharge the three Operators, not a formal notice of discharge." [DE 1-1 at 80; DE 20 at ⁋ 26]. Further, the Company asserted that no termination had yet taken place and that a request for a Step 2 meeting was not made until several days later. [DE 1-1 at 81]. According to Local 150, the call was more than a courtesy and was in fact formal notice of the Company's action to terminate the LCLF employees. [DE 20 at ⁋ 27]. Although the parties continue debating about the contents of the phone call in their summary judgment briefing, the arbitrator explained in the arbitration award that Mr. McGarry did not testify during the arbitration hearing, rendering Mr. Deliberto's testimony of the December 4 phone call "unrebutted." [DE 1-1 at 81].

Mr. Deliberto testified that he was upset about the Company's decision to terminate, citing the proximity of the termination to the holiday season as a major concern, and notified Mr. McGarry that Local 150 would be grieving the terminations and that the parties would need to have a Step 2 meeting regarding each employee. [DE 1-1 at 80; DE 20 at ⁋ 29]. Local 150 contends the phone call constituted "both Republic's notice to [Local 150] of the discharges and [Local 150's] timely Step 2 grievance and hearing request under Article 4.3 of the CBA." [DE 1-1 at 80; DE 20 at ⁋ 30]. Mr. Deliberto further contends the request was made "within seconds, or

---

monitoring site conditions, observing scale activity, performing safety checks, and remaining available for operational needs. [*Id.* at 79–80]. One such point the witnesses stressed was the employees' practice of remaining in the shop in the morning and after lunch until the first truckload of garbage arrived. [*Id.* at 80]. This was to avoid idling the heavy equipment unnecessarily, which would waste fuel, increase wear, and was otherwise unproductive. [*Id.*]. Furthermore, the Company also monitored the heavy equipment for idling. [*Id.*]. Thus, according to Local 150, what the Company labeled as "unauthorized activity" and time theft was "in fact a reasonable and efficient operational practice grounded in logistical common sense and managerial directives." [*Id.*].

9

minutes at most, of McGarry's notification of the terminations, thus well within Section 4.3's 24-hour requirement." [DE 20 at ⁋ 30].

Concurrently, on December 4, 2023, Mr. Drinski issued written termination notices to Mr. Motyka and Mr. Thomas. [*Id.* at ⁋ 31]. Because Mr. Claussen was not at work on December 4, a written termination notice was not issued to him until December 5, 2023, when the Company called him into a formal termination meeting attended by Mr. Claussen, Mr. Drinski, Mr. Schroeder, and Local 150 Steward Chrissie Strong. [*Id.*; DE 23 at ⁋ D1]. That same day, the Company emailed to Mr. Deliberto and Local 150 the written termination notices issued to the LCLF employees. [*Id.* at ⁋ D2]. On December 8, 2023, Mr. Deliberto emailed Mr. Drinski three written grievances, one for each of the discharged employees. [*Id.* at ⁋ E1; DE 20 at ⁋ 32]. According to Mr. Deliberto, this was done for "recordkeeping purposes to create a paper trail." [DE 20 at ⁋ 32; *see* DE 17-2 (written grievance)].

After initially exchanging emails to set up a Step 2 meeting, on December 12, 2023, Mr. Drinski notified Mr. Deliberto that the December 8 grievances failed to meet the contractual time requirements under the CBA, stating, "please disregard the request for availability for the Step 2 meeting [*sic*] after reviewing [*sic*] of the CBA, per Section 4.3, the union did not meet the time requirements[.]" [DE 20 at ⁋ 33; DE 23 at ⁋ F1; *see* DE 17-1 at 2 (email thread)]. On December 13, 2023, Mr. Deliberto replied, stating, "if the company refuses to engage in a meeting then the Union hereby demands arbitration over the discharge of Dale Claussen, Allen Thomas, and Shaun Motyka." [DE 20 at ⁋ 33; DE 23 at ⁋ G1; *see* DE 17-1 at 1–2 (email thread)]. On December 19, 2023, Mr. Drinski replied to the email thread to reconfirm the Company's position on the timeliness of Local 150's grievances, stating, "As I indicted [*sic*], the Union was untimely in requesting the Step 2 meeting by its email on Friday, December 8, 2023, under the plain and

mandatory language of Article 4.3 of the CBA." [DE 20 at ⟧ 33; DE 23 at ⟧ H1; *see* DE 17-1 at 1 (email thread)]. The email goes on to say, "As such, in the event you desire to arbitrate this matter, the Company will be submitting the issue of arbitrability to the Arbitrator. If you seek to submit the grievance to Arbitration, please request to FMCS for a panel as required by Article 4.5." [DE 23 at ⟧ H1; *see* DE 17-1 at 1 (email thread)].

### C. Arbitration Award

Once the parties moved the grievance dispute to arbitration, the parties selected Arbitrator Richard Bales to hear Mr. Claussen's discharge matter. [DE 20 at ⟧ 21; DE 23 at ⟧ I1]. The parties selected other arbitrators to hear the respective discharge matters regarding Mr. Allen and Mr. Motyka. [DE 20 at ⟧ 21]. At the arbitration hearing for Mr. Claussen's discharge, the parties acknowledged and accepted the possibility that the outcome of the three grievances may vary or be inconsistent with one another. [DE 1-1 at 82; DE 23 at ⟧ I2]. Mr. Claussen's arbitration hearing took place over three days on August 23, December 12, and December 13, 2024. [DE 20 at ⟧ 22; DE 23 at ⟧ I1].

The issues presented to Arbitrator Bales were (1) whether Local 150 timely filed the grievance and request for a Step 2 hearing under Article 4, Section 4.3, and is therefore arbitrable; and (2) if so, whether the Company had just cause for discharging Mr. Claussen, and if not, what the remedy would be. [DE 20 at ⟧ 22; DE 23 at ⟧ I3]. Arbitrator Bales gave the parties a full opportunity to present their cases, examine and cross-examine witnesses, submit documentary evidence, and make arguments during both the hearing and through post-hearing briefs. [DE 23 at ⟧ I4]. The parties post-hearing briefs were submitted on March 19, 2025, and two weeks later, on April 2, 2025, Arbitrator Bales issued his decision. [DE 20 at ⟧ 24; DE 23 at ⟧ I5].

11

Beginning the analysis section of the award with the threshold issue of procedural arbitrability, Arbitrator Bales stated, "After careful consideration of the language of the agreement, the conduct of the parties, and the evidence presented at the hearing, I conclude that the Grievance was untimely and is therefore not procedurally arbitrable." [DE 1-1 at 88; DE 23 at ¶ I6]. In identifying the provisions of the NCLF CBA as relevant to the issues before him, Arbitrator Bales relied on Article 2, Sections 2.2 and 2.3, and Article 4, Sections 4.1, 4.2, 4.3, and 4.7. [DE 1-1 at 83–84; DE 23 at ¶ J1]. Arbitrator Bales also highlighted in red font particular language in those sections to "emphasize contract language critical to the arbitrability issue." [DE 1-1 at 84 and n.1; DE 23 at ¶ J1]. The decision was then based on three grounds.

For the first ground, Arbitrator Bales concluded that Local 150's written grievance and request for a Step 2 hearing was untimely under Article 4, Section 4.3, which provides that "[g]rievances relating to discharges must be presented at Step 2 within twenty-four (24) hours after the time the Union is notified of the Company's action." [DE 1-1 at 88]. Specifically, he reasoned that the Company issued Mr. Claussen its written discharge on December 5, 2023, yet Local 150's written grievance was not sent until December 8, 2023, more than seventy-six hours later. [*Id.*].

For the second ground, he found that the pre-discharge phone call on December 4, 2023, did not satisfy Article 4, Section 4.3, which requires that a grievance be presented "after the time the Union is notified of the Company's action." [*Id.* at 89]. He reached this conclusion based on two reasons. He began by explaining that the phone call, although a "helpful courtesy," did not constitute a completed "action" as required by Section 4.3 because Mr. Claussen had yet to be discharged at the time the December 4 phone call occurred. [*Id.*]. Next, he concluded that even if the call qualified as notice of the Company's "action," an oral statement would nonetheless be

12

insufficient to satisfy Section 4.3's requirement that the grievance be "presented." [*Id.*]. In reaching this alternative route, Arbitrator Bales found that while Section 4.3, which governs discharge-related grievances, does not impose a writing requirement, Section 4.1, Step 1 in fact does. [*Id.*].

He acknowledged that "[o]rdinarily, when a requirement appears explicitly in several provisions of a CBA but is omitted from another, that omission reflects the parties' intent that the requirement not apply to the omitted provision." [*Id.*]. But immediately following this acknowledgment, he noted three points which lead him to the conclusion that grievances under Section 4.3 must be in writing. [*Id.*]. First, in reciting Article 4.1's writing requirement, he stated, "*All* grievances shall be reduced to writing and submitted to the General Manager."[8] [*Id.* (emphasis in original)]. While this language is present under Step 1 for ordinary grievances, he homed in on the broad use of the "all grievances" language, finding the writing requirement was not expressly limited to Section 4.1 grievances and that it was reasonable to conclude that the requirement apply throughout the grievance procedure, including in Step 2 presentation of discharge-related grievances under Section 4.3. [*Id.*]. Next, he explained that "the overall structure of Article 4 reflects a heightened degree of formality and urgency in discharge grievances[,]" particularly given the compressed twenty-four-hour timeframe under Section 4.3 in comparison to the seven-day window under Section 4.1. [*Id.* at 90]. Accordingly, he reasoned that "[t]his heightened urgency and importance reinforces the conclusion that the parties intended a clear, formal, and unambiguous method of presentation—namely, written documentation[,]" and that permitting oral grievance presentation in such an instance would "invite precisely the

---

[8] As will be discussed below, Local 150 highlights the variation of Section 4.1's language in its argument. Section 4.1, Step 1 states, "All grievances shall be reduced to writing **and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence**." [DE 1-1 at 6 (emphasis added)].

sort of factual disputes and uncertainties present in this Arbitration." [*Id.*]. Lastly, he found Local 150's presentation of a written grievance inconsistent with its belief that the December 4 phone call satisfied the presentation requirement, and thus telling of "its recognition that formal documentation is necessary to properly 'present' a grievance under Article 4.3." [*Id.*].

For the third and final ground, Arbitrator Bales looked to prior occurrences of discharge to conclude that the Company did not waive its right to object to the grievance's timeliness. [*Id.* at 90]. Arbitrator Bales considered the 2020 discharges of two employees in which the Company could have but declined to enforce the timeliness requirement of Local 150's grievance. [*Id.*]. He found that this did not constitute past practice because it was a one-time occurrence and did not signify a pattern or intent to allow late discharges in the future. [*Id.*].

After concluding that the grievance was not appropriately presented for arbitration under Article 4, Section 4.3, Arbitrator Bales deemed the merits of the grievance moot. [*Id.* at 91; DE 23 at ¶¶ I7–I8].

## D. Procedural History

On June 25, 2025, Local 150 initiated this action, seeking to vacate Arbitrator Bales' award and remand the case back to arbitration for a decision on the merits of Mr. Claussen's discharge. [DE 1 at 7]. In its Answer, the Company responded by raising various affirmative defenses and filing a counterclaim seeking confirmation and enforcement of the arbitration award. [DE 8]. Following the pleading stage, and during the Rule 26(f) conference, the parties agreed to the following discovery plan:

> The parties developed a full factual record during the course of the three-day arbitration hearing implicated in this proceeding, including testimony memorialized in the hearing transcript as well as exhibits. The parties, therefore, agree that no discovery is warranted. The parties further agree that this matter should proceed directly to summary judgment motions.

14

[DE 12 at 1–2].

Soon thereafter, the parties cross-moved for summary judgment. [DE 15; DE 18]. Both sets of motions have been fully briefed and are now ripe for judgment. [*See* DE 16–17; DE 19–24]. Local 150 also moved to supplement the summary judgment record. [DE 28]. That motion is likewise fully briefed and ripe for judgment. [*See* DE 28–30]. Oral argument was held on April 8, 2026, to discuss both parties' summary judgment motions, as well as the motion to supplement. [DE 31].

## **LEGAL STANDARD**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if, under the relevant substantive law, it is outcome determinative. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the Court may "not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the Court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (internal citation omitted). If there is no genuine dispute of material fact, then summary judgment is appropriate, and the movant is entitled to judgment as a matter of law. *Id.*

15

## DISCUSSION

### I.    Motions for Summary Judgment [DE 15; DE 18].

The central issue presented in both parties' motions for summary judgment is whether Arbitrator Bales' award drew its essence from the CBA. This is essentially a question of law, requiring the Court to consider and rely upon the appropriate standards for setting aside an arbitration award. While the parties raise some factual disputes in their summary judgment briefing, particularly over the contents of the December 4 phone call, those disputes are immaterial given Arbitrator Bales' findings of fact, which the Court is bound by. *See United Paperworkers*, 484 U.S. at 38.

### A.   Judicial Scope of Arbitration Review

As a general note, the Labor Management Relations Acts (LMRA) provides for alternative dispute resolution, including arbitration, in addressing disputes involving a collective bargaining agreement. *See* 29 U.S.C. § 173. Thus, "[i]n seeking to confirm an arbitration award created by virtue of a collective bargaining agreement, recourse is to the LMRA, not the [Federal Arbitration Act (FAA)]." *Part-Time Fac. Ass'n at Columbia Coll. Chi. v. Columbia Coll. Chi.*, 892 F.3d 860, 864 n.3 (7th Cir. 2018); *see also Elmar Hotel Mgmt., LLC v. Unite Here Loc. 1*, 2025 WL 1807890, at *2 (N.D. Ill. July 1, 2025). That being said, arbitration under both acts is "generally subject to the same governing principles." *Columbia Coll. Chi.*, (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 n.6 (2010)). Likewise, while jurisdiction for this Court to review an arbitration award is sparked by Section 301 of the LMRA, *see Smart v. Int'l Bhd. v. of Elec. Workers, Loc. 702*, 315 F.3d 721, 724 (7th Cir. 2002) (citing 29 U.S.C. § 185), the FAA is not only applicable but is in fact often "used as a source of principles to guide the formulation of a federal common law of labor arbitration under section 301." *See Elmar*

16

*Hotel*, 2025 WL 1807890, at *2 (quoting *Glass Molder, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, Loc. 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 848 (7th Cir. 1995)). In addition, where neither the LMRA or FAA conflict and the FAA "provides a procedure or remedy not found in section 301 but does not step on section 301's toes," the FAA should be applied. *Smart*, 315 F.3d at 724–25.

Under the FAA, the Court may vacate an arbitration award where: (1) the award was procured through fraud, corruption, or undue means; (2) there was partiality or corruption in the arbitrator; (3) arbitrator misconduct occurred; or (4) the arbitrator "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a); *see also United Paperworkers*, 484 U.S. at 38. But as both the Seventh Circuit and Supreme Court have persistently explained, "[a] court's role in reviewing a labor arbitration award is 'very limited.'" *Ameren Ill. Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 616 (7th Cir. 2018) (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960)).[9] "The courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *Id.* (quoting *United Steelworkers*, 363 U.S. at 568). "As long as the arbitrator's award 'draws its essence from the [CBA],' and is not merely 'his own brand of industrial justice,' the award is legitimate." *Id.* (quoting *United Paperworkers*, 484 U.S. at 36). Further, "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's

---

[9] In noting the "extreme deference" afforded to arbitration decisions, *see United Food and Com. Workers, Loc. 1546 v. Illinois-American Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009), the Seventh Circuit has illustrated a court's authority to review them as "tightly limited," "severely limited," "extremely narrow," and "extraordinarily deferential," to name a few. *See Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 183 (7th Cir. 1985); *Chi. Typographical Union No. 16 v. Chi. Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir. 1991); *Ameren Ill. Co.*, 906 F.3d at 616.

'improvident, even silly factfinding' does not provide a basis for a reviewing court to refuse to enforce the award.'" *Id.* (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam)). This means that judicial deference will nonetheless apply where the "'court is convinced he committed [a] serious error' of fact or law in reaching the decision." *CITGO Petroleum Corp. v. United Steelworkers Union, Loc. Union No. 7-517*, 613 F. Supp. 3d 1059, 1069 (N.D. Ill. 2020) (alteration in original) (quoting *Garvey*, 532 U.S. at 509).

This extraordinarily deferential standard of reviewing an arbitration award "is grounded in courts' respect for the role of the labor arbitrator in administering 'a system of industrial self-government.'" *Ameren Ill. Co.*, 906 F.3d at 616–17 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 580 (1960)). Importantly, courts defer to the arbitration process because that is what the parties bargained for—the "private settlement of labor disputes without the intervention of government." *United Paperworkers*, 484 U.S. at 37. If this component of the parties' bargaining was not respected, then "arbitration would just be the first of a series of steps that always culminated in court litigation, and it would lose its *raison d'être*." *Butler Mfg. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 336 F.3d 629, 632 (7th Cir. 2003). "Arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Loc. 731*, 990 F.2d 957, 960 (7th Cir. 1993).

Notwithstanding, this does not mean that arbitration awards are per se invulnerable, totally insulated, or beyond the Court's optics. Under Section 301 of the LMRA, and as explained under Section 10 of the FAA, courts are specifically granted authority to determine, among other questions, whether an arbitrator has "exceeded the scope of his submission." *United*

*Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). As explained in *Enterprise Wheel*:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* The Supreme Court has further expanded on this guidance by explaining that "the arbitrator's task is to effectuate the intent of the parties," that "[h]is source of authority is the [CBA]," and that he "has no general authority to invoke public laws that conflict with the bargain between the parties." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974). Essentially, "[if] an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on the interpretation of the [CBA], the arbitrator has 'exceeded the scope of the submission." *Id.* (quoting *Enterprise Wheel*, 363 U.S. at 597). Stated differently, "[i]t is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract . . . that the award can be said not to 'draw its essence from the [CBA].'" *Ameren Ill. Co.*, 906 F.3d at 617–18 (quoting *Arch. of Ill., Div. of Apogee Coal Corp. v. Dist. 12, United Mine Workers of Am.*, 85 F.3d 1289, 1292 (7th Cir. 1996)).

For purposes of this case, an arbitrator's decision "draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be." *United Food*, 569 F.3d at 754.[10] It is sufficient that the "arbitrator's interpretation can in some rational manner be derived from the collective bargaining agreement."

---

[10] While it is also well understood that an arbitrator's interpretation may be set aside if it "is infected by fraud or other corruption, or if it orders an illegal act," *see, e.g.*, *Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987), that issue is not before the Court.

19

*Nat'l Working Co. v. Int'l Bhd. of Teamsters, Loc. 731*, 990 F.2d 957, 960 (7th Cir. 1993). Crucially, then, the focus for the Court "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Hill*, 814 F.2d at 1195. Simply put, a party "will not be heard to complain merely because the arbitrator's interpretation is a misinterpretation." *Id.* And where there is any reasonable doubt as to whether the arbitrator interpreted the CBA, and thus whether the award drew its essence from the CBA, the tie will go to the arbitrator and the Court will lean "in favor of enforcing the award." *Am. Postal Workers Union, AFL-CIO, Milwaukee Loc. v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999).

### B. The Arbitrator's Decision Drew Its Essence from the CBA

As explained in sufficient detail above, the critical question for the Court is simple: did Arbitrator Bales' award draw its essence from the CBA. To answer this question, the parties focused their analysis and arguments to essentially reframe the inquiry as follows: Did Arbitrator Bales *interpret* or *misinterpret* the CBA (requiring the Court to uphold the award) or did he *modify, add to, or subtract from* the CBA (requiring the Court to set the award aside)?

Beginning with the Company, it analogizes the NCLF CBA to a "blueprint" negotiated by the parties and states that upon being selected to review the NCLF CBA, Arbitrator Bales "did not bring in new architectural plans or imagine a different building to arrive at his decision." [DE 16 at 5]. Rather, as the Company contends, "he acted as a skilled builder, carefully reading the blueprint and constructing the outcome aligned to the Parties' original design." [*Id.*]. In this sense, the Company argues that Arbitrator Bales' decision was grounded in the language of the

20

CBA alone, and that this is a case of "arbitral restraint" rather than a case of "arbitral overreach" as Local 150 asserts. [*Id.*].

To support this argument, the Company starts by highlighting the language relied on in the decision, specifically that which Arbitrator Bales' emphasized in red font. [*Id.* at 6 (citing DE 1-1 at 84)]. The image below is from the arbitration award and showcases the exact language emphasized in red:



**STEP 1** - An effort shall be made to adjust the grievance by and between the steward, the employee having the grievance and the Company. All grievances shall be reduced to writing[1] and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence. All *written* grievances shall bear the name and signature of the aggrieved employee, list the specific nature of the grievance and state the alleged violation of the Agreement. * * *

STEP 2 – A meeting shall be held between the Company and the Union, within seven (7) calendar days. * * * The Company shall give its answer in writing to the Union within then (10) calendar days after the date of the Step 2 meeting.

**4.2 Union General Grievances.** Union general grievances involving the overall application or interpretation of the Agreement as it applies to the bargaining unit shall be reduced to writing and proceed directly to Step 2.

**4.3 Discharge Related Grievances.** Grievances incidental to termination or discharge shall proceed directly to Step 2. A request for a Step 2 hearing incidental to discharge or termination must be presented within twenty-four (24) hours after the time the Union is notified of the Company's action and the Step 2 hearing shall be held not later than seven (7) calendar days following such notice (J. 1A at 5).

* * *

**4.7 Time Limits.** Any time limit set forth above may be extended only by the mutual agreement of the parties.

[DE 1-1 at 84]. According to the Company, "the fact Arbitrator Bales identified the exact NCLF CBA provisions he interpreted (Article 4, Sections 4.1, 4.2, 4.3, and 4.7) unequivocally establish that his decision drew its essence from the collective bargaining agreement." [DE 16 at 7].

But beyond simply highlighting certain language, the Company argues that Arbitrator Bales interpreted this language in reaching his conclusion. Specifically, the Company first points to the evidence presented at the arbitration hearing, in which Arbitrator Bales found that Mr. Claussen's written discharge was issued on the morning of Tuesday December 5, 2023, whereas Local 150's written grievance and Step 2 request was not presented until Friday December 8, 2023—more than seventy-six hours later. [*Id.* (citing DE 1-1 at 88)]. Based on this evidence, the Company asserts that Arbitrator Bales then interpreted Article 4, Section 4.3 to conclude that Local 150's grievance was untimely given Section 4.3's twenty-four-hour presentation window. [*Id.* at 8]. The Company also argues that even if Local 150 attempts to limit Section 4.3's timeliness requirement to the presentation of a Step 2 hearing rather than to presentation of the grievance as well, this is a determination squarely within the arbitrator's, and not the Court's, interpretative domain. [*Id.* at 3, 8 (citing *Quality Custom Distribution Servs., LLC v. Int'l Bhd. of Teamsters, Loc. 710*, 131 F.4th 597, 599 (7th Cir. 2025) ("Year after year, in case after case, litigants insist that an arbitrator erred in adopting one view rather than another from the panoply of possible interpretations. Year after year, in case after case, we reject that assertion and hold that the choice belongs to the arbitrator.")].

Next, the Company draws attention to Arbitrator Bales' analysis regarding the December 4 phone call, noting his interpretation that even if the timeliness requirement was met, the call did not satisfy Section 4.3's presentation requirement because it only demonstrated the Company's "intent" to discharge the LCLF employees. [*Id.* at 9]. Arbitrator Bales found that

22

because the call took place one day before Mr. Claussen's discharge notice was issued, and because Section 4.3 requires that a grievance be presented "after the time the Union is notified of the Company's action," the December 4 phone call could not have constituted an "action" on behalf of the Company. [*Id.* at 11 (citing DE 1-1 at 89)]. Rather, as Arbitrator Bales noted in his decision, the call was only a "helpful courtesy" and that "[t]he better interpretation—consistent with the plain language of Article 4.3—is that the 24-hour clock begins only when a discharge has been formally executed and communicated to IUOE, not when Republic notifies IUOE of its intent to act." [*Id.* (citing DE 1-1 at 89)].

The Company also highlights Arbitrator Bales' alternative interpretation of Section 4.3's presentation requirement, specifically where he determined that discharge-related grievances must be presented in writing. [*Id.* at 12]. To this end, the Company zeroes in on Arbitrator Bales' reliance on language under Section 4.1, Step 1, which states that "[a]ll grievances shall be reduced to writing and presented to the employee's immediate supervisor within seven (7) calendar days of its occurrence." [*Id.* at 12 (citing DE 1-1 at 16–17)]. Using this language, Arbitrator Bales determined that any grievance, whether deemed ordinary under Section 4.1, Step 1 or discharge-related under Section 4.3, must be presented in writing, and that the December 4 phone call could not have constituted an adequate presentation given its oral nature. [*Id.* (citing DE 1-1 at 89)]. To support this reading, Arbitrator Bales made three observations: (1) the parties' bargained for broad language like "all grievances," highlighting their intention that the writing requirement not be limited solely to the Step 1 process; (2) the shortened timeline and heightened formality for discharge-related grievances "reinforces the conclusion that the parties intended a clear, formal, and unambiguous method of presentation"; and (3) Local 150's own conduct reflected a recognition of the writing requirement given they issued written grievances

23

despite advocating for the sufficiency of an oral grievance presentation. [*Id.* at 13–15 (citing DE 1-1 at 89–90)]. Based on this, the Company argues that "one simply cannot ignore the inescapable fact that Arbitrator Bales literally wrapped NCLF CBA Article 4 into his analysis and interpreted the plain meaning of the words in Article 4.1 and 4.3[.]" [*Id.* at 15].

In contrast to the Company's focus on the analysis conducted in the award, Local 150 argues there is no genuine dispute of material fact that Arbitrator Bales substituted his own language for language contained in the CBA, then relied on that substituted language in reaching his award. [DE 19 at 8]. To this end, Local 150 argues that Arbitrator Bales not only "went beyond the terms of the contract to reach the result set forth in his opinion," [*see id.* at 14 (quoting *Amax Coal Co. v. United Mine Workers of Am., Int'l Union*, 92 F.3d 571, 575 (7th Cir. 1996))], but that there is no possible interpretive route to the award given the evidence presented, [*id.* (citing *Arch. of Ill.*, 85 F.3d at 1293)].

Local 150 first asserts that Arbitrator Bales' interpretations are unsupported by the evidence presented during the arbitration hearing, particularly with regard to the contents of the December 4 phone call. [*Id.* at 12]. Local 150 points out that although Arbitrator Bales acknowledged Mr. Deliberto's testimony as true and "without rebuttal," and that Mr. Deliberto's testimony included no mention of the call being a "helpful courtesy" despite the Company claiming as much in its post-hearing brief, Arbitrator Bales nonetheless found the call only constituted notice of the intent to discharge and not an official "action" as required under Section 4.3 [*Id.* at 19]. Local 150 argues that the evidence disavows this conclusion because Mr. Motyka and Mr. Thomas were issued their termination notices on December 4, 2023—the day of the phone call—and that the only reason Mr. Claussen was not issued his termination notice was because he was not working that day. [*Id.*]. Thus, according to Local 150, there is no possible

24

interpretative route to suggest that the December 4 call did not qualify as an "action" by the Company.

Moving to the writing requirement, Local 150 points to Arbitrator Bales' reliance on concerns over "uncertainty," "confusion," and "disagreement" regarding the twenty-four-hour deadline, as well as the perceived principle that discharge-related grievances required a "heightened degree of formality and urgency." [*Id.* at 15]. According to Local 150, these outside concerns were never expressed by the parties and, more importantly, were never bargained for. [*Id.*]. Next, Local 150 points to where Arbitrator Bales stated that "[t]he better interpretation— consistent with the plain language of Article 4.3—is that the 24-hour clock begins only when a discharge has been formally executed and communicated to [Local 150], not when Republic notifies [Local 150] of its intent to act." [*Id.* at 16]. Here, Local 150 argues the words "formally executed and communicated" do not appear anywhere in the plain language of the CBA, suggesting that Arbitrator Bales rewrote the parties language to achieve the ultimate outcome reached. [*Id.* at 16–17 (quoting *Chi. Typographical Union*, 935 F.2d at 1505 (explaining that in reviewing an arbitration decision, "[t]he arbitrator is not free to think or say, '[t]he contract says X, but my view of sound policy leads me to decree Y'"))].

Local 150 also highlights the integration of the writing requirement from Section 4.1, Step 1 into Section 4.3 as an example of Arbitrator Bales exceeding the breadth of his authority. Focusing on his statement that "[a]ll grievances shall be reduced to writing and submitted to the General Manager," Local 150 contends this showcases two instances of substitution: (1) the swapping of "presented" for "submitted"; and (2) the invention of the phrase "to the General Manager" in place of "to the employee's immediate supervisor." [*Id.* at 18 (citing DE 1-1 at 89)]. As to the former, Local 150 contends this misrepresentation is at the heart of this case because

25

the parties chose to include "presented" under both Section 4.1 and Section 4.3, yet chose to only include a writing requirement under Section 4.1, Step 1. [*Id.* at 19]. Local 150 argues the substitution of "submitted" for "presented" fails to consider the deliberate choice to include certain words in some provisions, yet not include them in others, a concept Arbitrator Bales even acknowledged in his award.[11] [*Id.*]. Moreover, Local 150 asserts that it was improper to impose language from Section 4.1 onto Section 4.3, particularly where other components like the time-restrictions (seven days under Section 4.1; twenty-four hours under Section 4.3) were deliberately different under each. [*Id.*]. To this end, Local 150 argues that Arbitrator Bales cherry-picked certain language and disregarded the rest, thereby violating his arbitrative obligations and exceeding his authority. [*Id.*].

Lastly, Local 150 argues that it was improper for Arbitrator Bales to consider evidence of past practice unless necessary to clarify an ambiguity, of which here there was none. [*Id.* at 22 (quoting *Tootsie Roll Indus., Inc. v. Loc. Union No. 1, Bakery, Confectionary & Tobacco Workers Int'l Union*, 832 F.2d 81, 84 (7th Cir. 1987) ("While reliance on the law of the shop is appropriate to interpret ambiguous contract terms, . . . the law of the shop cannot be relied upon to modify clear and unambiguous provisions."))]. Here, Local 150 contends that Arbitrator Bales, in finding that the parties intended for a writing requirement to apply to discharge-related grievances, looked to a prior discharge of two employees in 2020 where Local 150 filed two

---

[11] Local 150 also raises a plain language argument that Arbitrator Bales imposed the writing requirement from Section 4.1, Step 1 without considering the language of the surrounding provisions. [DE 19 at 20]. In particular, Arbitrator Bales found that "the phrase 'all grievances' is not expressly limited to grievances initiated under Article 4.1. It is reasonable to conclude that this broad requirement was intended to apply throughout the grievance procedure—including the Step 2 presentation of Discharge Related Grievances under Article 4.3." [*Id.* (quoting DE 1-1 at 89)]. Local 150 contends that this reading ignores the fact that Section 4.3 explicitly chose to bypass Step 1 and go straight to Step 2. [*Id.*]. Local 150 further contends this reading looks past Section 4.2 entirely, where the parties imputed a writing requirement for union general grievances. [*Id.* at 21]. According to Local 150, if the "all grievances" language truly was intended to apply to the entire grievance procedure, then the parties would have had no need to include it under Section 4.2. [*Id.*].

26

written grievances. [*Id.* at 23]. Local 150 argues this was especially egregious because this was not only a one-time occurrence, but contradicts Article 19, Section 19.1's clear language that the CBA "represents the entire agreement of the parties," and thus no other considerations outside of the CBA should have been made [*Id.*].

Based on the totality of the parties' arguments, the evidence presented in the arbitration record, and Arbitrator Bales' analysis and ultimate decision, the Court is persuaded that Arbitrator Bales' award drew its essence from the NCLF CBA. First, although Local 150 is perturbed by Arbitrator Bales' findings of fact surrounding the December 4 phone call and argues there is no genuine dispute of material fact that Mr. Deliberto orally grieved Mr. Claussen's discharge, this is ultimately immaterial. The Court is not at liberty to second guess or disturb findings of fact made in the arbitration record, even if the Court believes those findings were flawed or made in error. *See United Paperworkers*, 484 U.S. at 38; *CITGO*, 613 F. Supp. 3d at 1069 (quoting *Garvey*, 532 U.S. at 509).

Second, the Court is convinced that Arbitrator Bales interpreted the NCLF CBA. His decision was based on the language of the CBA itself, relied on plain language interpretations to reach the end outcome of the award, and was bolstered by considerations over what the parties likely intended when they initially bargained for that language. Simply put, he attempted to give meaning to the CBA. *See ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Loc. 710*, 153 F.3d 774, 778 (7th Cir. 1998). True, an argument can be made that he may have *misinterpreted* the CBA, particularly with regard to the writing requirement, and the Court may very well have read the same language with stark contrast. But misinterpretation is still an interpretation, and without signs that fraud or dishonesty was prevalent, an interpretation—no matter the caliber— is all the standard requires. *See Hill*, 814 F.2d at 1195 (explaining that a court's focus "is not

27

whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract").

Moreover, while Arbitrator Bales misstated the exact language of the CBA and instead stated, "[a]ll grievances shall be reduced to writing and **submitted to the General Manager**," [*see* DE 1-1 at 89 (emphasis added)], it is not clear to the Court that this misstatement was material, deliberate, or that it meaningfully infected the final decision. Specifically, the issue of *who* the grievance must be presented to was not before the arbitrator. And as counsel for the Company noted during the oral argument, the primary interpretative question before the arbitrator was determining the meaning behind the word "presented." [DE 31]. Although Local 150 argues that the parties chose "presented" over "submitted" in the final CBA language, and that it was improper for Arbitrator Bales to quote the wrong language, it is never shown that these two words carry material difference. Rather, this misquotation appears to have been a throwaway line in a decision replete with analysis hinging on the official language of the CBA.

The Court is also unpersuaded that Arbitrator Bales exceeded his authority by considering past practice, as Local 150 contends, in reaching the interpretation that a written grievance is required. Ordinarily, extrinsic evidence like past practice should not be accounted for when a bargaining agreement's language is unambiguous. *See Chi. Reg'l Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 406 (7th Cir. 2016); *see also Butch v. Alcoa USA Corp.*, 725 F. Supp. 3d 913, 922 (S.D. Ind. 2024) (citing *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018) ("Only if a term is ambiguous may the court turn to extrinsic evidence for the term's meaning."). A quick glance at the arbitration award, though, reveals that such a consideration was not made. In contrast, Arbitrator Bales—who was addressing the separate

argument of whether the Company waived its right to challenge the timeliness of Local 150's grievance—actually determined that past practice should not be considered, and that the 2020 discharges Local 150 cited to in its evidence do not qualify as past practice to begin with. [DE 101 at 90].

Lastly, the Court finds it helpful to compare this case with cases in which an arbitrator either exceeded their authority or the decision did not draw its essence from the agreement. In *Polk Brothers v. Chicago Truck Drivers, Helpers, and Warehouse Workers Union (Independent)*, the arbitrator believed the bargaining agreements at issue allowed him to award reinstatement beyond their express termination dates and did not restrict his authority to fashion an appropriate remedy. 973 F.2d 593, 597 (7th Cir. 1992).[12] The Seventh Circuit disagreed, finding that the arbitrator's decisions were contrary to the contractual provisions at issue and could not be saved by claims of ambiguity where the provisions themselves were unambiguous. *Id.* at 598–99. In *Young Radiator Co. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, U.A.W. and its Local Union No. 37*, the Seventh Circuit found an arbitrator's award reinstating a discharged employee did not draw its essence from the CBA where the arbitrator failed to confine himself to the terms of the CBA. 734 F.2d 321, 325 (7th Cir. 1984). Specifically, the court found it improper for the arbitrator to impose a "motivating cause" condition into the employer's right to terminate for theft, thereby hampering the employer's express right under the CBA. *Id.* Finally, in *USAA Savings Bank v. Goff*, a recent

---

[12] The agreements in *Polk Bros.* appear to have contained some overlapping language as that in Section 4.6 of the NCLF CBA. Specifically, one CBA stated: "The arbitrator shall have no power to add to, subtract from, modify or amend any provision of this Agreement, change existing wage rates, or arbitrate proposals for the amendment or renewal of this agreement, unless otherwise agreed." *Polk Bros.*, 973 F.2d at 597. Another agreement contained a similar provision, stating that the arbitration lacked authority to "determine arbitrarily nor to add to, subtract from, modify or amend any provision of this Agreement, nor to substitute his discretion for the discretion of the Union or the Employer, change existing wage rates, or arbitrate proposals for the amendment or renewal of this Agreement." *Id.*

29

non-labor arbitration case, the Seventh Circuit found an arbitrator, who failed to conduct a post-award review, exceeded their authority by ignoring contractual language that was "clear and unambiguous and need[ed] no interpretation." 170 F.4th 1051, 1055 (7th Cir. 2026).

Notably, these cases did not quarrel with an arbitrator's interpretation; rather, each involved examples of an arbitrator either ignoring unambiguous language or imposing their own modifications. While Local 150 disagrees with Arbitrator Bales' reading of the grievance provisions, these interpretations—or misinterpretations—cannot be equated to inappropriate modifications. Moreover, the fact that the language was interpreted at all negates the possibility that the language was ignored outright.

### C. Conclusion

Because the Court finds that Arbitrator Bales' award drew its essence from the NCLF CBA, the award should be enforced. Accordingly, summary judgment in favor of the Company is appropriate.

### II.    Motion to Supplement the Summary Judgment Record [DE 28]

In addition to moving for summary judgment, Local 150 also moved to supplement the summary judgment record with additional post-briefing facts it believed justify vacatur of the arbitration award. [*See* DE 28]. Specifically, Local 150 sought to include the following items of evidence: (1) a Law360 article published on December 8, 2025, in which Arbitrator Bales discussed the arbitration award concerning Mr. Claussen's discharge; (2) subsequent email correspondence between Arbitrator Bales and the parties following the Law360 article's publication, in which Arbitrator Bales purportedly admitted that he misquoted a provision of the CBA in his award; and (3) a sister arbitration award issued on February 17, 2026, by Arbitrator Michael Capone, who reached a contrary conclusion when addressing the arbitrability of Local 150's grievance over Mr. Thomas' discharge. [*Id.*]. Because Local Rule 56-1 is silent as to

whether additional evidentiary materials may be placed into the record, the matter is entirely within the Court's sound discretion.

For the same reasons as the Company raised in its response, however, the Court agrees that the materials Local 150 seeks to supplement the record with should not be considered. Above all else, the parties agreed in their Rule 26(f) discovery plan that there was no need to conduct discovery because the record would be limited to any evidence, testimony, and argumentation made as part of the arbitration record, as well as the arbitration award itself. [DE 12–13]. If either party were allowed to consider outside evidence at this stage, then the entire purpose of the parties' Rule 26(f) plan would be undermined. Not only that, but to avoid the possibility of prejudice, permitting additional discovery for one side would necessarily require allowing the other side to do the same. This in turn would lead only to additional briefing and an eventual delay in the Court's docket.

Notwithstanding the Rule 26(f) discovery plan, the Court is also persuaded that none of the evidence Local 150 seeks to supplement the record with is admissible. First, the substance of the Law360 article would constitute inadmissible hearsay and could only be brought in for the fact that it is mentioned by Arbitrator Bales. That point aside, the article's relevance is also left wanting, as its only perceived relevance comes from the fact that Arbitrator Bales mentioned it in his correspondence. Second, the email correspondence between Arbitrator Bales and the parties is both irrelevant and immaterial to the matter at hand: whether Local 150's grievance complied with the grievance provisions of the NCLF CBA. As the Court explained in detail above, even if Arbitrator Bales acknowledged his misquoting of one line in the award, the award itself did not hinge on this mistake. Thus, it is unclear how this would affect the outcome. Finally, Arbitrator Capone's award is clearly outside the arbitration record and irrelevant to the issue before the

31

Court. Moreover, the only reason Arbitrator Capone's award would come in is to show a different interpretation of the CBA's grievance provisions. Yet the parties understood and acknowledged that by having each grievance proceed through a separate arbitration in front of a separate arbitrator, there existed the possibility that the outcomes could be inconsistent with one another. [*See* DE 1-1 at 82]. Thus, like the email correspondence, it is unclear how this evidence would affect the Court's review.

Accordingly, the Court denies Local 150's motion to supplement the summary judgment record.

## **CONCLUSION**

For the reasons stated above, the Court **DENIES** Local 150's Motion to Supplement the Summary Judgment Record [DE 28], **DENIES** Local 150's Motion for Summary Judgment [DE 18], and **GRANTS** the Company's Motion for Summary Judgment [DE 15]. Accordingly, the Court CONFIRMS the arbitration award issued by Arbitrator Bales on April 2, 2025, and ORDERS that Local 150 comply with the award. Lastly, because this Opinion and Order ends the merits review of this case, the Clerk is **DIRECTED** to close this case.

SO ORDERED.

ENTERED: April 22, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court

32